## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| COLE ULRICH, PAUL AIELLO, ANGELA BAILEY, DALE BLAND, JACOB AND BRITNEY BRELLENTHIN, DANIEL AND LYNN DAVIS, DUANE EGGE, PAUL NORTHUP, RYAN VOLMERT, KENNETH JAMES WILKINSON, AND SEAN JOSEPH ZIMMETT, individually and on behalf of all others similarly situated, | Civil Action No.<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |
| Plaintiffs,<br>v. | |
| GENERAL MOTORS, LLC, | |
| Defendant. | |

## TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................................1

JURISDICTION AND VENUE ........................................................................................5

THE PARTIES .......................................................................................................................6

FACTUAL ALLEGATIONS ..........................................................................................10

    A.    The Defective Eight-Speed Automatic Transmissions (GM 8L90 and 8L45) .................14

    B.    GM's Knowledge of the Shudder Defect ......................................................................18

    C.    GM's Knowledge of the Harsh Shift Defect.................................................................31

    D.    GM TSBs Also Show Pre-Sale Knowledge of Defects and Incomplete Disclosure of the Shudder and Drive Quality Defects. .........................................................................................36

        1.    Service Bulletin 14-07-30-001 ................................................................................37

        2.    Service Bulletin 15-NA-007.....................................................................................41

        3.    Service Bulletin 16-NA-014.....................................................................................41

        4.    Service Bulletin 16-NA-019.....................................................................................43

        5.    Service Bulletin 16-NA-175.....................................................................................45

        6.    Service Bulletin 16-NA-213.....................................................................................48

        7.    Service Bulletin 16-NA-361.....................................................................................48

        8.    Service Bulletin 16-NA-411.....................................................................................51

        9.    Service Bulletin 18-NA-355.....................................................................................52

    E.    Consumer Complaints to NHTSA Also Demonstrate That GM Should Have Known About the Transmission Defects Since 2015 to the Present. ..............................................53

        1.    2015 Cadillac Escalade ............................................................................................54

        2.    2016 Cadillac Escalade ............................................................................................56

        3.    2015 Chevrolet Corvette ..........................................................................................59

        4.    2016 Chevrolet Camaro ...........................................................................................63

        5.    2017 Chevrolet Camaro ...........................................................................................65

        6.    2015 Chevrolet Silverado.........................................................................................66

        7.    2016 Chevrolet Silverado.........................................................................................71

        8.    2017 Chevrolet Silverado.........................................................................................73

        9.    2017 Chevrolet Colorado .........................................................................................79

        10.    2018 Chevrolet Colorado .........................................................................................86

        11.    2015 GMC Sierra......................................................................................................91

        12.    2016 GMC Sierra......................................................................................................95

13. 2017 GMC Sierra.................................................................................100

14. 2015 GMC Yukon Denali ...................................................................106

15. 2016 GMC Yukon Denali ...................................................................109

16. 2017 GMC Yukon Denali ...................................................................111

17. 2017 GMC Canyon .............................................................................111

18. 2018 GMC Canyon .............................................................................113

F.  Consumer Complaints on Internet Forums Also Demonstrate That GM Was Aware of the Transmission Defects .......................................................................................114

1. Complaints on Edmunds.com...............................................................114

2. Complaints on Cars.com.......................................................................121

3. Complaints on CarComplaints.com......................................................126

4. Complaints on gmauthority.com ..........................................................135

5. Complaints on gminsidenews.com .......................................................140

6. Complaints on gm-trucks.com .............................................................141

7. Complaints on cadillacforums.com ......................................................150

G.  Criticism of the Transmission Defects in Trade Publications Also Demonstrate GM's Knowledge of the Defects. ..........................................................................155

H.  Plaintiffs' Experiences ............................................................................157

1. Paul Aiello ...........................................................................................157

2. Angela Bailey .......................................................................................162

3. Dale Bland ............................................................................................165

4. Jacob and Britney Brellenthin ..............................................................167

5. Daniel and Lynn Davis .........................................................................170

6. Duane Egge ..........................................................................................172

7. Paul Northup.........................................................................................175

8. Cole Ulrich ...........................................................................................180

9. Ryan Volmert .......................................................................................181

10. Kenneth James Wilkinson ....................................................................184

11. Sean Joseph Zimmett ...........................................................................187

**TOLLING OF THE STATUTES OF LIMITATIONS ...................190**

A.  GM Has Actively Concealed the Transmission Defects ...........................190

B.  Estoppel .................................................................................................197

C.  Discovery Rule.......................................................................................198

**CLASS ACTION ALLEGATIONS** .................................................................**200**

**CAUSES OF ACTION** ........................................................................**206**

    COUNT 1 Breach of Warranty Under the Magnuson-Moss Warranty Act  15 U.S.C. § 2303, Et Seq..................................................................................................................206

    COUNT 2 Unjust Enrichment.........................................................................................210

    COUNT 3 Fraudulent Omission ....................................................................................211

    COUNT 4 Violation of California Consumer Legal Remedies Act  Cal. Civ. Code § 1750, Et Seq.....................................................................................................................213

    COUNT 5 Violation of California Unfair Competition Law  Cal. Bus. & Prof. Code § 17200, Et Seq. .......................................................................................................217

    COUNT 6 Breach of Implied Warranty Pursuant to The Songbeverly Consumer Warranty Act  Cal. Civ. Code §§ 1792 And 1791.1, Et Seq..........................................................220

    COUNT 7 Breach of Express Warranty  Cal. Com. Code § 2313....................................224

    COUNT 8 Violation of the Connecticut Unlawful Trade Practices Act Conn. Gen. Stat. § 42-110a, Et Seq. .......................................................................................................230

    COUNT 9 Breach of Express Warranty  Conn. Gen. Stat. § 42A-2-313 ..........................233

    COUNT 10 Violation of the Private Right of Action for Consumer Frauds Act  Iowa Code §714H.1, Et Seq. ...................................................................................................239

    COUNT 11 Breach of the Implied Warranty of Merchantability Iowa Code §§ 554.2314 and 554.2315 ....................................................................................................................243

    COUNT 12 Breach of Express Warranty Iowa Code § 554.2313 ....................................247

    COUNT 13 Breach of Express Warranty Ind. Code § 26-1-2-313 ...................................252

    COUNT 14 Breach of the Implied Warranty of Merchantability Ind. Code § 26-1-2-314.258

    COUNT 15 Violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws 93A, § 1, Et Seq. ............................................................................................................261

    COUNT 16 Breach of the Implied Warranty of Merchantability Mass. Gen. Laws Ch. 106 § 2-314 265

    COUNT 17 Breach of the Express Warranty Mass. Gen. Laws Ch. 106 § 2-313.............269

    COUNT 18 Violations of the Missouri Merchandising Practices Act Mo. Rev. Stat. § 407.010, Et Seq. .............................................................................................................275

    COUNT 19 Breach of the Implied Warranty of Merchantability Mo. Rev. Stat. § 400.2-314 279

    COUNT 20 Breach of Express Warranty Mo. Rev. Stat. § 400.2-313 ..............................283

    COUNT 21 Violation of the North Dakota Unlawful Sale or Advertising Practices Law N.D. Cent. Code § 51-15, Et Seq. ....................................................................................289

COUNT 22 Breach of the Implied Warranty of Merchantability N.D. Cent. Code § 41-02-31    294

COUNT 23 Breach of Express Warranty N.D. Cent. Code § 41-02-30 ...........................298

COUNT 24 Violation of the Oregon Consumer Protection Act Or. Rev. Stat. § 646.605, Et Seq.    304

COUNT 25 Breach of the Implied Warranty of Merchantability Or. Rev. Stat. § 72.3140 308

COUNT 26 Breach of Express Warranty Or. Rev. Stat. § 72.3130...................................311

COUNT 27 Violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act 6. R.I. Gen. Laws § 6-13.1-1, Et Seq. .......................................................................317

COUNT 28  Breach of the Implied Warranty of Merchantability 6a R.I. Gen. Laws § 6a-2-314    321

COUNT 29 Breach Of Express Warranty 6a R.I. Gen. Laws Ann. § 6a-2-313 ................325

COUNT 30 Violation of South Dakota Deceptive Trade Practices and Consumer Protection Law S.D. Codified Laws § 37-24, Et Seq.......................................................................331

COUNT 31 Breach of Express Warranty S.D. Codified Laws § 57a-2-313 .....................336

COUNT 32 Breach of the Implied Warranty of Merchantability S.D. Codified Laws § 57a-2-314 342

**REQUEST FOR RELIEF** ...............................................................................**346**

**JURY TRIAL DEMANDED**........................................................................**348**

1.      Plaintiffs Paul Aiello, Angela Bailey, Dale Bland, Daniel and Lynn Davis, Duane Egge, James Jackson, Paul Northup, Cole Ulrich, Ryan Volmert, Kenneth James Wilkinson, and Sean Joseph Zimmett ("Plaintiffs"), for themselves and on behalf of all others similarly situated, bring this action against General Motors, LLC ("GM" or "Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

## NATURE OF THE ACTION

2.      This proposed class action is brought by new and used purchasers who allege that GM concealed two known defects from its customers in the United States who purchased vehicles designed manufactured, marketed, distributed, sold, warranted and serviced by GM and equipped with GM's Hydra-Matic 8L90 transmission or Hydra-Matic 8L45 transmission (collectively, "Class Vehicles"[1]). A poorly chosen and insufficiently validated automatic transmission fluid caused the Class Vehicles to shudder at higher gears. (Shudder Defect). A defectively designed transmission that fails to adequately purge air from valve bodies causes delayed

---

[1] The Class Vehicles include: the 2015-2019 Chevrolet Silverado; the 2017-2019 Chevrolet Colorado; the 2015-2019 Chevrolet Corvette; the 2016-2019 Chevrolet Camaro; the 2015-2019 Cadillac Escalade and Escalade ESV; the 2016-2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; the 2015-2019 GMC Sierra, Yukon, and Yukon XL, and Yukon Denali XL; and the 2017-2019 GMC Canyon.

shifting, jerking, lurching, and overall poor shift quality (Harsh Shift Defect). Together these Transmission Defects afflict 8L90 and 8L45 transmissions manufactured between 2014 and March of 2019.

3.     This action includes states and causes of action that were *not* part of the jurisdiction certified for class treatment in *Speerly, et al, v. General Motors, LLC*, 19-11044-DML-DRG, ECF No. 284 (E.D. Mich. Mar. 20, 2023). All references to a docket entry are to the *Speerly* case.

4.     The Transmission Defects manifest themselves within the limited warranty period or shortly after the limited warranty period expires. The defects can cause unsafe conditions in the Class Vehicles, including but not limited vehicles suddenly lurching forward, shuddering, and significant delays in acceleration. GM itself classifies the Defects as presenting a safety risk at 3 out of 5 on its internal "severity" safety scale *See, e.g., Speerly*, ECF No. 174-7, PageID.6153, 6195; ECF No. 177-6, PageID.7295, 7313.

5.     GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, GM's warranty covers all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission

Defects do not fall into any of the above excluded categories, it is covered under GM's express warranty. However, when Class Members bring their vehicles to GM's authorized agents for repair, they are either told that their vehicles are behaving normally, given ineffective repairs, or are having their transmissions or components replaced with the same defective parts.

6.    With respect to the ATF defect, GM developed a fix in 2018 (a flush with a conventional fluid it calls Mod1a). GM was aware that its proprietary ATF (212b and Option B) would fail in the presence of water and over time. GM however decided three things antithetical to good corporate citizenry. First, it forewent paying for a field action to replace for free all purchasers of its 8L transmissions made between 2014 and March 1, 2019. GM engineers encouraged the program, which at about $305 a vehicle would have cost GM about $592M. ECF No. 206-11, PageID.12487; ECF No. 206-12, PageID.12494. But in March of 2019, GM management rejected this request, but limited the flush to unsold vehicles. ECF No. 220-3, PageID.14608. Second, GM rejected even doing an Mod1a fluid flush even for *all* of its unsold vehicles that still had the defective transmission fluids. GM could have spent $73M to flush out all 240,893 unsold 8L vehicles in June of 2019. *Id.,* PageID.7169. Instead, GM only replaced the defective ATF in 6,518 unsold Cadillacs and trucks in certain states where it expected customers to complain within warranty. ECF No.177-3, PageID.7168-7169. GM sold the remaining vehicles

knowing it had an ATF that would fail over time. Finally, GM never alerted existing customers that it had a new ATF. Instead, GM decided that it would cover fluid flushes *if* the customer was under warranty and complained about Shudder to a dealer. ECF No. 200-15, PageID.11657. Essentially, GM hoped the customers would not learn about the fix for the problem GM created until after their warranty period elapsed. Several purchasers including Plaintiffs Dale Bland and Jacob and Britney Brellenthin wound up paying for the Mod1a fluid flush themselves after their warranty expired.

7.      GM also knew it was going to have to redesign the transmission to correct the Harsh Shift Defect by altering both hardware and software components in a "Generation 2" or "Gen 2" redesign, begun in 2018. That was not completed until January of 2023. GM hid this from prospective customers and even dealers.

8.      GM even considered service packages to ameliorate the Shudder and Harsh Shift Defects with owners of the Class Vehicles. The proposed programs totaled over $1,299,0000. However, GM failed to notify consumers prior to purchase of the nature and extent of the Transmission Defects plaguing Class Vehicles or provide any adequate post-purchase remedy.

9.      GM learned of the Transmission Defects through many sources and very early. These include, (1) comments of test drivers in 2013 that showed both Shudder and Harsh Shift; (2) an immediate spike in warranty claims post-launch that

quickly became the "#1 warranty issue" at GM; (3) its own Service Bulletins; (5) records from the National Highway Traffic Safety Administration ("NHTSA"), (6) customer complaints posted on internet forums and survey taken by J.D. Power; (7) its own records of customers' complaints, (8) dealership repair records and requests for technical assistance.

10.    Because of GM's misconduct, Plaintiffs and Class Members have been damaged in three ways: 1) at the point of sale by overpaying for the purchase of the Class Vehicles, 2) at the point of resale, as the value of the poorly performing 8L vehicles is below comparable vehicles; and 3) the costs of repairing the Vehicles.

11.    Plaintiffs seek class wide recovery for themselves and similarly situated purchasers of the Class Vehicles.

## JURISDICTION AND VENUE

12.    This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members is in the hundreds of thousands, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

13.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all the claims are derived

from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

14.     This Court has personal jurisdiction over Defendant because it is headquartered in the State of Michigan; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Michigan; and otherwise intentionally avails itself of the markets within Michigan through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Michigan.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, where GM is headquartered.

## THE PARTIES

16.     Plaintiff Paul Aiello is a citizen and resident of Massachusetts and over the age of eighteen. Plaintiff Paul Aiello purchased a used 2016 Cadillac CT6, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about February 15, 2017.

17.     Plaintiff Angela Bailey is a citizen and resident of South Dakota and over the age of eighteen. Plaintiff Angela Bailey purchased a used 2017 Chevrolet 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, on or

about June 6, 2020.

18.     Plaintiff Dale Bland is a citizen and resident of Missouri and over the age of eighteen. Plaintiff Dale Bland purchased a new 2018 Chevrolet Colorado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 6, 2018.

19.     Plaintiffs Jacob and Britney Brellenthin are citizens and residents of Indiana and are over the age of eighteen. Plaintiffs Jacob and Britney Brellenthin purchased a new 2018 Chevrolet Silverado 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about December 14, 2017.

20.     Plaintiffs Daniel and Lynn Marie Davis are citizens and residents of Iowa, over the age of eighteen. Plaintiffs Daniel and Lynn Marie Davis purchased a new 2017 Chevy Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about February 25, 2017.

21.     Plaintiff Duane Egge is a citizen and resident of Minnesota and is over the age of eighteen. Plaintiff Duane Egge purchased a used 2015 Chevrolet Corvette Stingray manufactured by GM and containing an 8L90 or 8L45 transmission, on or about June 7, 2016.

22.     Paul Northup is a citizen and resident of Rhode Island and is over the age of eighteen. Plaintiff Paul Northup purchased a new 2018 Chevrolet Colorado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about July

16, 2018.

23.    Plaintiff Cole Ulrich is a citizen and resident of North Carolina, over the age of eighteen years. Plaintiff Ulrich purchased a new 2017 Chevrolet Silverado 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about October 28, 2016 in California.

24.    Plaintiff Ryan Volmert is a citizen and resident of Missouri and is over the age of eighteen. Plaintiff Ryan Volmert purchased a used 2018 GMC Sierra, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about August 26, 2019.

25.    Plaintiff Kenneth James Wilkinson is a citizen and resident of Oregon and is over the age of eighteen.  Plaintiff Kenneth Wilkinson purchased a used 2018 Chevrolet Colorado ZR2 manufactured by GM and containing an 8L90 or 8L45 transmission, on or about April 27, 2019.

26.    Plaintiff Sean Joseph Zimmett is a citizen and resident of Connecticut and over the age of eighteen. Plaintiff Sean Zimmett purchased a new 2018 GMC Canyon, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about February 28, 2018.

27.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265. The sole member and owner of General Motors LLC is

General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

28.     General Motors LLC, itself and through its affiliates, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Michigan. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

29.     At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Michigan and throughout the United States of America.

30.     To sell vehicles to the general public, GM enters into agreements with dealerships who are then authorized to sell GM-branded vehicles such as the Class Vehicles to consumers such as Plaintiffs. In return for the exclusive right to sell new GM-branded vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties GM provides directly to consumers. These contracts give GM a significant amount of control over the actions

9

of the dealerships, including sales and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to GM's explicit instructions, issued through service manuals, TSBs, preliminary information bulletins ("PIs"), information service bulletins, and other documents, often only referred to by a "Document ID." Per the agreements between GM and the authorized dealers, consumers such as Plaintiffs can receive services under GM's issued warranties at dealer locations that are convenient to them.

31.     GM also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

32.     GM is the drafter of the warranties contained in the manuals it provides to consumers nationwide, the terms of which unreasonably favor GM. Consumers are not given a meaningful choice in the terms of those warranties provided by GM, and those warranties are offered on a "take it or leave it" basis.

## **FACTUAL ALLEGATIONS**

33.     GM designs, manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Buick, Cadillac, Chevrolet, and GMC brands. In 2022, GM sold 2,274,088 vehicles in the United States alone, "recapturing the number one spot" from Toyota by a

margin of 165,630 vehicles.[2] Overall, GM experienced a 2.5 percent increase compared to 2021.[3]

34.    GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.

35.    Since 2014, GM has designed, manufactured, distributed, sold, and leased the Class Vehicles, which include the 2015-2019 Chevrolet Silverado; the 2017-2019 Chevrolet Colorado; the 2015-2019 Chevrolet Corvette; the 2016-2019 Chevrolet Camaro; the 2015-2019 Cadillac Escalade and Escalade ESV; the 2016-2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; the 2015-2019 GMC Sierra, Yukon, and Yukon XL, and Yukon Denali XL; and the 2017-2019 GMC Canyon. GM has sold, directly or indirectly, through dealers and other retail outlets, over 1 million of the Class Vehicles in the United States from the Fall of 2014 to March of 2019.

36.    GM provided all purchasers of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW"). The New Vehicle Limited Warranty for Cadillac-brand Class Vehicles ("Cadillac Warranty"), which included a "Bumper-to-

_____

[2] https://www.caranddriver.com/news/a42397091/gm-beats-toyota-2022-sales/
[3] *Id.*

Bumper" warranty and a Powertrain warranty, stated in relevant part:

**What Is Covered**

**Warranty Applies**

This warranty is for GM vehicles registered in the United States and normally operated in the United States, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**

The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**

To obtain warranty repairs, take the vehicle to a Cadillac dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**

The complete vehicle is covered for 4 years or 50,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

**Powertrain Component Warranty Coverage**.

The powertrain is covered for 7 years or 70,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

\*\*\*

**Transmission/Transaxle Coverage includes**: All internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle. Also covered are any actuators directly connected to the transmission (slave cylinder, etc.).

*Exclusions*: Excluded from the powertrain coverage are transmission cooling lines, hoses, radiator, sensors, wiring, and electrical connectors. Also excluded are the clutch and pressure plate as well as any Transmission Control Module and/or module programming.

\*\*\*

**Other Terms**: This warranty gives you specific legal rights and you may also have other rights which vary from state to state. GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles. **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty**. (ECF No. 41-2, 2015 Cadillac Limited Warranty and Owner Assistance Information at PageID.3006, 3007, 3014.)

37.     The New Vehicle Limited Warranty for Chevrolet and GM-brand Class

Vehicles ("Chevrolet/GM Warranty") included substantially the same terms as the

Cadillac Warranty terms excerpted above, except that the Chevrolet/GM Warranty's

"Bumper-to-Bumper" coverage period was limited to "the first 3 years or 36,000

miles, whichever comes first," and the Powertrain warranty coverage period was

13

limited to "5 years or 60,000 miles, whichever comes first." (ECF No. 41-3, 2016 Chevrolet Limited Warranty and Owner Assistance Information at PageID.3054, 3056, 3057, 3065.)

38.     The Cadillac Warranty for the Class Vehicles includes substantially the same terms as the Chevrolet and GMC-brand vehicle warranties, but with slightly longer warranty coverage, e.g., 4 year or 50,000 mile bumper-to-bumper warranty coverage and 6 year or 70,000 mile powertrain coverage.

39.     The warranties and representations contained in the Cadillac Warranty and the Chevrolet/GMC Warranties (collectively, the "Warranties") were and are material to Plaintiffs because Plaintiffs would not have purchased their Class Vehicles or would not have paid as much as they did if the transmissions in their Class Vehicles were not covered by a full warranty.

**A.     The Defective Eight-Speed Automatic Transmissions (GM 8L90 and 8L45)**

40.     In January 2014, GM began marketing the release of a new, eight-speed automatic transmission to be included in some of its vehicles for model year 2015. GM-brand vehicles for model years 2014 and older had automatic transmissions of six or fewer speeds.

41.     The engines in the Class Vehicles produce power and then send that power to the 8L90 or 8L45 automatic transmission. The transmission then takes that power and delivers it to the rear drive transmissions of the Class Vehicle, while

ensuring the engine stays within predetermined RPMs. The transmission also seeks to maximize the efficiency of the Class Vehicles' engines by balancing fuel consumption and torque.

42.    As background, transmissions use toothed gears that interact with each other to produce torque. The term "gear ratio" refers to the relationship between gears. For example, if an input gear has 20 teeth and it interacts with an output gear that has 10 teeth, the 10-tooth gear must spin twice to fully spin the 20-tooth gear. A gear ratio is then calculated by taking the number of teeth on the output gear and dividing it by the input gear. In this example, the gear ratio would be 1:2 (typically expressed as 0.5:1).

43.    Automatic transmissions automate the switching of gears using multi-plate clutches, which adjust according to the speed that the vehicle is traveling. Thus, instead of manually operating a clutch, the vehicle's transmission constantly monitors and engages and disengages gears according to the speed at which the vehicle is moving. This is done through the use of fluid pressure, which provides the necessary pressure to activate clutches and bands that in turn determines what gear to engage.

44.    GM marketed and sold its new eight-speed automatic transmissions as having "world-class performance" rivaling top performance vehicles, lightning-fast and smooth shifting, along with improved fuel efficiency, among other

representations. (ECF No. 41-4, GM press release, "New 8-Speed Enables Quicker, More Efficient Corvette." August 20, 2014.)

45.    For instance, GM's own press release dated January 13, 2014 introduced the new 8L90 transmission as being "tuned for world-class shift-response times," and "deliver[ing] shift performance that rivals the dual-clutch/semi-automatic transmissions found in many supercars – but with the smoothness and refinement that comes with a conventional automatic fitted with a torque converter." In addition, the technology and design of the new 8L90 transmission "help make the new [Corvette] Z06 surprisingly fuel efficient." (ECF No. 41-5 , GM press release, "2015 Chevrolet Corvette Z06 is Most Capable, Ever." January 13, 2014). GM touted similar characteristics for its 8L45 transmission in press releases in 2015. (ECF No. 41-6, GM press release, "2016 Camaro's Driving Fun Rooted in New Powertrains." May 16, 2015; ECF No. 41-7, GM press release, "Cadillac CT6 to Debut Next Generation Powertrain." March 23, 2015).

46.    In another GM press release, GM continued to represent the high quality of the new eight-speed automatic transmission:

> In fact, in the 2015 Corvette Stingray, [8L90 transmission] enables a class-leading 29-mpg EPA highway estimate – a 3.5-percent increase in fuel economy over the previous six-speed automatic – and a quicker 0-60 time of 3.7 seconds, all while delivering wide-open-throttle upshifts quicker than those of the dual-clutch transmission offered in the Porsche 911.

> "GM's new 8L90 eight-speed automatic represents a rare win-win-win scenario for customers," said Kavoos Kaveh, global chief engineer for eight-

speed automatic transmissions. "It offers greater performance and efficiency, while weighing less than the transmission it replaces. That's a rare accomplishment in the industry today – and one for which GM has been awarded more than two dozen patents."

****

The lower engine speed reduces fuel consumption, while a new torque converter design enhances refinement, particularly during low-speed gear changes. "The Corvette's new eight-speed automatic delivers the comfort and drivability of a true automatic transmission, as well as lightning-fast shifts and the manual control that enhance the performance-driving experience," said Kaveh. "It was designed to enhance the driving experience, with performance on par with dual-clutch designs, but without sacrificing refinement. . . . Additionally, a torque converter design with a turbine damper complements performance with excellent refinement at low engine speeds."

47.    However, the 8L90 and 8L45 transmissions deliver anything but

"comfort and drivability[,]" "lightning-fast shifts[,]" and "enhanc[ed] refinement,

particularly during low-speed gear changes." In fact, the Transmission Defects in

the 8L90 and 8L45 transmissions causes unsafe conditions, including, but not

limited to, Class Vehicles suddenly lurching forward, sudden acceleration, delayed

acceleration, and shuddering at higher gears. These conditions present a safety

hazard because they severely affect the driver's ability to control the car's speed,

acceleration, and deceleration. As an example, these conditions may make it difficult

to safely merge into traffic, back out of a garage or driveway, and drivers have

reported sudden lurching into intersections when attempting to gradually accelerate

from a stopped position and other dangerous driving conditions. Even more

troubling, the Transmission Defects can cause the vehicle to delay downshifting and

decelerating when the brakes are depressed.

48.     The Transmission Defects also causes premature wear to the 8L90 and 8L45 Transmissions' components and other vehicle parts, which can require repeated and/or expensive repairs, including replacement of the transmission and its related components.

## B.     GM's Knowledge of the Shudder Defect

49.     As early as June 2013, GM knew or should have known that the 8L90 and 8L45 transmissions were defective and that the Transmission Defects would adversely affect the drivability of the Class Vehicles and cause safety hazards. A June 24, 2013 email noted during the pre-production stages of the 8L transmission disclosed that "the shudder is terrible" in the Corvette. *Speerly*, ECF No. 224-9, PageID.15558. Minutes from a subsequent "Corvette driveline disturbance work group" dated "26JN13" stated "the driveline shudder appears to be similar to the 2014 6-speed issue that was experienced. Root cause of the 2015 program has not been identified but is believed to be the flat/negative friction slope of the LuK WFP friction material." *Speerly*, ECF No. 224-10, PageID.15561; ECF No. 178-13, PageID.7749.[4]

50.     A July 24, 2013 email suggested "we should test the 8L45 vehicles to

---

[4] The 6-speed transmission case resulted in a separate lawsuit subsequently resolved. *McKee v. General Motors, LLC,* No. 18-11303 (E.D. Mich.) ECF No. 54, PageID.728.

see if they have shudder like the 8L90 vehicles." ECF No. 178-13, PageID.7750. Another email that same day attributed the shudder to "an interaction of TCC friction material characteristics and 212B trans fluid." ECF No. 224-11, PageID.15564.

51.    A series of September 2013 emails where A.C.E Bill Goodrich described "classic slip/stick [shudder] and not just a transient event" and discussed replacing the friction material or a top treat." ECF No. 224-12, PageID.15566-68.

52.    By the Fall of 2015, GM started seeing a spike in warranty claims for shudder in 8L vehicles. ECF No. 220-3, PageID.14775. GM began having meetings with more senior engineers across disciplines to try to solve the problem, often multiple times a week. ECF No. 224-13, PageID.15575-76.

53.    By February of 2016, the "TCC shudder on 8-speed" became urgent. *Speerly,* ECF No. 178-13, PageID.7751. By this point, GM had already begun a "RedX" study to try to determine the root cause of the 8-speed shudder. *Id.*

54.    Around this same time, GM's Chief Engineer fretted, "[shudder] is going to below [sic] up real soon we have to work around the clock" to solve it. ECF No. 224-16, PageID.15620. He was afraid to discuss shudder on online forums, noting, "what do we tell them? Bad oil? Bad friction? Bad integration? We are opening a can of worm [sic]." ECF No. 224-18, PageID.15641. GM instead posted that customers should not worry about shudder if they had not yet experienced it. *Speerly*, ECF No. 224-19, PageID.15649. GM knew driving with the Shudder Defect

can glaze and permanently damage the clutch material. ECF No. 220-3, PageID.14669.

55.   By March of 2016, GM was referring to the "8 speed shuddering crises" GM000104616. "8spd shudder is #1 warranty item in the company!!!" ECF No. 220-3, PageID.14778.

56.   In 2016, the president of Cadillac (Johan de Nysschen) reviewed dealer complaints related by customer. He summarized the 8L story bleakly:

> This is quite an appalling set of problems.
>
> The dealer anger at this multitude of issues, based on the dialogue at the meeting today, is exacerbated by their perception that
>
> - we don't have fixes
> - we are telling customers it's "normal", there is no problem
> - we fix one thing, and hope it solves the problem
> - we fix one thing, then another goes wrong
> - we are trying to manage cost, not customer satisfaction
> - we are trying to avoid transmission replacement at all costs, even when justified
> - when all else fails, we buy back cars, yet still don't fix the problem for the next customer
>
> They fear we are turning our most valuable and loyal customers into brand terrorists, with severe implications for the future of Escalade.

ECF No. 249-9, PageID.19572.

57.   By May of 2016, Afton, the supplier of 212b, noted that even small amounts of water in the fluid can cause shudder (reminder that shudder is due in large part if not in whole as the response of a friction curve with a negative slope). ECF No. 220-3, PageID.14784. GM engineers had already found that adding water

could cause shudder but found it a "really eye opening" how water was impacting the ATF even with more robust friction materials. Afton warned, "Water clearly is extremely detrimental to friction and must be avoided at all opportunity." *Id.;* ECF No. 178-13, PageID.7752. The "RedX" team similarly concluded that the presence of water, even in small concentrations, in the ATF caused shudder. ECF No. 178-13, PageID.7752.

58.    GM was investigating "water intrusion" as a possibility for shudder as early as April of 2016. ECF No. 178-13, PageID.7752. In the Spring of 2016, some GM engineers surmised that the esters (binders) holding the friction materials could get hydrolyzed in the presence of water. *Id*. GM engineer Dr. Peter Radecki suggested further water testing of Option B – another PAO-based ATF that had an additional "top treat" compared to 212b to boost the friction slope of the ATF. Id.

59.    In July of 2016, Afton reiterated its "working theory that ester in the 212B/Option B is hydrolyzing" leading to shudder. *Speerly*, ECF No. 178-13, PageID.7752. GM and Afton knew that as little as 0.1% water could disrupt friction or degrade materials. *Id*. The two had already discussed higher warranty claims in Florida and whether dew point temperatures or humidity could be a causal factor in the 8L shudder claims. ECF No. 178-13, PageID.7752-53.

60.    In a 2017 forum post GM wrongly claimed it had eliminated shudder. ECF No. 224-20, PageID.15651; ECF No. 224-17, PageID.15631-32.

61.    By October of 2017, based upon warranty analysis of regions and seasonal trends, Dr. Radecki concluded that moisture entering the transmission via humidity was the main pathway that ATF degradation would occur. ECF No. 178-13, PageID.7753. Even then, the shudder / TC warranty rates nationally for the MY15 8L90 models were at 227 IPTV – or 22.7%. *Speerly*, ECF No. 200-13, PageID.10684.

62.    By December of 2017, GM concluded Option B had little to no impact (reduction) on warranty claims. ECF No. 200-11, PageID.10673.

63.    By February of 2018, Afton confirmed that "while Option B is a better friction system than 212b, GMWEAR tests with 1,000 (ppm) water indicate a propensity for shudder." ECF No. 178-13, PageID.7753. While Afton could not determine exactly how water contributed to the failure of the PAO-based fluids, its leading theory was that water displaces the friction modifiers on friction material surface. *Id*. "Ester plays a role." *Id*.

64.    Also in February of 2018, GM had determined that the high warranty claims for TCC shudder was the result of "the ATF's (Dexron HP) sensitivity to moisture being inhaled thru the corporate vent system design via daily cycles of air temperature and humidity degrading the friction characteristics of the oil w/samples having estimated range of water between 400-1200 ppm." ECF No. 224-2, PageID.15493. GM was finding many customers would come back repeatedly for

22

the issue. *Id*. at PageID.15492 (noting 15% of customers with 8L45 would require service at 60 months of service, and 68% will return a second time.)

65.    Other engineers noted moisture was not the sole reason for shudder. As Randy Melanson of GM explained to Peter Radecki and Max Burgman in April of 2018, it was only a matter of time before it would fail; moisture just moved it along faster:

> Max and Peter, I think you're both right. And I'm not just handing out participation trophies here. On 8-speed, original 212B does not need water to shudder, it will do that very nicely on its own, thanks to insufficient friction modifiers designed into the additive package. If we had a sealed trans and no water contamination, we would still see shudder developing at ~ 20-40k miles, and eventually they'd all pop, given enough time. Since our trans is not sealed, water simply accelerates the friction curve degradation depending on how much and how fast net accumulation occurs. In summary, it's the combination of a poorly designed FM package and PAO fluid sensitivity to water (from high ester levels) that is behind the huge shudder IPTV we're seeing in 2015-2017 MY's.

> - Original DexHP/212B was *designed and approved by GM*, and even without water sensitivity, in the opinion of Starting Devices TS, would have generated significant shudder warranty, albeit at higher mileage
>   - *Internal predictions were that shudder would start appearing in the 30-40k mile/18-36 MIS timeframe*
> - Water sensitivity of DexHP, *unknown by anyone at the time of release*, simply moved this timeline forward
> - *Question is should Afton/Exxon have known about water sensitivity of Dex HP, since it clearly aggravated and accelerated shudder warranty claims?*

*Speerly*, ECF No. 220-3, PageID.14800; ECF No. 204-17, PageID.11830.

In his "Shudder 101" tutorial for other engineers, Dr. Radecki explained how the original ATF formulation and friction material was never going to deliver the friction slope needed to avoid shudder, and that Option B would only hold that slope for a

very short time., ECF No. 220-3, PageID.14674. Not until Mod1a would GM's ATF

for the 8L deliver the necessary performance to avoid TCC shudder:



  66. Radecki continued examining warranty rates for TCC shudder / TC

replacement associated with higher dew points and humidity. By January of 2018,

the IPTV for the MY15 8L90s was 299 or about 30% claims rate nationally.

However, in Florida it was 777, or 77%. ECF No. 178-13, PageID.7754. By June of

2018, the national rate for MY15 8L90 on the K2XX platform grew to 346 (34.6%)

with a Florida level at 85.7%. ECF No. 220-3, PageID.14694.



67.    In March of 2019, GM introduced a GTL ATF Mod1a into service. Afterwards, the corrected TCC Shudder. Claims fell for midsize trucks from 255 IPTV to 18. ECF No. 249-6, PageID.19562. Dr. Radecki and others testified it was / is one of the best ATF formulations available and should be used in all 8L vehicles. ECF No. 180-1, PageID.8325.

68.    GM considered what actions to take now that it belatedly came up with an ATF that stopped Shudder in its 8L vehicles. ECF No. 220-3, PageID.14608. GM Engineer Tim Anguish favored this:

> I think the option of flushing every 8spd we have made with GTL is best for our customers but I know there is a whole lot more that goes into that decision. I don't think we are going to end the bleeding any other way. We can reduce but not stop the returns with the other options.

ECF No. 204-11, PageID.11694. He estimated $592M to flush all 8L vehicles. ECF No. 206-11, PageID.12487. GM Chief Engineer Clyde Bulloch rejected a broad field action and supported flushing only unsold vehicles.

> [william.j.goodrich@gm.com]
>
> **Subject**:  RE: SUFS 458647442401 Submitted for 8RWD Transmission Sudder
>
> Hi Nancy, I support moving forward for the unsold vehicle population and the CCA transmission service stock.  I don't support a field action for all of the vehicles already in the field.  Thanks, Clyde

ECF No. 220-3, PageID.14608.

69.    But GM did not even do that. In June 2019, at a management review of 8L Shudder complaints, GM examined flushing all unsold vehicles (240,893).

26

## Torque Converter Shudder during light Acceleration between 25-80 MPH at Steady Speed

 **2015-2019MY Camaro, Corvette, CTS, Escalade, Yukon, CT6, ATS, FST, MST, GVAN (M5N, M5U, M5T, M5X, MQE)**
**Global Vehicle Volume 1,970,910 (2015-07-2 – 2019-04-04)**
**Unsold population Volume 240,893**

Sev.#: 2 Det.#: 2 Occ.#: 5  IRN#: 20  GVS-CORE ID: N19-221782

**Discovery:** On 3/11/2019 a speak up for safety was issued by the GM quality organization for a warranty issue of a shudder in the 8-Speed transmissions. In May of 2018 the issue was reviewed (CORE 215295) with a future potential break point for new transmission fluid that could potentially address the shudder. The new transmission fluid was released and implemented on 12/10/2018 at TTO and 1/30/2019 at STO.  The quality organization is requesting a drain and flush of the old fluid and fill  of the new fluid for all unsold vehicles.  5/20/2019 Quality organization has modified request to include only all unsold Cadillac vehicles globally less China and all unsold Mid-size truck vehicles located in the following states NC, TX, AL, FL, GA, LA, MS, SC and TN where humidity contributes to higher claims.   `DISCOVERY`

**Condition:** Torque converter shudder.   `CONDITION`

**Effect of the Condition:**  The customer could experience a shake / shudder feeling that may be described as driving over rumble strips or rough pavement. The vehicle vibration could be at a dissatisfying level, causing them to bring it in for warranty repair.   `EFFECT`

**Root Cause:**  1.  ATF robustness to moisture.  Moisture introduced via the vent system causes degradation to the friction characteristics of the  automatic transmission fluid.  2.  Anti-shudder Durability, the ATF's ability to maintain a positive friction slope over time (age).

*Speerly,* ECF No. 177-3, PageID.7167. GM described two root causes for Shudder – the ATF's lack of robustness to moisture and the ATF's inability to maintain a positive friction slope over time. *Id.*. The "Occ." or "Occurrence" level of 5 indicates a warranty level at GM of "extremely high rate" and "almost certain to occur." GM considered four options for unsold vehicles, and went with the cheapest one for GM: flushing unsold Cadillacs and midsized trucks in certain states:

## Torque Converter Shudder Summary

**4 Proposed Population / Cost scenarios**

Removed VIN's that could be tied to a TUN with known new fluid
Program team recommend option 3

| Scenario (Excluding China) | Population | Estimated Cost (USD) |
|---|---|---|
| 1.  All Unsold Cadillac | 3,262 | 1,204,704 |
| 2.  All Unsold Cadillac and All Unsold MST | 21,680 | 5,524,879 |
| 3.  All Unsold Cadillac and All Unsold MST in states: NC, TX, AL, FL, GA, LA, MS, SC, TN | 6,712 * New Pop report 6819 | 1,936,767 *New Cost 2,083,946 |
| 4.  All Unsold Cadillac and All Unsold in states: NC, TX, AL, FL, GA, LA, MS, SC, TN | 36,279 | 7,884,786 |

ECF No. 177-3, PageID.7209.

70.     In early 2019, GM amended TSB 18-NA-355, that recommends that all MY15-MY19 8L vehicles with shudder receive a fluid flush with Mod1a. ECF No. 202-5, PageID.11124-40. In August the TSB was amended to eliminate any diagnostic tests for TCC shudder.

71.     GM's choice to so limit the flush has resulted in customers having to pay for the flush out of pocket when their vehicle is out of warranty; a complaint raised by one consumer on April 1, 2020 on carcomplaints.com at https://www.carcomplaints.com/Chevrolet/Corvette/2015/transmission/shuddering.shtml (last accessed March 1, 2024). The consumer explained:

I have a 2019 Silverado High Country that has given me transmission problems to include the shuddering, a hesitation to engage in gear when parking and suddenly dropping into gear lurching me forward (a safety concern of mine), and hard shifting, e.g. sporadically both up and down shifting, and from reverse to drive and visa-versa. I've taken it into the dealer

I purchase the truck from twice. The first time I was told that "it is normal", and there "were no codes stored in the computer regarding any abnormality". The second time I carried it back to the dealer I let them know I was made aware of a class action lawsuit. I was told the problem was caused during assembly; that too much lubricant was used on interference fit components not utilizing a key. They said there was a technical Service Bulletin to flush the transmission. This seemed to take care of the problem initially, but the hard shifting has again reared its' ugly head.

Oddly, well really not oddly, at about 3,000 miles on our 2015 Corvette Stingray, we experienced the shuddering problem; about the same number of miles as the truck. Unfortunately for us, we hadn't driven the car much, so the original factory warranty had expired. We had purchased at a cost of roughly $3,000 an extended warranty offered by GM through Ally. I figured it would be covered, so I carried the Vette in for the "fix". I was told that fluid changes weren't covered by the warranty, even though the dealer told me this time that the wrong fluid had been used, that GM hadn't developed the proper transmission fluid at the time of production. I guess they only realized it later when these problems began to surface. I had to pay the cost out of my pocket.

- Michael G., White House, US

72.    Plaintiffs in this case have similarly had to pay for the flush out of pocket. For example, Plaintiff Dale Bland initially had to pay $484.22 out of pocket for his vehicle's transmission to be flushed and refilled with updated fluid. Plaintiffs Jacob and Britney Brellenthin also had to pay $582.93 out of pocket for this service.

73.    That customers would eventually have to pay out of pocket for a fix that GM knew it had to a problem solely of its own creations was foreseen by GM Engineer Clyde Bulloch. When asked about those customers who had the faulty ATF in their vehicles but didn't know about the Mod1a flush, and came in after their warranty expired, Mr. Bulloch simply stated that would be the customer's problem:

```
 8      BY MR. LEOPOLD:
 9      Q.   Well, Mr. Bulloch, if you owned a vehicle, and you
10           never knew there was a problem, but the manufacturer
11           knew there was a problem, and you didn't have warranty
12           anymore, and you took it into the dealership, and they
13           say, "Oh, yeah, there's been a problem for years."
14           You want to get it fixed, you don't have a warranty
15           anymore, you're going to have to pay for it; how would
16           that make you feel?
17                MR. COLLIER:  Objection to form: improper
18           hypothetical.
19                THE WITNESS:  You know, I would--you know,
20           I would recognize that, you know, the company had
21           upheld its warranty obligations to me, and at this
22           point the vehicle is out of warranty.
```

*Speerly*, ECF No. 249-4, PageID.19554.

74.    By September 2019, Dr. Radecki's warranty data showed the claims for TCC shudder / TC replacement were at 56% nationally for many MY 15 8L90 models. *Speerly*, ECF No. 201-13, PageID.10989. The IPTV for MY16 8L90 Shudder / TC was 290, or 29% in less than 48 MIS (Months In Service). *Id.* at PageID.10990.The MY17 models were also above 111 IPTV. *Id.* at PageID.10991. Radecki later "ballparked" the Florida IPTV for shudder at 5 years at 2000 IPTV. ECF No. 180-1, PageID.8323. As he put it; on average, each Florida 8L buyer would have two transmission repairs just for TCC shudder. *Id*.

75.     In September of 2021, after a NHTSA complaint of an accident related to TCC Shudder, GM opened another "Speak Up for Safety" Open Investigative Review. ECF No. 174-7, PageID.6153. After the report, GM raised the "severity" or "Sev." of the Shudder Defect to a 3 out of 5. *Id*. This comported to a risk of a "minor injury event, brief anomaly in control or safety function or feature [.]" *Id*. at PageID.6195. Once again GM engineers floated the suggestion of a field action to flush some 8L vehicles of the defective ATFs – this time at a cost of $92M. *Id*., PageID.6154. Despite the accident, GM management gave the request a CWNFA – "closed with no further action." *Id*., PageID.6153.

## C.     GM's Knowledge of the Harsh Shift Defect

76.     GM has long known that its 8L transmissions suffer from drive quality issues. They have long been the subject of comments by customers:



*Speerly,* ECF No. 210-7, PageID.13581.

77.    As explained in a June 2021 OIR, these "first shift of the day," "garage shift," and "rough coast downs," result from the transmission's inability to purge trapped air due to an insufficient valve body architecture. *Speerly,* ECF No. 174-5, PageID.6102.



78.    The "Occ." or "occurrence" of warranty claims for Harsh Shift Defects was assessed at 4 out of 5 or a "high rate": 30 to 110 IPTV (3 to 11%). *Id.*; *Speerly,* ECF No. 174-4, PageID.6079. The "Sev." number was 3 out of 5 representing a safety risk. GM classified it on the Automotive Safety Integrity Level A, with a severity class of S3 and a controllability of C1. To GM the Harsh Shift Defect was

one where "most drivers will be able to prevent a mishap by applying corrective counter steering/or corrective braking." ECF No. 174-5, PageID.6120.

79.     The "Essence of the Learning" for GM regarding the Harsh Shift Defect was the only major redesign could resolve the shifting problems. That redesign had been underway since 2018, though not shared with prospective customers:



*Id.* at 20.

80.     GM knew that the Gen 2 redesign would not occur until MY23. *Speerly*, ECF No. 210-7, PageID.13580-81. The first models rolled off production on January 24th, 2023. Rhian Hunt, *2023 Chevy Colorado, GMC Canyon Production Under Way: Video*, GM Authority (Jan. 25, 2023) https://gmauthority.com/blog/2023/01/2023-chevy-colorado-gmc-canyon-

production-under-way-video/. In a clear admission to the Gen 1's shortcomings, a

GM Chief Engineer stated:

> "I wouldn't say it's all new, but from a component perspective, there's a lot new in it," 2023 Chevy Colorado Chief Engineer, Nick Katcherian, told GM Authority Executive Editor, Alex Luft, when asked if the eight-speed was all-new from the ground up. "We learned a lot from the first-gen eight-speed on this truck, we've taken all those learnings and added more componentry, **and really tried to move the eight-speed to a position where we could be proud of. We know what the customers have been complaining about on the current generation and we fixed everything that we could within reason,**" Katcherian added.[5]

81.    GM hid the shift quality problem it learned of pre-launch. Test drivers

noted a "3 second delay …flare, and a quick harsh engagement which causes the

vehicle to lurch." ECF No. 224-24, PageID.15665. One vehicle lurched off its post

during a test. ECF No. 180-1, PageID.8333-34.

82.    The known shortcomings of the 8L transmission are summarized in a

spreadsheet "8RWD Transmission Program Summary" that tracked progress for

each year's 8L models. *Speerly*, ECF No. 177-7. For different categories, such as

Product Engineering and Quality, GM would assess whether its targets would be met

with a simple green, yellow, red system.

---

[5] Trey Hawkins, *2023 Chevy Colorado Eight-Speed Automatic Transmission Not All-New*,    GM    Authority,    (Oct.    29,    2022) https://gmauthority.com/blog/2022/10/how-the-2023-chevy-colorado-eight-speed-automatic-transmission-was-improved.



83. For Every year from 2015 to 2019, the 8L models were either red or yellow. ECF No. 177-7, PageID.7339-44. The status comments are replete with acknowledgments of **"Cold Garage Shift Delay"** and "**TCC Shudder**", "**Delayed Engagement**", "**Poor first of the day**", "**Quality targets not being met due to harsh shifts and other driveability complaints**." *Id.* (emphasis in the original).

84. In 2019, Mark Gordon, a brand quality manager who interacted with dealers, admitted that "shift quality issues are an ongoing concern with the 8 Speed transmission. . . .Unfortunately, these issues have been through an Op-ex and a service solution is not going to be developed due to cost." ECF No. 224-28, PageID.15711.

85. A year later, Gordon repeated that "unfortunately" shift quality complaints in Class Vehicles continued to increase and would only stop once the Gen 2 redesign was completed—information he warned was "(GM Confidential)." *Speerly*, ECF No. 206-16, PageID.12551. GM instructed dealers to tell customers that the harsh shifts were normal, and not to replace transmissions. ECF No. 206-16, PageID.12535, 12537. That 2016 technical service bulletin has been updated annually to include models up to 2022. 16-NA-361, NHTSA, 2 (February, 2022)

35

https://static.nhtsa.gov/odi/tsbs/2022/MC-10212591-9999.pdf .

86.    In 2020, GM undertook a "Business Case Analysis for Service Packages" to address shift quality in the MY15-MY19 vehicles. ECF No. 206-13, PageID.12505. GM considered a valve body replacement ($1,250) or transmission replacement ($4,450) for vehicles presumed to be still under warranty:

| Executive Summary – Business Case Analysis Service Package    Presenter: Norman Peralta | | | | | |
|---|---|---|---|---|---|
| Business Case Analysis | 15MY-17MY | 18MY-19MY | All Model Years | Annual Expense (19CY) | Comments |
| Brand Quality Buyback Data | 15MY + 16MY = 26% 17MY = 51% | 18MY = 13% 19MY = 9% | 1831 | | *Buyback percentage is last 6 months of repurchases (July-Dec 2019), FST/SUV |
| Legal Buyback Quantity | N/A | N/A | **Redacted for Privilege** | | |
| Brand Quality Buyback Washout Expense | N/A | N/A | $61.5M | $26M | $57.7M (FST and SUV) $3.8M (MST) |
| Legal Buyback Washout Expense | | **Redacted for Privilege** | | | |
| Shift Quality Warranty Spend | $92M | $8M | $100M | $27M | Shift Quality Labor Codes, FST/SUV/MST |
| Shift Quality Service Package Consideration | Transmission Replacement | Valve Body | N/A | | *Cal/Software required for each MY/vehicle, w/misc hardware |
| Expected Effectiveness | 80% | 80%-90% | | | |
| Estimated Warranty Cost for Service Package | $647M | $60M | $707M | | Estimated cost volumes: 15MY-17MY ($4450 x 150,000) 18MY-19MY ($1250 x 30,000) |

*Id.,* PageID.12506. GM considered $707M to address just the shift problems for all MY15-MY19 8L purchasers. GM decided not to proceed with the proposal.

### D.    GM TSBs Also Show Pre-Sale Knowledge of Defects and Incomplete Disclosure of the Shudder and Drive Quality Defects.

87.    From September 2014 to at least February 2019, GM issued many service bulletins and service bulletin updates ("Service Bulletins," "Technical

Service Bulletins," or "TSBs") to its dealers in the United States, but not its customers, acknowledging problems of harsh shifting, shuddering, jerking, clunking, and delays in acceleration or deceleration relating to the 8L90 and 8L45 transmissions.

### 1.   Service Bulletin 14-07-30-001

88.   On or around September 1, 2014, GM issued Service Bulletin 14-07-30-001 with the subject "Information on Transmission Adaptive Functions." This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015 Cadillac Escalade, 2015 Cadillac Escalade ESV, 2015 Chevrolet Corvette, and 2015 GMC Yukon. In the bulletin, GM stated that "[s]ome customers may comment on low mileage vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare. Customers should be advised that the transmission makes use of an adaptive function that will help to refine the shift feel while driving and improve shift quality." The bulletin also included description of transmission's adaptive learning functions and a section titled "How to Adapt Your Transmission" containing GM's instructions to train the adaptive learn process "for a concern with a 1-2 upshift" and "for a concern with a 3-1 coastdown (closed throttle) shift."

89.   From October 2014 to October 2018, GM subsequently issued seven updates to Service Bulletin 14-07-30-001, numbered 14-07-30-001A through 14-07-

30-001G. On or around October 8, 2014, GM issued Service Bulletin 14-07-30-001A with the same subject and covered vehicles listed on the previous version. In this bulletin, GM again noted that "[s]ome customers may comment on low mileage vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare." This revised bulletin was issued to provide updated information in the "How to Adapt Your Transmission" section, including a chart of shifts and their corresponding clutches, along with new, more detailed instructions to train the adaptive learn process for each of these clutches.

90.   On or around December 1, 2014, GM issued Service Bulletin 14-07-30-001B with the subject "Information on Transmission Adaptive Functions and Correcting Low Mileage Harsh Shift." In addition to the vehicles listed on the previous versions of this bulletin, the following models equipped with 8L90 transmissions were added: 2015 Chevrolet Silverado, 2015 GMC Sierras, and 2015 GMC Yukon XLs. The revised bulletin also included instructions for resetting and "relearning" transmission adapts using diagnostic software ("Transmission Adaptive Values Learn procedure through GDS 2") instead of performing the adaptive instructions while driving the vehicle but noted that the software function would not resolve the issue in 2015 Corvettes built before September 29, 2014, which "must be driven to learn the adapts."

91.   On or about January 27, 2015, GM issued Service Bulletin 14-07-30-

38

001C with the same subject, the same covered vehicles, and substantially the same information included in the previous version. However, this revised version added a note to the "How to Adapt Your Transmission" section stating that "[t]he transmission fluid temperature must be between 75°C (167°F) and 85°C (185°F) during the drive procedure or adapts will not be learned."

92.    On or about May 7, 2015, GM issued Service Bulletin 14-07-30-001D with the same subject and covered vehicles listed on the previous version. In this revised bulletin, GM provided updated instructions for resetting and "relearning" transmission adapts using different diagnostic software, the Transmission Service Fast Learn procedure through GDS 2, as opposed to the Transmission Adaptive Values Learn procedure in previous bulletins.

93.    On or about July 27, 2015, GM issued Service Bulletin 14-07-30-001E with the same subject and covered vehicles listed on the previous version. It also included substantially the same instructions for resetting and "relearning" transmission adapts. However, this revised bulletin included new information explicitly acknowledging that the Warranty applied to the transmission repair, stating: "Warranty Information. For vehicles repaired under the Powertrain coverage, use the following labor operation. Reference the Applicable Warranties section of Investigate Vehicle History (IVH) for coverage information," and listing the applicable labor code as 8480318.

94.    On or about March 4, 2016, GM issued Service Bulletin 14-07-30-001F with the same subject and covered vehicles listed on the previous version. This revised bulletin repeated that "[s]ome customers may comment on low mileage vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare" but added that "[c]learing the shift adapts without performing a Service Fast Learn should not be considered a repair procedure as the transmission will simply relearn the previous settings." The bulletin then proceeded to outline more detailed instructions "to determine what steps should be followed" to diagnose and perform the recommended "relearn" functions to adapt the clutches. However, like the previous version, this bulletin explicitly acknowledged that the Warranty applied to the transmission repair, stating: "Warranty Information. For vehicles repaired under the Powertrain coverage, use the following labor operation. Reference the Applicable Warranties section of Investigate Vehicle History (IVH) for coverage information," and listing the applicable labor code as 8480318.

95.    On or about March 3, 2017, GM issued Service Bulletin 14-07-30-001G with the same subject as the previous version. However, this revised bulletin applied only to 2015 Chevrolet Corvettes equipped with 8L90 transmissions (RPO M5U) and instructed GM technicians, "For all truck and utility applications with the 8L90 automatic transmission, refer to 16-NA-411 for the latest information for correcting low mileage harsh shifts." This revised bulletin's substantive information,

including the service instructions and warranty information, otherwise remained the same as the previous version.

## 2.   *Service Bulletin 15-NA-007*

96.    On or around September 15, 2015, GM issued Service Bulletin 15-NA-007 in response to customer complaints reporting conditions such as delayed engagement, "Firm garage shifts, Park to Drive or Park to Reverse after the vehicle has be [sic] sitting for several hours with the engine off," a clunking noise when the engine starts, and/or an illuminated malfunction lamp relating to diagnostic transmission code P16F3. This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015 Cadillac Escalade, 2015 Chevrolet Silverado, 2015 GMC Sierra, 2015 GMC Yukon and included directions regarding a software update and programming the transmission control module ("TCM").

97.    GM re-issued three updates to this service bulletin. On or around September 30, 2015, "delayed engagement" was removed from the subject. On or around October 21, 2015, the bulletin was expanded to cover the 2015 Chevrolet Corvette. On or around January 22, 2016, the bulletin was expanded to cover the 2016 model years for the vehicles listed in the original bulletin.

## 3.   *Service Bulletin 16-NA-014*

98.    On or around January 21, 2016, GM issued Service Bulletin 16-NA-

41

014 with the subject "Delayed Engagement After Sitting With Engine Off." This bulletin applied to the following vehicle models equipped with an 8L45 or 8L90 transmission: 2015-2016 Cadillac Escalade, 2016 Cadillac Escalade ESV, 2016 Cadillac ATS, 2016 Cadillac CTS, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, 2015-2016 GMC Yukon and 2015-2016 GMC Yukon XL. In the bulletin, GM stated that "[s]ome customers may comment on a condition of delayed engagement when the transmission is shifted from Park to Reverse or Park to Drive after the vehicle has been sitting with the engine off. This condition may typically occur after several hours or more commonly overnight." GM's recommended correction was to "[i]nstall a new stator shaft support assembly.

99.   GM issued an update on or around April 22, 2016 to update part numbers.

100.   On or around June 16, 2016, GM issued an update to clarify the reported condition, to identify the cause of the reported condition, and to add diagnostic procedures for the C5 clutch and torque converter. Specifically, GM stated that "[t]his condition may be caused by the torque converter draining the transmission fluid back into the transmission pan." Additionally, GM advised that customers may describe the reported condition as follows: Vehicle delaying into gear; Not wanting to move; Feeling like the transmission is slipping; Delayed engagement followed by

a harsh engagement.

101.   On or around November 17, 2016, GM issued an update to clarify the applicable vehicle models and provide more detailed repair or diagnostic procedures. The updated bulletin applied to the following vehicle models within the VIN range identified in the bulletin: vehicles equipped with an 8L45 or 8L90 transmission: 2015-2016 Cadillac ATS, 2015-2016 Cadillac CTS; vehicles equipped with an 8L45 transmission: 2015-2016 Chevrolet Camaros with a 3.6L engine and VIN on or before September 28, 2015, 2015-2016 Chevrolet Camaros with a 2.0L engine and VIN on or before November 9, 2019; vehicles equipped with an 8L90 transmission: 2015-2016 Cadillac Escalade, 2015-2016 Cadillac Escalade ESV, 2015-2016 Chevrolet Camaro, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, 2015-2016 GMC Yukon, and 2015-2016 GMC Yukon XL. GM's recommended correction was to replace parts of the transmission and/or the transmission pan, depending on the symptoms described by the customer. Like PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

### 4.   *Service Bulletin 16-NA-019*

102.   On or around January 25, 2016, GM issued Service Bulletin 16-NA-019 with the subject "Information on Transmission Adaptive Functions and Correcting Low Mileage Harsh Shifts, Slips, or Flares." This bulletin applied to all

2016 passenger cars and trucks under the Buick, Cadillac, Chevrolet, or GMC brands equipped with 8L90 or 8L45 automatic transmissions (RPOs M5U, M5T, M5N, M5X). Under the "Condition" section of this bulletin, GM stated, "[s]ome may comment on low mileage vehicles with an automatic transmissions [sic] that they shifting may feel too firm (harsh), slips, or flares. Customers should be advised that the transmission makes use of an adaptive function that will help to refine the shift feel while driving and improve shift quality." The bulletin also included description of transmission's adaptive learning functions and instructions for resetting and "relearning" transmission adapts. Like PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

103.   On or around August 19, 2016, GM issued an update to Service Bulletin 16-NA-019 as 16-NA-019A with "[a]dded 2017 Model Year and updated information." Specifically, the bulletin directed GM technicians to "check the ECM/TCM Software/Calibrations against what's currently in the vehicle and if the description of the update is relevant to the customer concern please perform the update prior to proceeding with the learns" outlined in the revised bulletin. The revised bulletin included the same "Warranty Information" section as the original bulletin.

### 5.    *Service Bulletin 16-NA-175*

104.    On or around May 31, 2016, GM issued Service Bulletin 16-NA-175 with the subject "Shake and/or Shudder During Light Throttle Acceleration Between 48 and 104 KM/H (30 and 65 MPH) at a Steady State." This bulletin applied to the following vehicle models built after November 1, 2015 equipped with a 5.3L or 6.2L engine and equipped with 8L90 transmissions (RPO M5U): 2016 Cadillac Escalade models; 2016 Chevrolet Silverado, 2016 GMC Sierra, and 2016 GMC Yukon models.

105.    In the bulletin, GM advised its service technicians that customers may report:

> A shake and/or shudder during light throttle acceleration between 48 and 104 km/h (30 and 65 mph) steady state driving when transmission is not actively shifting gears.
>
> A shudder feeling that may be described as driving over rumble strips or rough pavement.
>
> A shudder feeling that is evident in both Drive and M7 mode.

106.    GM included procedures to diagnose and service the shudder issue, including detailed instructions for flushing the transmission several times and cleaning "the pan/magnet if any metallic particles present and replac[ing] filter if debris is found[.]" Similar to PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor

45

Operation code.

107.  From June 2016 to February 2019, GM subsequently issued 13 updates to Service Bulletin 16-NA-175.

108.  GM issued an update on or around June 1, 2016, adding a breakpoint date, and again on or around November 29, 2016 to add the 2017 model years and updated information to service personnel, including graphics, in the diagnosis instructions.

109.  On or around February 27, 2017, GM issued another update to Service Bulletin 16-NA-175. This version applied to the following vehicles containing 8L90 (M5U, M5X) or 8L45 (M5T, M5N) transmissions: all GM passenger cars and trucks for model years 2015-2017 and Cadillac, Chevrolet, and GMC brands. GM also provided detailed instructions for diagnosing the shudder as a TCC (torque converter clutch) shudder using picoscope and NVH software.

110.  GM issued an update on or around April 18, 2017 to update the information on the chart specifying, for each model year, the conditions under which the shudder was observed. Another update was issued on or around August 24, 2017 to expand the miles per hour ranges where the shudder occurred and to include more detailed information on diagnostics. Another update was issued on or around October 4, 2017 to update VIN breakpoints. On or around December 1, 2017, another update was issued to include the 2018 model years and updated Service

46

Procedure sections. On or about December 14, 2017, the bulletin was again revised to remove the "Note" statement regarding the use of DEXRON VI to flow and flush transmission cooling system. On or about June 5, 2018, another revised bulletin was released to remove the Colorado/Canyon Models and update a note regarding Canadian dealer orders. On or around September 4, 2018, a revised bulletin was issued to include a "Parts Information" section.

111.    On or around October 10, 2018, GM issued yet another revised bulletin to update the vehicle models section and the models in shudder conditions test table, to remove VIN Breakpoint information, to add the 2019 Model Year, to remove the Transmission Filter Replacement information and to change the fluid quantity in the Parts Information section. This bulletin applied to the following vehicle models equipped with 8 speed automatic transmissions: 2016-2019 Cadillac ATS (M5N, M5U); 2016-2018 Cadillac CT6 (M5N, M5U); 2016-2019 Cadillac CTS 9M5N, M5U); 2015-2017 Cadillac Escalades (M5U); 2016-2019 Chevrolet Camaros (M5T); 2016-2018 Chevrolet Camaros (M5U); 2019 Chevrolet Colorado (M5T); 2015-2019 Chevrolet Corvettes (M5U); 2015-2018 Chevrolet Silverado (M5U, M5X); 2015-2017 GMC Yukon (M5U); 2019 GMC Canyons (M5T); 2015-2018 GMC Sierras (M5U, M5X). Importantly, GM stated:

> Important: Do NOT replace the torque converter or transmission assembly for this condition. Engineer reviews have proven that replacing the torque converter does not provide a long-term solution to TCC shudder. A revised

service procedure will be released in Q1 of 2019. If the vehicle experiences a repeat shudder condition, this document should be followed again.

112. On or around February 08, 2019, GMC issued the fourteenth version of Service Bulletin 16-NA-175. This bulletin removed all the diagnostic and service procedure information and instead directed technicians to "[f]ollow the service procedures outlined in TSB 18-NA-355."

### 6. *Service Bulletin 16-NA-213*

113. On or around June 28, 2016, GM issued yet another Service Bulletin to address consumer comments "that the transmission has developed a harsh shift." This bulletin, 16-NA-213, applied to the following vehicle models equipped with an 8L90 or 8L45 transmission (RPOs M5U, M5T, M5N) built between July 1, 2015 to September 14, 2015: 2015-2016 Cadillac Escalade, 2015-2016 Cadillac ATS, ATS V, CTS, CTS V, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, and 2015-2016 GMC Sierra. The bulletin specifically noted that "there may be more than one shift that is harsh" and that some transmissions, those with "a suspect Clutch Control Solenoid," should have the valve body replaced.

### 7. *Service Bulletin 16-NA-361*

114. Since 2016, GM has issued Service Bulletin 16-NA-361. It states:

48



**Bulletin No.: 16-NA-361**
**Date: Apr-2017**

# Service Bulletin

# INFORMATION

**Subject:** Information on Transmission Harsh 1-2 Shift Upon First Start Up/Shift of the Day Under Light Throttle

| Brand: | Model: | Model Year: | | VIN: | | Engine: | Transmission: |
|---|---|---|---|---|---|---|---|
| | | from | to | from | to | | |
| Cadillac | ATS | 2016 | 2017 | | | | Automatic 8L45, 8L90 (M5T, M5N, M5U, M5X) |
| | CTS Models | | | | | | |
| | CT6 | | | | | | |
| | Escalade Models | 2015 | | | | | |
| Chevrolet | Camaro | 2016 | 2017 | | | | |
| | Corvette | 2015 | 2017 | | | | |
| | Silverado | | | | | | |
| GMC | Sierra | 2015 | 2017 | | | | Automatic 8L90 (M5U, M5X) |
| | Yukon | | | | | | |

| Involved Region or Country | North America and N.A. Export Regions |
|---|---|
| Condition | Some customers may comment that the transmission exhibits a harsh 1-2 shift on the first shift of the day, typically under light throttle. |
| Cause | This condition is due to the initial clutch fill time of the 2-3-4-6-8 (C4) clutch. |
| Information | Some customers may experience a flare condition on the first 1-2 shift of the day or after the vehicle has been parked for several hours. The condition may have developed after the replacement of a complete transmission assembly or the replacement of the stator support to correct a delayed engagement condition. This is most likely to occur under light throttle conditions. Subsequent 1-2 shifts have acceptable shift feel. Replacing transmission components will not correct the condition. |

| | |
|---|---|
| Correction | **Important:** Replacing transmission components or complete assemblies will not improve the condition. |
| | The first 1-2 shift of the day may be harsh. The customers' vehicle should be compared to a like vehicle under the same driving conditions. **Do Not** replace any parts for this condition. |
| | **Note:** This condition will not impact the designed performance or reliability of the vehicle. |
| Version | 3 |
| Modified | Nov. 18, 2016 - Revised the Cause section. |
| | April 6, 2017 - Added models and Revised the Condition, Cause and Correction sections. |

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely. If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information.

WE SUPPORT VOLUNTARY TECHNICIAN CERTIFICATION

115.   This same bulletin has been updated nearly every year with additional models added. *See, e.g.*, *Speerly*, ECF No. 249-5, PageID.19558-59 (October 2019 Update). Updates were done in August of 2020 and January of 2022. They all share as the "Subject Information on Transmission Harsh 1-2 Shift Upon First Start Up/Shift of the Day Under Light Throttle." They all cover automatic 8L45-8L90 transmissions. The "Condition" and "Cause" are the same:

| | |
|---|---|
| Condition | Some customers may comment that the transmission exhibits a harsh 1-2 shift on the first shift of the day, typically under light throttle. |
| Cause | This condition is due to the initial clutch fill time of the 2-3-4-6-8 (C4) clutch. |

And the "correction" is the same:

50



| | Important: Replacing transmission components or complete assemblies will not improve the condition. |
| --- | --- |
| Correction | The first 1-2 shift of the day may be harsh. The customers' vehicle should be compared to a like vehicle under the same driving conditions. Do Not replace any parts for this condition. |
| | Note: This condition will not impact the designed performance or reliability of the vehicle. |

116.   Thus, GM has been issuing a technical service bulletin for a Harsh Shift Defect for six years **that directs dealers to do no service**. GM knows that the Harsh Shift Defect cannot be fixed by replacing components, or even complete assemblies, because the Gen 1 8L transmissions were defectively designed.

### 8.   *Service Bulletin 16-NA-411*

117.   On or around January 20, 2017, GM issued Service Bulletin 16-NA-411 to provide GM technicians with yet another a procedure to reprogram the ECM and TCM to correct ongoing complaints relating to the Transmission Defects. This bulletin applied to the following vehicle models equipped with an 8L90 transmission: 2015-2016 Cadillac Escalade models; 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, and 2015-2016 GMC Yukon models. Specifically, the bulletin addressed the following consumer comments on the following condition: Harsh 1-2 upshift (except for the first 1-2 upshift of the day); Harsh 3-1 downshift when de-accelerating to a stop; Harsh downshift under heavy throttle apply; Active Fuel Management (AFM) V4 to V8 transition harshness; Coast down downshifts.

118.   Notably, the bulletin specifically acknowledged that, "The new ECM

and TCM software will not improve the following conditions and should not be installed for any of the following conditions: Shift quality of the first 1-2 shift of the day; Power-On lift foot upshifts (Heavy throttle application followed by a closed throttle application which results in a transmission up shift); Delayed/slow engagement (Refer to Bulletins 16-NA-014 and 16-NA-364); TCC Shudder (Refer to PIP5337 and Bulletin 16-NA-175); Engine or Chassis induced vibrations.

### 9.    *Service Bulletin 18-NA-355*

119.   On or about February 8, 2019, GM issued TSB 18-NA-355 (replacing 18-NA-177), regarding "Shake and/or Shudder During Light Throttle Acceleration Between 25 and 80 MPH … at Steady Speed." It was updated several more times through August 2019. ECF No. 200-15.

120.   The vehicles covered by this bulletin includes all of the class vehicles:

| Brand: | Model: | Model Year: | | Date Breakpoint: | | Engine: (2.0L, 2.5L, 3.0L, 3.6L, 5.3L, 6.2L) | Transmission: (8L45, 8L90 Automatic) |
|---|---|---|---|---|---|---|---|
| | | from | to | from | to | | |
| Cadillac | ATS | 2016 | 2019 | | Feb. 1, 2019 | LCV, LGX, LTG, LT4, LF4 | M5N, M5T, M5U |
| | CTS | | | | | | |
| | CT6 | 2016 | 2018 | | EOP | LGX, LGW, LTG | M5N, M5X |
| | Escalade Models | 2015 | 2017 | | | L86 | M5U |
| Chevrolet | Camaro | 2016 | 2019 | | Feb. 1, 2019 | LGX, LTG, LT1 | M5T, M5U |
| | Colorado | 2017 | 2019 | | March 1, 2019 | LGZ | M5T |
| | Corvette | 2015 | 2019 | SOP | Feb. 1, 2019 | LT1, LT4 | M5U |
| | Silverado Models | 2015 | 2018 | | EOP | L83, L86, L8B | M5U, M5X |
| GMC | Canyon | 2017 | 2019 | | March 1, 2019 | LGZ | M5T |
| | Sierra Models | 2015 | 2018 | | EOP | L83, L86, L8B | M5U, M5X |
| | Yukon Models | 2015 | 2017 | | | L86 | M5U |

52

The condition, cause, and correction are as follows:

| Involved Region or Country | United States, Canada, Middle East Operations (MEO) |
|---|---|
| Condition | Some customers may comment that their vehicle is experiencing a shake and/or shudder during light throttle acceleration between 25 and 80 mph (40 and 128 km/h) steady state driving when transmission is not actively shifting gears. |
| | ⇒  The condition may be described as if they are driving over rumble strips or a concrete road surface with rough expansion joints. |
| Cause | This condition may be due to Torque Converter Clutch (TCC) Shudder. |
| Correction | Vehicles that are presented with TCC shudder should have the appropriate fluid exchange procedure completed. Diagnosis beyond the customer compliant is not required if vehicle was built prior to production dates indicated above. |
| | For vehicles built after the production dates listed above. |
| | ⇒  If a customer presents a vehicle with a similar complaint, follow normal SI diagnostics. These vehicles are already equipped with the latest HP fluid. |

121.   The Fix for vehicles with this problem was replacing the defective ATF (either 212b or Option B) with Mod1a. In August of 2019, the requirement to do a diagnostic test for Shudder was eliminated.

**E.   Consumer Complaints to NHTSA Also Demonstrate That GM Should Have Known About the Transmission Defects Since 2015 to the Present.**

122.   Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* 49 U.S.C.A. §§ 30166, 30170 (West 2024).

123.   Under information and belief, GM personnel communicate with NHTSA and review complaints on the website as part of GM's open investigation review process.

124.   Automakers have a legal obligation to identify and report emerging

safety-related defects to NHTSA under the Early Warning Report requirements. 49 U.S.C.A. §§ 30166(m). Thus, GM knew or should have known of the many complaints about the Transmission Defects logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Transmission Defects.

125. Hundreds, if not thousands, of purchasers of the Class Vehicles have experienced problems with the transmission. Complaints that owners filed with the NHTSA demonstrate that the Transmission Defects are widespread and dangerous and that they manifest without warning. The complaints also indicate GM's awareness of the problems with the transmission and how potentially dangerous the defective condition is for consumers. The following is just a small sampling of the over hundreds of safety-related complaints describing the Transmission Defects, Safecar.gov, Search for Complaints (May 7, 2019), http://www-odi.nhtsa.dot.gov/complaints/ (spelling and grammar mistakes remain as found in the original):

### 1.   *2015 Cadillac Escalade*

126. On the NHTSA website, there are at least 40 consumer complaints for "2015 Cadillac Escalade." As one example, on May 13, 2015, the following incident was reported:

> ACCELERATION FOR NO REASON. I WAS BACKING OUT OF A PARKING SPOT AND I PUT THE CAR IN REVERSE. I WAS NEARING

THE EDGE OF THE CURB ON MY RIGHT FRONT WHEEL SO I STEPPED ON THE BRAKE, STOPPED THE CAR, AND SHIFTED INTO DRIVE SO I COULD MOVE THE VEHICLE FORWARD TO AVOID HITTING THE CURB WHILE BACKING OUT . ONCE I SHIFTED INTO DRIVE, THE CAR WENT TO FULL ACCELERATION FOR NO REASON AND HIT A POLE AT FULL ACCELERATION APPROXIMATELY 5 FEET AWAY.

127. Another incident involving a 2015 Cadillac Escalade was reported on

November 23, 2015:

MY 2015 CADILLAC ESCALADE HAS BEEN IN THE SHOP FOR 130+ DAYS IN THE FIRST CALENDAR YEAR FOR DEFECTIVE BRAKES, TRANSMISSION, SUSPENSION, ELECTRICAL, AND HVAC. I HAVE CONTACTED GM AND THEY DON'T WANT TO REPURCHASE THE VEHICLE. THE VEHICLE IS CONSTANTLY IN THE SHOP FOR PROBLEMS AND IT IS NOT A VEHICLE THAT SHOULD BE OPERATED ON PUBLIC ROADWAYS. THE TRANSMISSION HAS BEEN REPLACED ONCE BEFORE DUE TO DEFECTS IN DESIGN AND BUILD QUALITY. THE TRANSMISSION NOW CAUSES THE CAR TO TAKE OFF IN 4TH GEAR RATHER THAN IN 1ST GEAR WHICH MEANS THE CAR FEELS AS IF THERE IS NO POWER TO PROPEL THE VEHICLE. THE TRANSMISSION SLIPS AND FEELS AS IF IT IS BROKEN. I HAVE TAKEN IT TO THE DEALER AT LEAST 5 TIMES AND GM NOW DOES NOT WANT TO REPLACE THE TRANSMISSION EVEN THOUGH THE DEALER HAS VERIFIED THE CONCERN AND DOCUMENTED IT. I FEEL THAT GM IS NOT DOING ENOUGH TO ENSURE SAFE VEHICLES ARE ON THE ROAD. THIS TRANSMISSION ISSUE IS GOING TO CAUSE AN ACCIDENT ONE DAY. I HAVE ALREADY PUT GM ON NOTICE ALL THE WAY UP TO THE EXECUTIVE LEVEL AND THEY DON'T WANT TO DO ANYTHING ABOUT IT. I FEEL THAT NHTSA SHOULD INVESTIGATE THE ISSUES THAT PLAGUE 2015 FULL SIZE GM SUV OWNERS. THERE ARE A LOT OF US OUT THERE ACCORDING TO MY RESEARCH.

128. Another incident involving a 2015 Cadillac Escalade was reported on

January 5, 2016:

> ENGINE NOISE AND VIBRATION ON COLD START. VERY LOUD
> GRINDING NOISE COMING FROM ENGINE. HAD IT LOOKED AT 2
> TIMES. DEALER SERVICE MANGER JIMMIE STATES ITS NORMAL.
> THEY ALL MAKE THAT NOISE. I AM 54 YEARS OLD OWNED MORE
> THAN 15 CARS IN MY LIFE . THIS IS NOT NORMAL. THEY DO NOT
> WANT TO FIX IT.

### 2.    *2016 Cadillac Escalade*

129.    On the NHTSA website, there are at least 29 consumer complaints for

"2016 Cadillac Escalade." As one example, on January 30, 2016, the following

incident was reported:

> CAR VIBRATES FROM 35MPH UP TO 80 PLUS. HAD IT TO DEALER
> 5 TIMES AND THEY KNOW THAT THERE IS A VIBRATION. THEY
> SAID GM SAID THE TORQUE CONVERTER WAS OUT OF BALANCE
> AND GM WAS DESIGNING A FIX . ABOUT 5 CALLS AND THREE
> WEEK LATER THEY RECEIVED A NEW SPECIAL TORQUE
> CONVERTER AND AFTER IT WAS INSTALLED THE VIBRATION
> WAS STILL THERE. YOU CAN FEEL THE VIBRATION IN THE
> STEERING WHEEL, THROTTLE, CENTER CONSOLE, FLOOR, AND
> THE SEAT. THE SERVICE MANAGER HAS BEEN VERY POLITE AND
> HAS GONE OUT OF HIS WAY TO HELP. A GM FIELD SERVICE REP
> HAS LOOKED AT THE CAR AND SAID IT IS WITHIN GM SPEC,S. I
> AM READING ALL OVER THE INTERNET OF THE SAME PROBLEM
> AND GM HAS REPLACED DRIVELINES, TRANSMISSIONS, TIRES,
> TORQUE CONVERTERS, SHOCKS, REAR AXLES, ENGINE MOUNTS,
> ETC. AND STILL HAVE A VIBRATION PROBLEM. THEY HAVE EVEN
> BOUGHT SOME OF THE 2015 AND 2016 BACK. THIS IS HAPPENING
> ON ALL GM FULL SIZE SUV'S. CHEVROLET, GMC, AND CADILLAC.

130.    Another incident involving a 2016 Cadillac Escalade was reported on

February 2, 2016:

THE CONTACT OWNS A 2016 CADILLAC ESCALADE. THE CONTACT STATED THAT WHILE DRIVING AT 35 MPH, THE VEHICLE BEGAN TO VIBRATE AS THE SPEED INCREASED. THE VEHICLE WAS TAKEN TO BE REPAIRED BUT THE DEALER COULD NOT REMEDY THE FAILURE. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 4,000.

131.   Another incident involving a 2016 Cadillac Escalade was reported on

June 27, 2016:

VEHICLE EXHIBITS A CONSTANT VIBRATION AT SPEEDS BETWEEN 35 MPH AND 75 MPH. VIBRATION IS NOT ROAD RELATED, IT IS A CONSTANT, STEADY VIBRATION REGARDLESS OF ROAD CONDITIONS, BEST DESCRIBED AS IF THE VEHICLE WAS DRIVING OVER CORDUROY. THERE IS ALSO A STEADY "BUFFETING" NOISE COMING FROM THE CABIN OF THE VEHICLE AT SPEEDS BETWEEN 55 MPH AND 70MPH.

VEHICLE WAS BROUGHT TO INDEPENDENT TIRE SHOP (BY ME) TO HAVE TRANSMISSIONS AND TIRES ROAD FORCE BALANCED. REPORT WAS PROVIDED, ALL IN SPEC AND VIBRATION IS STILL PRESENT.

CURRENTLY, THERE IS A "OPEN TICKET" ON THE VEHICLE AT THE CADILLAC DEALERSHIP AWAITING A "GM ENGINEER" TO VERIFY THE VIBRATION. AS A RESULT, I DO NOT HAVE A COPY OF THE LATEST INVOICE VERIFYING THE SERVICE VISIT. THE VEHICLE CURRENTLY HAS 2000 MILES ON IT, THE VIBRATIONS WERE PRESENT SINE NEW AND SEEM TO BE GETTING WORSE.

132.   Another incident involving a 2016 Cadillac Escalade was reported on

February 25, 2017:

THE GEARS SHIFT ABRUPTLY. WHEN TAKING OFF THE GEARS WILL SHIFT HARD THAT IT FEELS AS IF SOMETHING HEAVY IS DROPPING IN THE ENGINE. TOOK VEHICLE TO DEALERSHIP

THREE TIMES WITH SAME PROBLEM. TOMORROW WILL BE
FOURTH TIME WITH SAME ABRUPT SHIFTING PROBLEM FOR A
TOTAL OF 4 TIMES. AFTER DEALERSHIP TRIES TO FIX IT IT
OPERATES WELL FOR ABOUT TWO TO THREE MONTHS AND THEN
THE PROBLEM STARTS AGAIN. ALSO, THE VEHICLE HAS LOST
ALL POWER TWICE NOW, BATTERY DEAD, DEAD, DEAD. WHEN
ATTEMPTING TO TURN ON THE LIGHTS BLINK QUICKLY,
MULTIPLE TIMES BUT IT DOES NOT HAVE ENOUGH POWER TO
TURN ON. THIS ESCALADE WAS 94,000 TOTAL AND IT IS NOT A
QUALITY VEHICLE! ROUGH RIDE WITH TRANSMISSION KICKING
IN SO ROUGH!!!

133.   Another incident involving a 2016 Cadillac Escalade was reported on

September 13, 2018:

KNOWN TRANSMISSION ISSUE WHICH CAUSES THE VEHICLE TO
BUCK AND SURGE WHEN YOU PULL UP TO TA STOP LIGHT, STOP
SIGN, ON HIGHWAY,OR IN TRAFFIC. EXTREMELY DANGEROUS.
DEALER STATES THAT THIS IS A KNOWN CONDITION WITH NO
FIX. DEALER DESCRIBES ISSUES WITH SOME VEHICLES WORSE
THAN OTHERS. GENERAL MANAGER OF COLONIAL CADILLAC
WOBURN MA 781-935-7000 (BRET DOUGLAS) STATES THAT HE
HAS DRIVEN VEHICLES WITH SAME ISSUES AND THERE IS NO FIX.
IT WAS CORRECTED IN THE 2018 VEHICLES BY GOING TO A 10
SPEED TRANSMISSION. OUR VEHICLE HAS BEEN IN FOR SERVICE
MULTIPLE TIMES WITHOUT ANY SUCCESS IN A REPAIR. WE ARE
AFRAID TO DRIVE THE VEHICLE AS IT SURGES FORWARD AT ANY
GIVEN MOMENT. CONTACTED CADILLAC AND THEY ARE
UNWILLING TO DO ANYTHING TO HELP WITH THE ISSUE. THEY
ARE CONCERNED THAT THIS WOULD START THEM DOWN A
SLIPPERY SLOPE FOR REPAIRING MANY 2015,16,17'S THAT HAVE
THE SAME ISSUE. YOU ONLY HAVE TO GOOGLE THE ISSUE TO SEE
THAT MANY GM OWNERS ARE DEALING WITH THIS SAME ISSUE.
THIS IS A SAFETY ISSUE THAT NEEDS TO HAVE A RESOLUTION.
SOMEONE IS GOING TO GET SERIOUSLY INJURED OR KILLED AS
A RESULT OF THIS TRANSMISSION ISSUE. PLEASE HELP

134.   Another incident involving a 2016 Cadillac Escalade was reported on

September 27, 2018:

> FROM A COLD START, WHEN TAKING VEHICLE OUT OF PARK AND
> INTO REVERSE, THE VEHICLE WILL SURGE OR BUCK PRIOR TO
> APPLYING THE ACCELERATOR. THIS HAPPENS ABOUT 1/4 OF THE
> DRIVE TIME. WHEN ACCELERATING AND THEN COMING TO A
> COAST AND BACK TO ACCELERATING, THE CAR WILL BUCK.
> THIS HAPPENS ABOUT 1/2 OF THE DRIVE TIME. FROM A COLD
> START, REVERSE, DRIVE, ACCELERATE TO 1MPH WHILE MAKING
> A SLIGHT RIGHT TURN OUT OF MY DRIVEWAY, THE VEHICLE
> BUCKS. THIS HAPPENS ABOUT 3/4 OF THE DRIVE TIME.

135.   Another incident involving a 2016 Cadillac Escalade was reported on

October 5, 2018:

> SHUDDER / VIBRATION BETWEEN 45 - 65 MPH. CAUSE WAS
> TORQUE CONVERTER. 85 - 90% OF VIBRATION WAS MITIGATED.
> CONTINUE TO HAVE STEADY VIBRATIONS 65 -70MPH AND
> ABOVE. DEALER ALSO INSTALLED NEW TIRES / TRANSMISSIONS
> AND I HAVE HAD A ROAD FORCE BALANCE.

136.   Another incident involving a 2016 Cadillac Escalade was reported on

February 9, 2019:

> TRANSMISSION STARTED SLIPPING AT 50K MILES.
>
> SINCE I AM IN THE TRANSPORTATION SERVICE INDUSTRY, I
> KNOW MANY PEOPLE THAT HAVE TRANSMISSION ISSUES ON
> ESCALADES.

### 3.     2015 Chevrolet Corvette

137.   On the NHTSA website, there are at least 27 consumer complaints for

59

"2015 Chevrolet Corvette." As one example, on October 12, 2014, the following

incident was reported:

> AT ANY SPEED THE CAR JERKS LIKE ONE OR MORE SPARK PLUG
> WIRES ARE NOT FIRING(PULLED OFF) IN ALL MODES, IT IS
> WORSE IN (E ECONOMY MODE) PUSH THE GAS DOWN IT GETS
> WORSE IN ALL MODES.
>
> I REPLACED THE PLUGS AND WIRES I STILL HAVE THIS
> PROBLEM, I WAS HOPING IT WAS A BAD PLUG OR WIRE, THAT
> HAPPENS.
>
> I TOOK IT TO THE DEALER WHEN THE CHECK ENGINE LIGHT
> CAME ON I PULLED THE FUSE FOR THE EXHAUST VALVES TO
> KEEP THEM OPEN THEY CHECKED THEN TESTED THE CAR AND
> TOLD ME IT WAS FINE NO OTHER CODES WERE FOUND.
>
> I HAVE 1800 MILES ON THE CAR NOW I TRIED EVERY 93 OCTANE
> FUEL AVAILABLE IN THIS AREA AND OTHER AREAS, HOPING IT
> WAS JUST BAD FUEL THAT MANY STATIONS CAN'T HAVE BAD
> FUEL FOR IT TO BE FUEL RELATED. *TR

138.   Another incident involving a 2015 Chevrolet Corvette was reported on

October 27, 2015:

> 8 SPEED AUTOMATIC TRANSMISSION DOWN SHIFTS AT A STOP
> WITH SUCH FORCE IT FEELS AS YOU HAVE BEEN HIT FROM
> BEHIND BY ANOTHER CAR WHILE COMING TO A STOP.
> TRANSMISSION ALSO WILL NOT ALWAYS ENGAGE PROPERLY
> AND WILL OVER REV AND SLAM INTO GEAR POSSIBLY CAUSING
> AN ACCIDENT. TRANSMISSION AT TIMES WILL DISENGAGE
> WHILE GOING FORWARD THEN SLAM INTO GEAR WITH GREAT
> FORCE. I WAS TOLD BY A GM INSIDER THAT GM IS AWARE SOME
> TRANSMISSIONS ARE DEFECTIVE AND IS WORKING ON A KIT TO
> FIX THE FLUID STARVATION PROBLEM INTERNALLY BUT HAS
> DONE NOTHING TO INFORM OWNERS OF THE POTENTIAL
> DANGERS OF ERRATIC SHIFTING THAT IT'S CAUSING WHILE

60

DRIVING. THIS ALSO CAUSES THE TRANSMISSION TO OVER HEAT AND TO ILLUMINATE A WARNING LAMP.

139.   Another incident involving a 2015 Chevrolet Corvette was reported on

February 27, 2016:

> 8-SPEED AUTOMATIC TRANSMISSION ALWAYS SHIFTS ERRATICALLY WHEN STARTING OUT COLD (LAZY SHIFT, SLOW SHIFT, ETC.) AND OCCASIONALLY DOES NOT DOWNSHIFT WHEN CAR COMES TO A STOP, ONLY TO SLAM HARD INTO 1ST WHEN GAS PEDAL IS PRESSED TO RESUME TRAVEL. DEALER SAYS GM CLAIMS THIS IS "NORMAL," BUT NO CAR I'VE EVER OWNED BEHAVES LIKE THIS. APPEARS TO BE FLUID STARVATION INTERNALLY. ANY FIX/REPLACEMENT WOULD BE COSTLY FOR GM, SO GIVEN THEIR HISTORY W/FAULTY IGNITION SWITCHES, NOT SURPRISED THEY'RE TRYING TO AVOID IT. TRANSMISSION IS DEFINITELY NOT NORMAL AND BEHAVIOR IS UNPREDICTABLE + UNACCEPTABLE -- ESPECIALLY AT THIS PRICE. WHEN CAR IS MOVING & TRANSMISSION IS IN DRIVE AND TRYING TO LAZILY SHIFT GEARS, YOU TEMPORARILY LOSE ABILITY TO APPLY POWER, WHICH IS BOTH DANGEROUS AND UNNERVING. CLEARLY, THIS TRANSMISSION WAS PUT INTO PRODUCTION W/INADEQUATE TESTING & DEVELOPMENT. A RECALL IS NECESSARY TO FIX PROPERLY.

140.   On May 17, 2016, the following incident involving a 2015 Chevrolet

Corvette was reported:

> AUTOMATIC 8 SPEED TRANSMISSION HAD TO BE REPLACED AT 2000 MILES ON THE ODOMETER DUE TO HARD SHIFTS AND SHIFTING AUTOMATICALLY TO LOW GEAR AT HIGHWAY SPEEDS NEARLY BRINGING THE CAR TO A STOP IN INTERSTATE TRAFFIC, NOW 700 MILES AND 4 MONTHS LATER THE TRANSMISSION IS STUCK IN SECOND GEAR AND YOU CANT DRIVE FAST ENOUGH TO GET OUT OF THE WAY OF

TRAFFIC. AND I KNOW OF SEVERAL OTHER CARS LIKE IT THAT HAVE SIMILAR PROBLEMS. THIS IS A REAL SAFETY PROBLEM AND GM SEEMS TO IGNORE IT, PROBABLY UNTIL SOMEONE GETS HURT OR KILLED.

141.   On August 8, 2016, the following incident involving a 2015 Chevrolet

Corvette was reported:

AUTOMATIC A8 TRANSMISSION HAS THE FOLLOWING ISSUES: 1)MORNING SHIFT FROM REVERSE TO DRIVE SEVERELY DELAYED, BANGS IN EVENTUALLY. 2) ERRATIC SHIFTING IN NORMAL TRAFFIC 3) THE 2-1 DOWNSHIFT WHEN COMING TO A STOP RESULTS IN SEVERE BANG, LURCHES FORWARD AND IS VERY UNSAFE IN A PARKING LOT SITUATION. ALSO IN STOP AND GO TRAFFIC, SAME LURCHING FORWARD. FEELS AS IF SOMEONE HIT YOU FROM BEHIND 4) TORQUE CONVERTER LOCKUP IN 5TH AND 6TH GEAR. DEALER TORE APART THE CAR TO REPLACE THE STATOR, PERFORMED SOFTWARE UPDATE - NEITHER SOLUTION WORKED.

142.   On August 8, 2016, another incident involving a 2015 Chevrolet

Corvette was reported:

THE A8 AUTOMATIC TRANSMISSION IN THE 2015 CORVETTE IS PRONE TO OCCASIONAL HARD DOWNSHIFTS FROM 2ND TO 1ST GEAR WHEN DRIVING AT SLOW SPEEDS (LESS THAN 10 MPH). SOMETIMES THE DOWNSHIFTS ARE SO VIOLENT THAT THE CAR JERKS FORWARD SEVERAL FEET. THE FIRST TIME IT HAPPENED I THOUGHT I HAD BEEN REAR ENDED BY ANOTHER CAR. THE UNPREDICTABLE BEHAVIOR OF THE TRANSMISSION IS ESPECIALLY DANGEROUS IN PROXIMITY TO PEDESTRIANS OR OTHER VEHICLES.

143.   On September 25, 2016, the following incident involving a 2015

Chevrolet Corvette was reported:

JUST AS YOU ACCELERATE, AROUND 1200 TO 1500 RPM, WITH A LIGHT TOUCH, YOU HEAR WANT IS BEING DESCRIBED AS A "WARBLE" SOUND. IT HAS A METALLIC RING AND LASTS A FEW SECONDS.

LOADING THE ENGINE ON A HILL MAKES THE SOUND MORE INTENSE. IT IS HAPPENING TO A STOCK 2015 STINGRAY COUPE. THOUGHT THIS WAS ONLY HAPPENING TO ME BECAUSE OTHERS DO NO HAVE THIS ISSUE BUT FOUND A GROUP OF CORVETTE OWNERS ON THE CORVETTE FORUM WITH THE SAME ISSUE.

### 4.    *2016 Chevrolet Camaro*

144.    On the NHTSA website, there are at least 53 consumer complaints for "2016 Chevrolet Camaro." As one example, on July 5, 2016, the following incident was reported:

PURCHASED 2016 CHEVROLET CAMARO ON 6/18/2016 FEW DAYS AFTER THE ENGINE WAS RUNNING VERY ROUGH, GRINDING NOISE, TRANSMISSION SHIFTING HARD, THE CHECK ENGINE LIGHT ILLUMINATED AND SPEED REDUCED TO 5 MPH SHOWED ON DISPLAY. THIS HAS BEEN GOING ON SINCE THEN, I BROUGHT TO DEALER ON 7/1/2016 AND THE SERVICE MECHANIC TOOK BACK TO CHECK CODES AND INFORMED ME THAT NUMEROUS ERROR CODES WERE DETECTED AND TOLD ME TO GO AHEAD AND TAKE VEHICLE HOME BECAUSE IT WAS A HOLIDAY WEEKEND AND TO RETURN ON TUESDAY 7/5/2016 TO BE INSPECTED FOR REPAIR.

145.    Another incident involving a 2016 Chevrolet Camaro was reported on March 19, 2018:

I BOUGHT MY CAR IN SEPT. 2016 AFTER THE FIRST COUPLE OF MONTHS AT RANDOM TIMES THE TRANSMISSION MAKES A BOOM SOUND WHEN SLOWING DOWN FROM SPEEDS OVER 55 MPH OR DURING ACCELERATION FROM STOP AND GO RUSH

63

HOUR TRAFFIC IT'S AS IF THE TRANSMISSION HAS TO CATCH UP
WITH THE ACCELERATOR. I GET MONTHLY DIAGNOSTICS AND
NOTHING SHOWS UP AS AN ISSUE.

146.   Another incident involving a 2016 Chevrolet Camaro was reported on

August 25, 2018:

WHEN YOU GOING DOWN THE ROAD TRANSMISSION 7/8 GEAR
SHUTTERS LIKE IT'S SLIPPING

147.   Another incident involving a 2016 Chevrolet Camaro was reported on

November 20, 2018:

THE 8 SPEED AUTOMATIC TRANSMISSION HAS A SHUTTER AT
LOW ENGINE RPM BETWEEN 1200 TO 1500 RPM. THE SHUTTER
WILL OCCUR IN 2ND, 3RD, 4TH, 5TH, AND 6TH GEAR WHEN
ENGINE RPM IS 1200 TO 1500. THE VEHICLE HAS 10,000 MILES ON
IT. THIS HAPPENS ON OPEN ROADS IN ALL CONDITIONS AND AT
VARIOUS SPEEDS + GEAR.

148.   Another incident involving a 2016 Chevrolet Camaro was reported on

February 27, 2019:

WHEN DRIVING, THE VEHICLE WILL VIBRATE/SHUDDER
PERIODICALLY. WHEN PULLING INTO TRAFFIC, SOMETIMES IT
DOES NOT SHIFT PROPERLY AND PRESENTS A DANGER. THE
DEALER FLUSHED THE TRANSMISSION FLUID RECENTLY, BUT IT
IS STARTING TO HAPPEN AGAIN.

149.   Another incident involving a 2016 Chevrolet Camaro was reported on

January 17, 2019:

ISSUE 1 - 8 SPEED AUTOMATIC TRANSMISION IS SHIFTING HARD
BETWEEN GEARS AND ALSO HAS A SHUTTER AT LOW ENGINE

RPM BETWEEN 1200 TO 1500 RPM. THE SHUTTER WILL OCCUR IN MOST GEARS. ESPECIALLY NOTICEABLE WHEN USING CRUISE CONTROL. IT HAPPENS IN ALL ROADS IN ALL CONDITIONS AND AT VARIOUS SPEEDS + GEAR...

### 5. *2017 Chevrolet Camaro*

150. On the NHTSA website, there are at least 43 consumer complaints for "2017 Chevrolet Camaro." As one example, on November 1, 2018, the following incident was reported:

> MY CAR HAS BEEN HAVING A LOT OF VIBRATIONS, SPUTTERING, RUMBLING WHILE DRIVING. ESPECIALLY WHEN SPEEDING UP. IT HAPPENS WHILE IN CRUISE CONTROL ALSO. I TOOK IT TO BE SERVICED AND THEY SAID IT WAS THE TORQUE CONVERTER. THEY FLUSHED THE SYSTEM AND SAID IT SHOULD CLEAR UP AFTER 200 MILES WITH THE NEW FLUID THEY REPLACED. I TOOK IT BACK BECAUSE IT HAS BEEN OVER 500 MILES AND IS STILL HAPPENING. I WAS TOLD ALL THEY CAN DO IS REPLACE THE FLUID AGAIN FOR NOW UNTIL THEY FIX THE PROBLEM. WHY ARE THEY NOT ABLE TO REPLACE THE TORQUE CONVERTER NOW BEFORE IT CAUSES MORE INTENSIVE DAMAGE? I AM AFRAID AS IT GETS WORSE I WILL BE BROKEN DOWN ON THE SIDE OF THE ROAD WITH A CAR THAT IS IN WORSE REPAIR THAN IT SHOULD BE.

151. Another incident involving a 2017 Chevrolet Camaro was reported on February 2, 2019, as follows:

> HARD SHIFTS BETWEEN 1ST & 2ND GEAR VIBRATION BETWEEN 1500 & 1800 RPM. THIS CAR HAS ACTIVE FUEL MANAGEMENT VIBRATION SEEMS TO HAPPEN WORSE WHEN IN 4 CYLINDER MODE. GM IS AWARE OF THE ISSUE AND KEEPS PROMISING A FIX WHICH HAS YET TO BE RELEASED. BLAME IT ON FLUID IN TRANSMISSION.

### 6.    *2015 Chevrolet Silverado*

152.    On the NHTSA website, there are at least 485 consumer complaints for

"2015 Chevrolet Silverado." As one example, on November 20, 2015, the following

incident was reported:

> TRANSMISSION CANNOT FIND GEARS WHEN COASTING OR
> SLOWING DOWN AND THEN HITTING ACCELERATOR. VERY
> DANGEROUS WHEN IT HESITATES FOR SECONDS BEFORE
> FINDING THE RIGHT GEAR AND GOING, OR IT STAYS IN TOO HIGH
> OF A GEAR INSTEAD OF DOWNSHIFTING TO ACCELERATE AND
> RATTLES. HAPPENS EVERY TIME I DRIVE THE TRUCK, AND MANY
> OTHER PEOPLE HAVE THE SAME ISSUE. GM DOESN'T CARE!

153.    Another incident involving a 2015 Chevrolet Silverado was reported on

April 6, 2016:

> HAD BEEN COMPLAINING SINCE 2 DAYS AFTER PURCHASE THAT
> TRANSMISSION WAS SHAKING/SHIMMYING/SPUTTERING. WAS
> PULLING ONTO A COUNTY HIGHWAY OFF OF A RESIDENTIAL
> TYPE ROAD (AFTER PICKING UP GRANDDAUGHTER FROM
> SCHOOL - SHE WAS IN TRUCK) AND TRUCK BOGGED DOWN &
> WOULDN'T GO. INTERSECTION IS AT TOP OF HILL AND AROUND
> A CORNER. WAS CLEAR WHEN I STARTED PULLING OUT, BUT
> WAS ALMOST HIT BY ONCOMING TRUCK BEFORE I GOT MY
> TRUCK TO GET ON ACROSS THE INTERSECTION. HAS BEEN IN
> SHOP TWICE TO FIX IT. FIRST TIME TO DOUBLE TRANSMISSION
> FLUSH. THAT DIDN'T WORK. NEXT TIME A FEW WEEKS LATER, A
> TECHNICIAN HOOKED UP A COMPUTER TO MY TRUCK SO HE
> COULD MANUALLY SHIFT GEARS WHILE RIDING WITH ME. HE
> FELT THE ISSUES AND SAID HE SAW SEVERAL PROBLEMS.
> DEALERSHIP ENDED UP REPLACING TORQUE CONVERTER. ALSO
> REPLACED VLOM MANIFOLD - WHATEVER THAT IS? THAT'S
> WHAT IT SAYS ON WORK ORDER. THE PROBLEM STILL EXISTS. I
> BELIEVE THERE ARE BULLETINS OUT ON THIS TRUCK'S

TRANSMISSION ALREADY. I HAVE TALKED TO OTHERS WHO HAVE HAD THE SAME PROBLEM.

154.   Another incident involving a 2015 Chevrolet Silverado was reported on

May 12, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. WHILE DRIVING 30 MPH, THE VEHICLE DOWNSHIFTED UNCONTROLLABLY WITHOUT WARNING. ALSO, WHILE IN THE PARK POSITION, THE VEHICLE SUDDENLY LUNGED FORWARD AND HAD TO BE RESTARTED. THE CONTACT STATED THAT THE TRANSMISSION INDEPENDENTLY ENGAGED INTO FIRST GEAR WITHOUT WARNING AND CAUSED THE VEHICLE TO SHIFT FORWARD ON MORE THAN ONE OCCASION. THE VEHICLE RECEIVED AN UNKNOWN REPAIR, BUT THE FAILURE RECURRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 14,000. ....UPDATED 0711/16 *BF

155.   Another incident involving a 2015 Chevrolet Silverado was reported on

June 8, 2016:

THE TRUCK HAS A CONSTANT VIBRATION AT HIGHWAY SPEEDS. TWO DIFFERENT DEALERS HAVE VERIFIED THE PROBLEM, GM FIELD ENGINEERS VERIFIED THERE IS AN ISSUE, AND THE ENGINEER RECOMMENDED THE DEALER CHANGE REAR END PARTS, STILL NO FIX. TWO DIFFERENT DEALERS FELT ROADFORCE BALANCING THE TIRES WOULD HELP; IT HAS NOT. THE TRUCK ALSO MAKES A CHIRPING NOISE WHEN TRANSITIONING FROM 4 CYLINDERS BACK TO 8 CYLINDERS.

156.   Another incident involving a 2015 Chevrolet Silverado was reported on

July 14, 2016:

I AM CONCERNED ABOUT THE EXCESSIVE SHAKING/VIBRATION IN THIS 2015 CHEVY SILVERADO AND, THUS FAR, GM CUSTOMER

SERVICE AND THE DEALERSHIP HAVE NO RESOLUTION IN SIGHT. THE PROBLEM HAS BEEN OCCURING AT HIGHWAY SPEEDS (MOST NOTABLE ABOVE 73 MPH) SINCE THE TRUCK WAS PURCHASED AUG 2015. AS THEY CAN'T IDENTIFY THE CAUSE OF THE PROBLEM, I CAN'T BE SURE THE ORIGIN IS OR IS NOT A SAFETY-REATED CONCERN. THE DEALERSHIP HAS BALANCED, RE-BALANCED, ROTATED, AND ROAD PRESSURE TESTED TIRES TO NO AVAIL. EVEN TRIED A NEW SET OF TIRES OFF OF A 2016 MODEL TO NO AVAIL. AS THIS MATTER CONTINUES AND DOESN'T APPEAR TO BE TIRE-RELATED, I'M WORRIED THAT THE ISSUE MAY BE IN THE SUSPENSION AND WILL, AT SOME POINT, CAUSE OR CREATE A CATASTROPHIC FAILURE.

157. Another incident involving a 2015 Chevrolet Silverado was reported on

August 8, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. UPON DEPRESSING THE ACCELERATOR PEDAL, THE VEHICLE WAS EXTREMELY SLOW TO ACCELERATE WITH A DRASTIC REDUCTION IN SPEED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO TWO DEALERS WHO WERE UNABLE TO REPLICATE AND DIAGNOSE THE FAILURE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND PROVIDED NO RECOMMENDATION OR REPAIR SOLUTION. THE FAILURE MILEAGE WAS NOT AVAILABLE.

158. Another incident involving a 2015 Chevrolet Silverado was reported on

August 20, 2016:

THE TRANSMISSION HESITATES WHEN SHIFTING IN AUTOMATIC BUT WHEN IN MANUAL MODE IT SHIFTS FINE WITH NO ISSUES. THIS HAS BEEN A ON GOING ISSUE AND PROBLEM THE SERVICE CENTER FOR A LOCAL DEALERSHIP CAN NOT FIND THE ISSUE. BUT THERE IS SOMETHING GOING ON WITH THE TRANSMISSION.

159.    Another incident involving a 2015 Chevrolet Silverado was reported on

September 14, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. WHILE DRIVING 10 MPH, THE ACCELERATOR PEDAL WAS DEPRESSED AND THE VEHICLE ACCELERATED IN EXCESS. THE VEHICLE WAS TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE WIRING HARNESS, PART OF THE TRANSMISSION, AND MULTIPLE OTHER PARTS NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED; HOWEVER, THE FAILURE RECURRED. IN ADDITION, WHILE DRIVING AT A VERY LOW SPEED, "HAUL GEARS" DISPLAYED ON THE MESSAGE BOARD AS THE VEHICLE SWITCHED INTO A LOW GEAR INDEPENDENTLY. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS 3,000. THE VIN WAS UNAVAILABLE.

160.    Another incident involving a 2015 Chevrolet Silverado was reported on

September 26, 2016:

I PARK IN A 5 LEVEL PARKING GARAGE. SEVERAL MONTHS AGO, I WAS LEAVING WHEN I CAME UP TO THE RAMP TO THE NEXT LOWER LEVEL. I LET OFF ON THE ACCELERATOR BEFORE I WENT FROM FLAT TO LOWERING RAMP. THE TRUCK SHIFTED UP TO SECOND GEAR, ACCELERATED AND THROUGH ME TOWARD THE VEHICLE IN FRONT. THE TRUCK WENT OUT OF MY CONTROL. IF I WERE NOT A SAFE DRIVER I WOULD HAVE STRUCK THE VEHICLE. THIS ISSUE HAS OCCURRED ANOTHER TIME AS WELL. THERE HAVE BEEN OTHER PROBLEMS WHICH ARE NUMEROUS. I WILL ADDRESS THEM INDIVIDUAL IN FURTHER COMPLAINTS.

161.    Another incident involving a 2015 Chevrolet Silverado was reported on

September 27, 2016:

ON SEPT 21 2016 I ARRIVED AT MY HOME. I DROVE UP MY GRAVEL DRIVEWAY IN D(DRIVE) AND SLOWED TO A STOP AND MY TRUCK

69

BEGAN TO ROLL BACKWARD UNDER MY CONTROL. I WAS
CHECKING ON THE GROUND FOR LAWN DAMAGE. THE TRUCK
SHUTTERED TWICE, SHUT OFF AND STARTED TO ROLL
BACKWARD TOWARD A TREE. I QUICKLY REGAINED CONTROL
WITH A PANIC STOP. I WAS ABLE TO PLACE THE TRUCK IN PARK
AND RESTART THE TRUCK. I HAD LOST CONTROL OF THE TRUCK.

162.    Another incident involving a 2015 Chevrolet Silverado was reported on

November 9, 2016:

RANSMISSION IS LURCHING IF DRIVING 50 MPH THEN SLOW
DOWN TO 35 MPH WHEN YOU GO TO SPEED BACK UP IT LURCHES.
COMPLAINED TO CHEVROLET SEVERAL TIMES THEY SAY
CANNOT FIND ANYTHING WRONG.

163.    Another incident involving a 2015 Chevrolet Silverado was reported on

December 12, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500.
WHILE DRIVING APPROXIMATELY 45 MPH, THE CHECK ENGINE
INDICATOR ILLUMINATED. THE VEHICLE STARTED TO
DECELERATE WHEN DEPRESSING THE ACCELERATOR PEDAL.
THE VEHICLE WAS TAKEN TO THE DEALER, BUT WAS NOT
DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE
AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE
WAS 33,000.

164.    Another incident involving a 2015 Chevrolet Silverado was reported on

December 13, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500.
THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS
SPEEDS, THERE WAS A LOUD CLUNKING NOISE COMING FROM
THE REAR OF THE VEHICLE. THE CONTACT STATED THAT THE
FAILURE OCCURRED AFTER SHIFTING GEARS. THE VEHICLE WAS

70

NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 17,000.

### 7.     *2016 Chevrolet Silverado*

165.    On the NHTSA website, there are at least 250 consumer complaints for "2016 Chevrolet Silverado." As one example, on May 11, 2016, the following incident was reported:

> I BOUGHT A 2016 CHEVY SILVERADO 1500 LTZ Z71 AND IT VIBRATES AT IDLE AND THE TRANSMISSION IS SLIPPING. I HAD ALREADY TOOK IT TO THE DEALERSHIP TO GET IT FIX, BUT NO LUCK. GM TOLD ME THAT IS HOW THE TRUCK IS DESIGNED TO OPERATE, WHICH IS HARD TO BELIEVE. THERE IS ABSOLUTELY ZERO HELP FROM GM TO HELP ME RESOLVE THE PROBLEM. I WAS GIVEN AN OPTION TO TRADE IT IN FOR A NEW ONE AT MY OWN EXPENSES OR DEAL WITH THE PROBLEM. FORD WOULD NOT TAKE MY TRUCK AS A TRADE IN NOR WILL GMC. THIS VEHICLE CAN POTENTIALLY BY DANGEROUS AND A LIABILITY AS THE TRANSMISSION SEEM TO HAVE A MIND OF ITS OWN AND THE CONSTANT VIBRATION CANNOT POSSIBLY HE GOOD FOR ANYONE.

166.    Another incident involving a 2016 Chevrolet Silverado was reported on October 3, 2016:

> THE ISSUE(S) THAT I AM EXPERIENCING ALL APPEAR TO BE WITH THE TRUCKS 8 SPEED TRANSMISSION. THE FIRST TWO OCCUR DURING BREAKING AND THE THIRD HAPPENS WHEN ACCELERATING FROM A "COLD" START. A DESCRIPTION OF EACH OF THE THREE MAJOR ISSUES ARE OUTLINED BELOW:
>
> 1)     DURING INITIAL BREAKING THE TRUCK WILL BEGIN TO SLOW DOWN AS INTENDED AND WITHOUT WARNING IT

71

ABRUPTLY ACCELERATES/SLIDES FORWARD (SEE BREAKING PROFILES). THIS TYPICALLY HAPPENS BETWEEN 10-20 MPH.

2)   DURING BREAKING JUST BEFORE COMING TO A STOP I EXPERIENCE A HARD JERK OR SHUDDER (SEE BREAKING PROFILES).

3)   DURING A "COLD" START, IN THE MORNING OR AFTER WORK, THE TRANSMISSION WILL SOMETIMES SLIP AND SHIFT HARD WHILE PULLING OUT OF MY DRIVEWAY/PARKING LOT.

THE ISSUES ARE ALL INTERMITTENT.

167.   Another incident involving a 2016 Chevrolet Silverado was reported on

October 16, 2016:

I HAD TWO EPISODES OF SUDDEN UNINTENDED ACCELERATION WHILE DRIVING HIGHWAY SPEEDS ON A HIGHWAY. TRUCK IS WEEKS OLD- 1500MILES ONLY. BRAKES STILL WORKED SO I WAS ABLE TO STOP. RPMS CONTINUED TO ESCALATE IN NEUTRAL AND PARK. HAD TO TURN OFF ENGINE QUICKLY TO ABORT THE PROBLEM. I'M TAKING THE TRUCK IN FOR EVALUATION TOMORROW. MY WIFE AND TWO OLDEST SONS WERE IN THE VEHICLE. *TR

168.   Another incident involving a 2016 Chevrolet Silverado was reported on

November 15, 2016:

TL* THE CONTACT OWNS A 2016 CHEVROLET SILVERADO 1500. WHILE ATTEMPTING TO ACCELERATE FROM A STOP, THE VEHICLE FAILED TO ACCELERATE. THE CONTACT COASTED INTO A PARKING LOT AND NOTICED THAT THE FRONT PASSENGER SIDE AXLE INDEPENDENTLY SHIFTED TO THE REAR OF THE CHASSIS, WHICH POTENTIALLY CAUSED A SPARK TO THE TIRES. THE VEHICLE WAS TAKEN TO THE DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE

AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 4,000.

### 8.    *2017 Chevrolet Silverado*

169.    On the NHTSA website, there are at least 140 consumer complaints for "2017 Chevrolet Silverado." As one example, on July 20, 2018, the following incident was reported:

> 8 SPEED TRANSMISSION CLUNKS WHEN SHIFTING INTO 2 GEAR AND AT TIMES FEELS LIKE YOU GOT REAR ENDED. WHEN IT DOWN SHIFTS INTO THE LOWER GEARS ITS ALSO CLUNKS AND IS NOT SMOOTH. THIS IS HAPPENING WHEN GOING AT SLOW SPEEDS AND IS WORSE AFTER A COLD START. THE VEHICLE SHIFTS FINE AT HWY SPEEDS. I HAVE ALREADY BROUGHT IT TO THE DEALERSHIP TWICE AND PROBLEM IS STILL THERE. TALKING TO OTHER PEOPLE WITH GM 8 SPEED TRANSMISSION AND THEY ARE HAVING THE SAME ISSUE. 8 SPEED TRANSMISSION NEEDS RECALL.POSSIBLY TORQUE CONVERTER.

170.    Another incident involving a 2017 Chevrolet Silverado was reported on July 18, 2018:

> ENGINE HESITATION, OR MISFIRING. JERKING, OR TRANSMISSION SHUTTERING WHEN ENGINE IS AT LOW RPM AND ON INCLINE. (I.E. WHEN TRAVELING ABOUT 45MPH AND START UP A HILL, THE RPM'S ARE ABOUT 1300 AND THE TRANSMISSION DOESN'T GEAR DOWN, SO IT STARTS SHUTTERING UNTIL YOU GIVE IT MORE ACCELERATION THAN USUAL.) AFTER DEALING WITH THIS ISSUE FOR NEARLY 8 MONTHS AND 15K MILES, I BELIEVE THIS SAFETY ISSUE SHOULD BE RECALLED. DEALER ORIGINALLY ACKNOWLEDGE THE PROBLEM BUT WAS UNSURE OF THE CAUSE. AFTER 5 REPAIR ATTEMPTS THE DEALER SAY THEY CAN'T DUPLICATE AND THE VEHICLE PERFORMS AS DESIGNED.

171.   Another incident involving a 2017 Chevrolet Silverado was reported on

May 9, 2018:

TRANSMISSION ABRUPTLY SHIFTING. FEEL LIKE THE TRUCK IS
BEING HIT BY ANOTHER VEHICLE. I DON'T KNOW WHEN IT'S
GONNA DO IT BUT WHEN IT DOES, ITS SCARY. THE OTHER DAY
WHILE TRYING TO BACK UP INTO MY DRIVE WAY, THE WOULD
NOT MOVE WHEN I PUSHED ON THE PEDAL. THEN ON IT'S OWN,
THE TRUCK BURNED RUBBER BACKWARDS WHEN I TOOK MY
FOOT OFF OF THE GAS PEDAL. I ALMOST DROVE INTO MY
GARAGE! THIS TRUCK IS NOT SAFE AND NEEDS TO BE REMOVED
FROM SERVICE! THIS IS AN ONGOING PROBLEM THAT YOU
NEVER KNOW WHEN IT'S GOING TO HAPPEN DURING YOU DRIVE.

172.   Another incident involving a 2017 Chevrolet Silverado was reported on

March 27, 2018:

VEHICLE HESITATION AND SURGES IN ACCELERATION. THIS
CONDITION IS A SAFETY ISSUE AS IT HESISTATES PULLING INTO
TRAFFIC, SURGES IN ACCELERATION HAVE CAUSED LOSS OF
TIRE TRACTION ON ICE COVERED ROADWAYS NEARLY
RESULTING IN A COLLISION. DEALERS HAVE ACKNOWLEDGED
AN ISSUE BUT ADVISE THEY ARE STILL WAITING ON A FIX FROM
GM.

173.   Another incident involving a 2017 Chevrolet Silverado was reported on

March 22, 2018:

PURCHASED MY 17 CHEVROLET SILVERADO 1500 ON 11/28/17 AND
RETURNED IT TO THE DEALERSHIP ON 12/1/17. THIS WAS DUE TO
A SEVERE SHUDDERING & SHIFTING IN THE TRANSMISSION &
SEVERE SHAKE IN THE FRONT END AT 70-90MPH. THEY
BALANCED & ROTATED THE TIRES, SAYING THE ISSUE WAS
FIXED, I PICKED THE VEHICLE BACK UP ON 12/4/17 BUT THE ISSUE

74

WAS NOT FIXED & AN ELECTRICAL ISSUE HAD ALSO OCCURRED.
I TOOK THE VEHICLE BACK ON 12/7 /18 WITH THE SAME
COMPLAINTS REGARDING THE TRANSMISSION & SHAKING IN
THE FRONT END, AS WELL AS THE ELECTRICAL ISSUE. THE
DEALERSHIP CALLED ME ON 12/8/17, TOLD ME THEY HAD BEEN
UNABLE TO DUPLICATE THE ISSUES, FINDING NOTHING WRONG.
I LEFT IT OVER THE WEEKEND, WENT IN MONDAY MORNING &
SPOKE TO THE SERVICE MANAGER DIRECTLY. HE TOLD ME HE
HAD PURCHASED THE SAME VEHICLE WITH THE SAME
TRANSMISSION ISSUES. SAID THERE WAS A POSSIBLE FIX BY
EXCHANGING THE TRANSMISSION FLUID & THEY WOULD USE A
NEW MACHINE PICO TO CHECK IT OUT. THEY HAD TO REPLACE
THE TORQUE CONVERTER DUE TO MALFUNCTIONING &
PERFORM A PROGRAMMING MODULE UPDATE ON RADIO, I
PICKED IT UP ON 12/22/17, ISSUE WITH THE TRANSMISSION WAS
STILL NOT RESOLVED. I TOOK IT TO A DIFFERENT DEALERSHIP
FOR TRANSMISSION SHUDDER, SHIFT & SHAKE ISSUE MOST
NOTICEABLE AT 70-90MPH, & RADIO ISSUE. THEY WERE ADVISED
TO PERFORM A MODULE UPDATE ON THE TRANSMISSION &
GIVEN 2 OPTIONS ON THE RADIO, THEY CHOSE TO REPLACE THE
SCREEN. I TOOK IT BACK TO THAT SAME DEALERSHIP, MODULE
UPDATE MADE TRANSMISSION/FRONT END ISSUE WORSE,
ESPECIALLY COMING OUT OF A CURVE. THEY'VE REPLACED MY
2 BACK TIRES SAID THEY WERE BAD & SHOULD FIX THE
SHAKING ISSUE IN THE FRONT END. UNABLE TO DUPLICATE
TRANSMISSION ISSUES THUS THEY CANNOT REPAIR IT. OWNERS
WITH THE SAME ISSUES ARE BEING TOLD GM KNOWS BUT CAN'T
FIX TRANSMISSION ISSUE.

174.   Another incident involving a 2017 Chevrolet Silverado was reported on

February 27, 2018:

TRUCK EXHIBITS A ROUGH IDLE AFTER TRUCK IS DRIVEN AND
WARM. IDLE CAUSES TEH TRUCK TO SHAKE AND FEELS LIKE IT
WILL DIE AT STOPS. RPM DROPS BELOW 300 RPM THEN GOES
BACK TO 490 RPM. IN ADDITION THE TRUCK WILL START TO

75

SHAKE AND VIBRATE AT HIGHWAY SPEEDS OF 75-80 MPH. GMC
SERVICE PERFORMED TSB CHANGING OUR ENGINE MOUNTS BUT
THAT HAS NOT FIXED THE ISSUE. THIS IS A KNOWN ISSUE ON
SILVERADOS AND NO FIX IN SITE. CONCERNED WITH SEAT
VIBRATION THIS IS A SAFETY ISSUE DUE TO POTENTIAL DRIVE
TRAIN PART FAILURE.

175.    Another incident involving a 2017 Chevrolet Silverado was reported on

February 26, 2018:

8 SPEED TRANSMISSION SHIFT VERY ROUGH FROM 1-2 AND 2-1
GEARS, FREQUENTLY HESITATES, MAKES CLUNKING SOUND.
HAVE TAKEN IT TO GM DEALER AND AM INFORMED THAT YES,
THAT'S THE WAY THE 8 SPEEDS ARE. THIS IS A $50K+ TRUCK. THIS
TRANSMISSION ISSUE CAUSES AND CAN CAUSE HESITATION
WHEN NEEDING TO ACCELERATE, THUS CREATING A SAFETY
HAZARD.

176.    Another incident involving a 2017 Chevrolet Silverado was reported on

February 13, 2018:

TRANSMISSION SHIFTS HARD AND VEHICLE SURGES AT LOW
SPEED WITH ACCOMPANING "CLUNK". PROBLEM OCCURS IN
BOTH UPSHIFT AND DOWN SHIFT. DEALER INFORMS ME THAT IS
A "LEARNING" CURVE FOR VEHICLE TO UNDERSTAND MY
DRIVING HABITS. HOWEVER I SEE ON SEVERAL AUTOMOTIVE
FORUMS THAT THIS HAS BEEN AN ISSUE FOR SOME TIME AND
HAS YET TO BE RESOLVED.

177.    Another incident involving a 2017 Chevrolet Silverado was reported on

February 1, 2018:

THE CONTACT OWNS A 2017 CHEVROLET SILVERADO 1500.
WHILE DRIVING 25 MPH, THE VEHICLE SHIFTED HARD FROM
FIRST TO SECOND GEAR. THE FAILURE OCCURRED EVERYDAY

SINCE THE VEHICLE WAS PURCHASED IN APRIL OF 2017. THE
VEHICLE WAS TAKEN TO O'REILLY CHEVROLET (6160 E
BROADWAY BLVD, TUCSON, AZ 85711) WHERE IT WAS
DIAGNOSED THAT THE TRANSMISSION CONTROL MODULE
FAILED. THE DEALER REPROGRAMMED THE TRANSMISSION,
WHICH FAILED TO REMEDY THE FAILURE. THE VEHICLE WAS
BROUGHT BACK TO THE DEALER AND THE VALVE BODY FOR
THE TRANSMISSION WAS REPLACED AND THE TRANSMISSION
FLUID WAS CHANGED. THE FAILURE RECURRED. THE
MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE FAILURE
MILEAGE WAS 16,000.

178.   Another incident involving a 2017 Chevrolet Silverado was reported on

January 6, 2018:

NOTICED AFTER PURCHASE THAT THERE IS VIBRATION LIKE A
BAD TIRE 35-42 MPH.

VIBRATION FELT IN SEAT, CONSOLE AND STEERING WHEEL 58-65
MPH. TRANSMISSION DOWN SHIFTS HARD SOMETIMES FEELS
LIKE BEING BUMPED FROM BEHIND, IT ALSO HESITATES AND
JERKS AFTER LETTING OFF THE ACCELERATOR AND
ACCELERATING AGAIN BETWEEN 25-45 MPH.

WHEN ACCELERATING IT SURGES, JERKS AND STUMBLES.
SOMETIMES WHEN ACCELERATING THE TRANSMISSION
DOWNSHIFTS AND HANGS IN THAT GEAR UNTIL YOU LET OFF
THE ACCELERATOR.

UNDER HEAVY ACCELERATION THERE IS VIBRATION IN THE
POWER TRAIN AND THE TRANSMISSION SEEM NOISY. AT 25 MPH
IT SHUTTERS LIKE THE TRANSMISSION IS IN TO HIGH OF A GEAR
UNDER LIGHT ACCELERATION.

RETURNED TO WALDORF CHEVROLET WHERE I PURCHASED IT
AND WAS TOLD THEY BALANCED 2 TIRES AND RESET THE ROAD
FORCE.SCANNED TRANSMISSION NO CODES TRANSMISSION OK

AFTER SHOP FOREMAN ROAD TESTED FOR 21 MILES NO OTHER
REPAIRS NEEDED.

PICKED IT UP DRIVING HOME NOTICED ALL THE PROBLEMS
WERE STILL THERE AND AFTER INSPECTION OF MY
TRANSMISSIONS NOTICED THAT THE TRANSMISSIONS WERE
BALANCED STILL HAD THE OLD WEIGHTS STILL ON THE
TRANSMISSIONS WITH NEW WEIGHTS ALSO.

MADE ANOTHER APPOINTMENT THIS TIME TO HAVE SHOP
FOREMAN (RICK) RIDE WITH ME TO SHOW HIM WHAT IT WAS
DOING WHICH WE DID AND LEFT MY TRUCK AGAIN.

AFTER 8 DAYS I AM TOLD IT WAS READY I WAS TOLD THEY DID
A PICO SCOPE TEST AND THE DRIVESHAFT WAS BEING
REPLACED THEN ONLY TESTED IT WAS OK. CHECKED RUN OUT
ON FLANGES ALL WITHIN SPECS. FOUND THE RIGHT REAR TIRE
BAD. THEY PUT STEEL WHEEL FROM ANOTHER TRUCK ON AND
ROAD TESTED WITH NO CHANGE. THEY DROVE ANOTHER TRUCK
AND IT RIDES THE SAME. EVEN HAS THE SHUTTERS ON HARD
ACCELERATION. SAID THEY CALLED GM TAC BACK AND THEY
DONT SEE A PROBLEM WITH THIS.

WRITTEN DOCUMENTS BE SENT VIA MAIL.

MADE ANOTHER APPOINTMENT

179.  Another incident involving a 2017 Chevrolet Silverado was reported on

October 27, 2017:

TRANSMISSION ON MY NEW 2016 Z71 LT 4X4 JUMPS INTO LOW
GEAR WHEN SLOWING DOWN. I TOOK IT TO THE DEALERSHIP
MULTIPLE TIMES, BUT KEEP GETTING TOLD IT SHIFTS FINE.
TOOK IT AGAIN AND HAD A MANAGER DRIVE THE TRUCK WITH
ME INSIDE AND AGREED THE TRANSMISSION WAS NOT GETTIN
INTO GEAR IN A NORMAL WAY. TOON IT BACK TO GET IT FIXED
AND WAS TOLD TRANSMISSION IS FINE. I NEED THIS FIXED OR I
WILL BE RETURNING HE TRUCK AS A LEMON TITLE.

78

180.   Another incident involving a 2017 Chevrolet Silverado was reported on

April 5, 2017:

> THE CONTACT OWNS A 2017 CHEVROLET SILVERADO 1500.
> WHILE DRIVING 45 MPH, THE TRANSMISSION FAILED TO SHIFT
> PROPERLY AND MADE A CLUNKING SOUND. THE FAILURE
> RECURRED MULTIPLE TIMES. THE VEHICLE WAS TAKEN TO A
> DEALER WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION
> FAILED AND NEEDED TO BE REPROGRAMMED. THE VEHICLE
> WAS REPAIRED, BUT THE FAILURE RECURRED. THE
> MANUFACTURER WAS MADE AWARE OF THE ISSUE. THE
> APPROXIMATE FAILURE MILEAGE WAS 30.

### 9.   *2017 Chevrolet Colorado*

181.   On the NHTSA website, there are at least 46 consumer complaints for

"2017 Chevrolet Colorado." As one example, on September 1, 2017, the following

incident was reported:

> AIR CONDITIONING IS INTERMITTENT/BLOWS WARM/EMITS FOG
> FROM VENTS. THE DEALER SAYS NO FIX AVAILABLE YET CITES
> PER DOC ID:5125499.SAYS ENGINEERING IS STUDYING PROBLEM.
> MINE STOPS WORKING-BLOWS WARM WITH IN 1/2 HOUR. ALSO
> IN STOP/GO TRAFFIC THE TRANSMISSION DOWNSHIFTS
> ABRUPTLY AND CAUSES TRUCK TO ACCELERATE FORWARD-
> HAVE TO APPLY BRAKES HARD TO AVOID COLLISION. DEALER
> SAYS CAN NOT REPEAT BUT SHIFTING IS CONSISTENTLY ABRUPT
> AND I HAVE ASKED ABOUT SOFTWARE UPDATES TO ALLIEVIATE
> THIS SAFTY CONCERN TO NO AVAIL

182.   Another incident involving a 2017 Chevrolet Colorado was reported on

September 13, 2017:

THE CONTACT OWNS A 2017 CHEVROLET COLORADO. WHILE DRIVING AT AN UNKNOWN SPEED, THE VEHICLE ACCELERATED AND JERKED. ADDITIONALLY, THE BRAKES WERE APPLIED, BUT FAILED TO RESPOND AND THE BRAKE PEDAL TRAVELED TO THE FLOORBOARD. IN ADDITION, THE CONTACT HEARD AN ABNORMAL SCRATCHING NOISE. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN SEVERAL TIMES TO GILROY CHEVROLET (6720 AUTOMALL CT, GILROY, CA 95020, 408-842-9301), BUT THEY WERE UNABLE TO DUPLICATE THE BRAKE FAILURE. THE DEALER DIAGNOSED THE ACCELERATION FAILURE AS THE FOUR WHEEL DRIVE BEING ENGAGED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED AND PROVIDED CASE NUMBER: 8-4000-730943. NO FURTHER ASSISTANCE WAS PROVIDED. THE FAILURE MILEAGE WAS APPROXIMATELY 17,759.

183.   Another incident involving a 2017 Chevrolet Colorado was reported on

November 1, 2017:

WHEN AUTOMATIC TRANSMISSION DOWNSHIFTS INTO 1ST GEAR COMING TO A STOP, IT LUNGES FORWARD. IF WHEN NOSING INTO A PARKING SPACE WITH ANY KIND OF POLE OR VEHICLE DIRECTLY IN FRONT OF MY TRUCK, NOT LEAVING ENOUGH SPACE MY TRUCK WOULD HIT WHATEVER. WHEN DRIVING SLOWLY WITH MY 8 SPEED AUTOMATIC TRANSMISSION SOMETIMES IT RATTLES AS IF I AM ON A RUMBLE STRIP AND SOMETIMES IT JUST CLUNKS OR THUDS. THIS AND OTHER SHIFT ISSUES MAKE ME EVEN MORE HYPER VIGILANT WHEN DRIVING. 6 MONTHS AFTER I PURCHASED MY BRAND NEW 2017 COLORADO, DURING A SPELL OF NEGATIVE DEGREE WEATHER I LOST THE FOLLOWING: MY CRUISE CONTROL, TRACTION CONTROL, FOUR-WHEEL DRIVE; MY ENGINE LIGHT CAME, OIL LIGHT ALL LIGHTS CAME ON AND MY RADIO STOPPED WORKING. I WAS TOLD BY MY CHEVY DEALER THAT THIS WAS NORMAL IN COLD WEATHER. NEXT, I WAS INFORMED IT MUST BE BECAUSE I WASHED MY VEHICLE THE DAY BEFORE. THIS

WENT ON FOR A FEW MONTHS, WITH ME SHOWING THEM VIDEOS
AND THEM TELLING ME THEY COULD NOT DUPLICATE THE
ISSUE. OCTOBER OF 2018 THEY REPLACED MY RADIO BECAUSE
EVIDENTLY THE RADIO HAD A BULLETIN THAT SHOWED ALL OF
THE THINGS I HAD COMPLAINED ABOUT. I WANT TO SAY THIS
HAPPENED IN EXCESS OF 10 OR MORE TIMES. DRIVING TO MY
MOTHERS ONE EVENING IN THE DARK MY DASH LIGHTS WERE
NOT DIMMING CORRECTLY AND THEN WENT OUT. AS I GOT TO A
FOUR WAY INTERSECTION WITH CARS COMING THEY CAME ON
SO BRIGHTLY I ALMOST GOT IN AN ACCIDENT WHICH PROMPTED
ME TO MAKE AN APPOINTMENT AND I WASN'T WILLING TO HEAR
SILLY EXCUSES.

184.   Another incident involving a 2017 Chevrolet Colorado was reported on

April 9, 2018:

8 SPEED AUTOMATIC TRANSMISSION - ROUGH SHIFTING,
USUALLY WHEN DRIVING BETWEEN 40 AND 60 MILES PER HOUR.
TRUCK INTERMITTENTLY FEELS LIKE IT IS RIDING OVER
RUMBLE STRIPS. TRANSMISSION SEEMS TO BE HUNTING.
POSSIBLE ISSUE WITH TORQUE CONVERTER.

185.   Another incident involving a 2017 Chevrolet Colorado was reported on

April 30, 2018:

8-SPEED AUTOMATIC TRANSMISSION IN INDECISIVE WHEN IT
COMES TO SHIFTING BETWEEN LOWER GEARS WHILE DRIVING.
TRANSMISSION MAKING CLUNKING "THUD" SOUND WHEN
SHIFTING OUT OF PARK AND INTO REVERSE. GEAR HUNTING
EXPERIENCED AT LOWER SPEEDS AND GEARS WHILE VEHICLE
ATTEMPTS SHIFTING.

186.   Another incident involving a 2017 Chevrolet Colorado was reported on

May 15, 2018:

81

I HAVE HAD REPEATED ISSUES WITH THE TRANSMISSION AND THE TRANSMISSION WILL NOT SHIFT OUT OF 5TH GEAR WHEN IN TOW MODE AND WHEN TOWING LOAD UNDER SPECIFICATIONS. I HAVE STARTED THE LEMON LAW PROCESS BUT THE MANUFACTURER HAS DENIED MY CLAIM AS OF TODAY.

187. Another incident involving a 2017 Chevrolet Colorado was reported on

May 15, 2018:

AT 21000 MILES FELT LIKE DRIVING OVER RUMBLE STRIPS AND TACH WOULD MOVE IN CRUISE. DEALER FLUSHED TRANS. 4 MONTHS LATER AT 29000 MILES SAME PROBLEM BUT NOW SHIFTING HARD NOTICED DURING ACCELERATION AND DECELERATION. CHANGED OUT CONVERTER AND FLUSH. NOW 3 MONTHS LATER AND ONLY 2500 MILES LATER IT HAS STARTED ALL OVER AGAIN. SO BACK TO THE DEALER I WILL GO. AM STARTING TO REGRET BUYING A CHEVY INSTEAD OF STAYING WITH MY TRUSTY FORD

188. Another incident involving a 2017 Chevrolet Colorado was reported on

June 21, 2018:

8 SPEED TRANSMISSION HAS HARD SHIFT WHEN AT LOW SPEEDS AND WHEN GOING INTO REVERSE

189. Another incident involving a 2017 Chevrolet Colorado was reported on

June 19, 2018:

WHEN DRIVING AT LOW SPEEDS MY 8 SPEED AUTO TRANSMISSION - CLUNKS OR THUDS - SPECIALLY FROM 1ST - 2ND - ITS SOUNDS LIKE A BANG - TOOK IT TO DEALER - SAID CHEVY KNOWS ABOUT IT - BUT THERE IS NO FIX YET.....GREAT!

190. Another incident involving a 2017 Chevrolet Colorado was reported on

June 30, 2018:

> WHEN AUTOMATIC TRANSMISSION DOWNSHIFTS INTO 1ST GEAR COMING TO A STOP, IT DOES SO HARSHLY AND LUNGES FORWARD. WHEN NOSING INTO A PARKING SPACE WITH A CONCRETE WALL AT THE FRONT OF THE PARKING SPACE, IF I HAD NOT ALLOWED ENOUGH SPACE FOR THE LUNGE, THE VEHICLE WOULD HAVE IMPACTED THE WALL. THIS CONDITION, ALONG WITH OTHER TRANSMISSION SHIFT IRREGULARITIES, HAPPENS PERIODICALLY AND I MUST REMAIN AWARE, ESPECIALLY COMING TO A STOP NEAR A CROSS WALK.

191.   Another incident involving a 2017 Chevrolet Colorado was reported on

July 7, 2018:

> EXPERIENCING ELECTRICAL PROBLEMS CAUSING STARTING ISSUES, WHILE DRIVING FAILURES IN DASH INDICATOR LIGHS, SPEEDOMETER, TACHOMETER, SHIFT CONTROL INDICATOR LIGHTS, AND TRANSMISSION CONTROL. LOSS OF POWER TO THE POINT TRUCK ALMOST COMES TO A STOP AND THEN SURGES, TWICE IT HAS ACCELERATED TRAVELING UP TO 50FT ESTIMATED.

192.   Another incident involving a 2017 Chevrolet Colorado was reported on

July 11, 2018:

> TRUCK BOGS DOWN, LOOSES POWER WHEN TAKING OFF FROM A STOP. FRONT TIRES FEEL LIKE THEY ARE SKIPPING EVEN THOUGH TRUCK IS IN 2 WHEEL DRIVE ESPECIALLY UP HILL. ONCE TRUCK GETS GOING IT RUMBLES AND VIBRATES SO MUCH IT BOTHERS YOUR EARS, CONSTANTLY LOOSING POWER AND SPEED AS YOUR DRIVING. WAS TOLD IT WAS THE TORQUE CONVERTER AND IT WAS REPLACED. TRUCK CONTINUED TO HAVE SAME ISSUE. TRUCK THEN "BLEW UP" (DEALERSHIP WORDS) WHILE I WAS DRIVING 75 MPH DOWN THE HIGHWAY. DEALERSHIP STATED "IT WAS LIKE YOUR TRUCK WENT INTO

LOW GEAR WHILE YOU WERE DRIVING AND IT SHOULD NEVER BE ABLE TO DO THAT". HAD FLUID FLUSH AND REPLACED AGAIN AND RUMBLING AND POWER LOSE STILL OCCURRING.

193.   Another incident involving a 2017 Chevrolet Colorado was reported on

August 19, 2018:

THE VEHICLE HAS A SHUDDER IN THE TRANSMISSION UNDER LIGHT THROTTLE ACCELERATION BETWEEN ABOUT 50 AND 80 MPH ON THE HIGHWAY. IT FEELS AS IF I'M DRIVING OVER RUMBLE STRIPS ON THE ROAD FOR ABOUT A SECOND. THEN IT WILL STOP FOR A SECOND OR TWO, AND THEN SHAKE AGAIN FOR A SECOND. WITHOUT THROTTLE, NO SHAKING OCCURS. THIS HAS BEEN OCCURRING FOR ABOUT TWO WEEKS, OR PERHAPS THE LAST 500 MILES. IT MIGHT BE DESCRIBED BY BULLETIN 18-NA-177.

194.   Another incident involving a 2017 Chevrolet Colorado was reported on

September 18, 2018:

SEPT 2018 HAVE NOTICED THAT TRUCK SEEMS TO VIBRATE, SHUDDER AT 50-60MPH. VIBRATION, SHUDDERING GOT WORSE, EVEN AT 25MPT. OCTOBER, I CONTACT SERVICE ADVISOR WHO BELIEVES MIGHT BE TORQUE CONVERTER NEED APPT TO VERIFY NOVEMBER FINALLY GOT APPT WITH SERVICE DEPT. THEY VERIFY IT IS TORQUE CONVERTOR AND ORDER PARTS. DECEMBER PARTS IN & TRUCK IN FOR 3 DAYS AS PARTS INSTALLED. TOLD THIS SHOULD SOLVE ISSUE, BUT CHEVROLET WORKING OF ANOTHER FIX FOR 1ST QUARTER OF 2019. TO DATE, I HAVE NOT NOTICED ANY ISSUES OF VIBRATION.

195.   Another incident involving a 2017 Chevrolet Colorado was reported on

October 25, 2018:

84

TRANSMISSION SHUDDER. FELLS LIKE DRIVING OVER RUMBLE
STRIPS. GM KNOWS OF THIS ISSUE BUT KEEPS PUTTING THESE 8
SPEED TRANSMISSIONS ON THE ROAD.

196.  Another incident involving a 2017 Chevrolet Colorado was reported on

November 1, 2018:

> TL THE CONTACT OWNS A 2017 CHEVROLET COLORADO. WHILE
> DRIVING AT HIGH SPEEDS, THE VEHICLE STARTED TO
> VIOLENTLY VIBRATE. THE FAILURE ALSO OCCURRED WHEN
> ACCELERATING FROM A STOP. THE VEHICLE WAS TAKEN TO
> DYER CHEVROLET FORT PIERCE (4200 US HIGHWAY 1, FORT
> PIERCE, FL 34982, (772) 242-3116) MULTIPLE TIMES FOR THE
> FAILURE WHERE THE TRANSMISSION WAS SERVICED AND
> FLUSHED; HOWEVER, THE FAILURE RECURRED. THE VEHICLE
> WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE
> OF THE FAILURE AND THE CONTACT RECEIVED A CASE NUMBER.
> THE FAILURE MILEAGE WAS 17,000.

197.  Another incident involving a 2017 Chevrolet Colorado was reported on

January 5, 2019:

> THE CONTACT OWNS A 2017 CHEVROLET COLORADO. WHILE
> DRIVING HIGHWAY SPEEDS, THE CONTACT NOTICED THAT THE
> TACHOMETER FLUCTUATED AND THE TRANSMISSION
> SHUDDERED. THE VEHICLE WAS TAKEN TO AN UNKNOWN
> DEALER WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION
> TORQUE CONVERTER FAILED. THE DEALER REPLACED THE
> TORQUE CONVERTER AND THE TRANSMISSION WAS FLUSHED.
> THE DEALER ALSO REPROGRAMMED THE TRANSMISSION
> COMPUTER. THE MANUFACTURER WAS CONTACTED AND
> PROVIDED CASE NUMBER: 94982753540. THE MANUFACTURER
> ISSUED TECHNICAL SERVICE BULLETIN NUMBER: 4942742
> PIE0405C (ENGINEERING INFORMATION TORQUE CONVERTER
> SHUDDER). THE APPROXIMATE FAILURE MILEAGE WAS 13,500.

85

198.   Another incident involving a 2017 Chevrolet Colorado was reported on

January 17, 2019:

> AT SPEEDS 45 MPH TRANSMISSION MAKES A LOAD THUMBING
> SOUND AND START SWITCHING BACK AND FORTH FOR GEAR. AT
> SPEEDS 60 UP TO 70 MPH A SHUDDERING STARTS MOSTLY UP
> GRADES AND DOWN GRADES. FROM REVIEW THERE IS A
> BULLETIN GM 16-NA-175. FROM WHAT I READ THIS DOESN'T FIX
> THE PROBLEM. THERE ARE NUMEROUS OF COMPLAINTS.

### 10.   *2018 Chevrolet Colorado*

199.   On the NHTSA website, there are at least 29 consumer complaints for

"2018 Chevrolet Colorado." As one example, on April 27, 2018, the following

incident was reported:

> IN MAY 2018 I PURCHASED A NEW CHEVY SILVERADO LT Z71 PU.
> I LIVE IN COLORADO AND WHEN I DRIVE THE TRUCK DOWN THE
> I-70 MOUNTAIN PASS THE TRANSMISSION IS DOWNSHIFTED
> BEYOND WHAT IO WOULD CALL A SAFE DOWN SHIFT. IM
> TRAVELING DOWN THE PASS, JUST COASTING, DOWN HILL
> ASSIST MODE IS OFF @ ROUGHLY 55 MPH THE TRANSMISSION
> DOWN SHIFT HARD. THE RPM GOES FROM ~1850 TO ~3800 RPM.
> THE ENGINE AND TRANSMISSION AND ENGINE BOTH MAKE A
> LOT OF NOISE WHEN THIS HAPPENS. I TRAVELED THE PASS
> ABOUT 8 TIME NOW AND THE TRUCK DOES THIS FUNNY SHIFT
> EVERYTIME AND I HAVE PICTURE SHOWING 4 EVENTS. I'VE
> TAKING THE DRIVE INTO THE DEALER AND SINCE THE
> COMPUTER DOESN'T LOG A ERROR CODE THE DEALER DOESN'T
> KNOW WHAT TO DO. THIS PAST WEEK THEY GAVE ANOTHER 2018
> P/U WITH THE SAME TRANNY AND ENGINE AND THAT TRUCK DID
> NOT DO THE SAME DOWNSHIFT. I BELIEVE THERE IS SOMETHING
> WRONG WITH MY TRUCK AND ALSO IF THIS EVENT HAPPENED
> IN THE WINTER ON A SNOWY ROAD THE TRUCK WOULD SPIN

OUT OF CONTROL AND CAUSE A ACCIDENT AND IS A HUGE
SAFETY CONCERN. I ALSO FILED A COMPLAINT WITH GM BUT
THEY ARE REALLY NOT HELP TO RESOLVE THIS PROBLEM. THE
DEALER LOOKED AT THE TRUCK AGAIN TODAY, NO CODES
RECORDED, THE RESET THE TRANSMISSION MEMORY TODAY TO
TRY AND SATISFY MY NEED TO DO SOMETHING. I NOW WAITING
TO HEAR BACK FROM THE DEALER ON THE NEXT STEPS. I WILL
ALSO CALL GM AGAIN TO GIVE THEM THIS INFORMATION. I AM
ATTACHING PICTURE THAT CLEARLY SHOW THIS PROBLEM. I
ALSO GIVEN THE DEALER THE SAME PICTURES.

200.   Another incident involving a 2018 Chevrolet Colorado was reported on

July 27, 2018:

CONSTANT VIBRATION/SHAKE COMING FROM THE VEHICLE AT
ANY SPEED ABOVE 65 MPH. THE TRUCK HAS BEEN LIKE THIS
SINCE THE DAY IT LEFT THE DEALERSHIP. WHEN ON HIGHWAY
AND VIBRATION IS FELT, PUTTING THE TRUCK IN NEUTRAL DOES
NOT CHANGE THE VIBRATION, SLOWING DOWN MAKES IT
SLIGHTLY WORSE, SPEEDING IT MAKES IT SLIGHTLY BETTER.
FEELS LIKE THERE IS SOMETHING SERIOUSLY WRONG WITH THE
GEOMETRY OF THE TRUCK MAKING IT UNSAFE TO DRIVE AT
HIGHWAY SPEEDS. ROAD FORCE BALANCE WAS ALREADY DONE
AND THE PROBLEM PERSISTS ON A BRAND NEW TRUCK.

201.   Another incident involving a 2018 Chevrolet Colorado was reported on

September 17, 2018:

CHEVY COLORADO A BAD VIBRATION IN DRIVETRAIN. TOOK
TRUCK TO DEALER WHO SAID IT WAS TORQUE CONVERTER
PROBLEM. IT HAS BEEN AT DEALER FOR 9 DAYS BECAUSE THEY
ARE DOING 9 VEHICLES A DAY FOR THIS PROBLEM. SUPPOSEDLY
THEY ARE GOING TO CHANGE TORQUE CONVERTOR, OTHERS
THEY JUST CHANGE THE OIL IN TORQUE CONVERTOR. THIS IS
DONE APPROXMATELY 9 TIMES A WEEK AT THIS ONE DEALER,

ROSS DOWNING IN HAMMOND, LA. THIS IS THE 8SP TRANS. THAT IS USED IN SEVERAL GM REAR DRIVE CARS AND TRUCKS. MY TRUCK ONLY HAS 6300 MILES ON IT. WHEN TRYING TO PASS VEHICLES ON INTERSTATE IT VIBRATES SO BAD OVER 70 MPH I AM AFRAID TO WRECK. OTHERS I HAVE TALKED TO AT DEALERSHIP CLAIM THERE VEHICLE VIBRATES AT LOWER SPEEDS, SURGES AND MAKING NOISE. THIS DEALERSHIP DOING 9 A WEEK, THAT PROBABLY IS SEVERAL THOUSAND A WEEK STATEWIDE. THIS IS A TERRIBLE PROBLEM THAT NEEDS FIXIN. MANY THANKS.

202.    Another incident involving a 2018 Chevrolet Colorado was reported on

October 1, 2018:

VEHICLE DEVELOPED A VIBRATION AT 80MPH WHICH FADES IN AND OUT. TIRES WERE ROAD FORCED BALANCED, AND ALIGNMENT WAS DONE. TRANSMISSION FLUID WAS CHANGED. THE SHACKING AT 80MPH CONTINUED. ON A 30 MILE COMMUTE AT 80MPH THE VIBRATION IS EXTREME 25% OF THE TIME (LIKE DRIVING OVER A RUMBLE STRIP), MODERATE ANOTHER 25% OF THE TIME, AND THE OTHER 50% THE VIBRATION IS NOT NOTICEABLE.

203.    Another incident involving a 2018 Chevrolet Colorado was reported on

October 3, 2018:

MY VEHICLE SHAKES AND SHUTTERS WHEN ACCELERATING. I HAVE BROUGHT IT TO CHEVROLET OF WESLEY CHAPEL FL 3 TIMES FOR THE SAME PROBLEM. THE PROCEEDED TO DO A "FLUSH" AND HAVE REPLACED THE TORQUE CONVERTER.

204.    Another incident involving a 2018 Chevrolet Colorado was reported on

October 3, 2018:

SEVERAL TIMES, WHILE DRIVING RIGHT AROUND 55 MPH, THE
TRANSMISSION DOWNSHIFTED FOR NO REASON ON THRUWAY
CONDITIONS. WHEN THIS HAPPENED, IT WAS ALMOST LIKE
SLAMMING ON THE BRAKES QUICKLY. ON ALL OCCASIONS, MY
BODY LURCHED FORWARD. IF SOMEONE WAS BEHIND ME, I
PROBABLY WOULD HAVE BEEN REAR ENDED. ON ANOTHER
OCCASION, WITH MY SON IN THE TRUCK, WE STOPPED AT A RED
LIGHT AND THE TRANSMISSION CLUNKED SO VIOLENTLY, THAT
WE BOTH THOUGHT WE WERE REAR ENDED AT FIRST. I
DESCRIBED THE ISSUE TO MY GM SERVICE SHOP WHO SAID THAT
THEY COULDN'T FIND AN ISSUE AND THAT THE CODES WERE
ALL NORMAL. I WAS ADVISED THAT THE CLUNK AT THE RED
LIGHT WAS COMMON, AS THE TRANSMISSION HAS TO RELIEVE
PRESSURE. NO WAY IS THIS NORMAL! I GOT ON LINE TO REVIEW
FORUMS AND IT APPEARS THIS IS A VERY PREVALENT ISSUE.
YESTERDAY, I LOST MY TRANSMISSION COMPLETELY ON A
THRUWAY. I HEARD A LOUD CLUNK AND THE RPMS SPIKED. I
LEFT THE HIGHWAY ASAP BUT COULD NOT GO OVER 30 MPH OR
THE RPMS WOULD JUST SPIKE WITHOUT MOTION RESPONSE.
EXITING THE THRUWAY AT THIS SPEED WAS VERY DANGEROUS!
EVEN WITH HAZARDS ON, DRIVERS SELDOM SLOW DOWN OR
MOVE OVER, ESPECIALLY 18 WHEELERS. THESE TRANSMISSIONS
ARE CLEARLY A SAFETY HAZARD.

205.   Another incident involving a 2018 Chevrolet Colorado was reported on

November 2, 2018:

THE EIGHT SPEED AUTOMATIC TRANSMISSION STUTTERS AND
ACTS LIKE IT DOESN'T KNOW WHAT GEAR TO GO INTO UNDER
LIGHT TO NORMAL ACCELERATION. THIS OCCURS WHILE COLD
AND DURING THE WARMING PERIOD, (NORMALLY UP TO
AROUND 180 DEGREES), BUT TENDS TO RESOLVE AFTER THE
ENGINE IS COMPLETELY WARMED UP. THIS TRANSMISSION
PROBLEM IS CONTINUOUS AND HAPPENS EVERY TIME AFTER
THE VEHICLE SITS ALL NIGHT OR IF IT HAS SIMPLY SIT FOR A
FEW HOURS. IT IS VERY APPARENT, OTHER PASSENGERS ASK

WHAT IS WRONG WITH THE VEHICLE WHEN THEY RIDE IN IT. I
BOUGHT THE VEHICLE NEW, BUT WHEN I TOOK THE TEST DRIVE
IT WAS ALREADY WARMED UP. THEREFORE I WAS UNAWARE OF
THE ISSUES PRESENT. I WENT BACK TO THE SALESMAN TO
DESCRIBE THE PROBLEM AND WAS INFORMED THIS HAPPENS
WITH ALL THE 2018 EIGHT SPEED SILVERADO'S HE HAS DRIVEN
ON THEIR LOT. I LOOKED ON THE INTERNET AND FOUND THESE
TRANSMISSIONS HAVE A LEARN CYCLE, SO I DECIDED TO GIVE
IT SOME TIME TO SEE IF WAS A LEARNING CURVE WITH THE
COMPUTER. IT NEVER CLEARED UP. I LATER BROUGHT THE
VEHICLE INTO THE DEALERSHIP FOR THE INITIAL SERVICE AND
DESCRIBED WHAT HAD BEEN HAPPENING WITH IT TO THE
SERVICE DEPARTMENT. I LEFT THE VEHICLE OVERNIGHT SO THE
TECHNICIAN COULD DRIVE FIRST THING IN THE MORNING AND
PERFORM AN SERVICES. THE NEXT DAY I WAS CALLED AND
TOLD MY VEHICLE WAS READY. UPON ARRIVAL I WAS
INFORMED THE TECHNICIAN WAS ABLE TO DUPLICATE THE
PROBLEMS I DESCRIBED, BUT IT WAS NORMAL FOR THE EIGHT
SPEED TRANSMISSION. HOWEVER, IT BECOMES WORSE TO
BRING IT BACK IN FOR FURTHER DIAGNOSIS. I CALLED GM, THEY
ALSO LOOKED INTO THE CASE FOR ABOUT A WEEK, THEN
CALLED BACK AND STATED THAT IS NORMAL FOR THE
TRANSMISSION. I BOUGHT THE VEHICLE NEW WITH ABOUT 2,500
MILES ON IT, (DEMO), AND HAVE HAD IT ONLY A FEW MONTHS.
IT CURRENTLY HAS LESS THAN 10,000 MILES ON IT.

206.   Another incident involving a 2018 Chevrolet Colorado was reported on

November 16, 2018:

I HAVE A 2018 CHEVROLET COLORADO LT 4WD CREW CAB.
MULTIPLE TIMES ON A COLD START THE ENGINE IS MISFIRING.
THE CHECK ENGINE LIKE COMES ON, THE VSA, AND T/C LIGHTS
ALL COME ON AND A NOTIFICATION ON THE DASH SAYING
STABILITRAK IS DISABLED. THE VEHICLE SHAKES TERRIBLY.
THE CHECK ENGINE LIGHT WILL FLASH AND THEN GO SOLID. I
AM AN AUTOMOTIVE TECHNICIAN. I KNOW THAT A MISFIRE

SHOULD SET A HARD DTC. WHEN THE VEHICLE IS TURNED OFF AND STARTED SEVERAL HOURS LATER THERE IS NO CHECK ENGINE LIGHT OR ANY OTHER LIGHT ON. THE DEALERSHIP IN MARYSVILLE, OH HAD MY TRUCK FOR 3 DAYS AND TOLD ME THEY CLEANED A BUNCH OF TERMINALS AT SEVERAL CONNECTORS. WHATEVER THAT IS SUPPOSED TO DO. THEY SAID THEY STARTED THE VEHICLE SEVERAL TIMES AFTER AND EVERYTHING WAS GOOD. THE NEXT DAY AFTER I PICKED THE TRUCK UP, IT DID THE SAME EXACT THING! EXTREMELY FRUSTRATING! I KNOW A CONTINUOUS MISFIRE LET'S UNBURNED FUEL INTO THE CATALYTIC CONVERTER WHICH LEADS TO PREMATURE BREAKDOWN OF THE CATALYST. SO MY QUESTION IS WHAT IS BEING DONE ABOUT THESE ISSUES? ANOTHER ISSUE IS WITH THE TRANSMISSION. ON A COLD START THERE IS A CLUNK NOISE. THEN WHEN YOU ARE DRIVING AT CRUISING SPEED AND YOU LET OFF THE THROTTLE AND DEPRESS THROTTLE AGAIN THERE IS A SHUDDER. ALSO, WHEN YOU COME TO A COMPLETE STOP THE VEHICLE TRIES TO JOLT FORWARD. THIS IS EXTREMELY CONCERNING ESPECIALLY ON A VEHICLE WITH ROUGHLY 18,000 MILES ON IT. THIS NEEDS TO BE ADDRESSED PROMPTLY!!

207.    Another incident involving a 2018 Chevrolet Colorado was reported on

January 28, 2019:

NOTICED A "SHUDDERING" IN THE TRANSMISSION DURING LIGHT ACCELERATION BETWEEN 40-60MPH AROUND 1500RPM. WHOLE TRUCK VIBRATES LIKE YOU ARE DRIVING OVER RUMBLE STRIPS. ONLY 4150 MILES ON THE TRUCK!

### 11.    *2015 GMC Sierra*

208.    On the NHTSA website, there are at least 385 consumer complaints for

"2015 GMC Sierra." As one example, on January 28, 2015, the following incident

was reported:

I HAD MADE A COMPLAINT TO CHAPDELAINE BUICK- GMC THAT MY BRAND NEW TRUCK DID NOT SEEM TO GO INTO FOUR WHEEL DRIVE. I WAS TOLD TO BRING THE TRUCK TO THE DEALERSHIP AND THEY WOULD CHECK IT FOR ME. I WAS TOLD BY THE SERVICE DEPARTMENT THAT THE TRUCK WORKED JUST FINE IN FOUR WHEEL DRIVE. I THEN NOTICED THAT THE TRUCK SEEM TO SHIFT VERY ROUGH AND I CALLED THE SERVICE DEPARTMENT AND TOLD THEM THAT SOMETHING HAD TO BE WRONG. THE SERVICE DEPARTMENT ASKED ME TO BRING THE TRUCK BACK DOWN TO THEM THE NEXT DAY AND THEY WOULD TAKE IT FOR A TEST DRIVE. WHILE I WAS DRIVING THE TRUCK TO THE DEALERSHIP IT SHIFTED FROM DRIVE INTO NEUTRAL.I COASTED TO A STOP PUT THE VEHICLE INTO PARK SHUT OFF AND RESTARTED THE ENGINE AND THEN SHIFTED BACK INTO DRIVE AND TRIED TO DRIVE AGAIN. THIS TIME THE VEHICLE SERVICE ENGINE LIGHT CAME ON AND THE VEHICLE STAYED IN LOW GEAR AND WOULD NOT SHIFT INTO A HIGHER GEAR. THE BEST SPEED I COULD MAKE WAS 10 MPH. I STOPPED THE VEHICLE AND RESTARTED TWO MORE TIMES. ON THE SECOND TRY THE VEHICLE DID GO INTO DRIVE. I MADE IT TO THE DEALERSHIP AND THEY TOOK IT FOR A TEST DRIVE AND UPON THEIR RETURN GAVE ME A LOANER VEHICLE. THEY HAD TO REBUILD THE TRANSMISSION ON MY BRAND NEW TRUCK WHICH TOOK ABOUT THREE DAYS. THANKFULLY THIS EVENT TOOK PLACE ON A BACK ROAD WITH LITTLE TRAFFIC. IF IT HAD HAPPENED ON A BUSY ROAD AN ACCIDENT MIGHT HAVE OCCURRED. *TR

209.   Another incident involving a 2015 GMC Sierra was reported on August

7, 2015:

THE CONTACT OWNS A 2015 GMC SIERRA. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS, THE TRANSMISSION VIBRATED CAUSING A HESITATION WHEN THE GEARS SHIFTED. THE CONTACT MENTIONED THAT THE FAILURE WAS MOST SEVERE WHILE DRIVING AT SPEEDS BETWEEN 40-50 MPH. THE VEHICLE WAS TAKEN TO A DEALER WHO CHANGED THE GEAR

RATIO AND ADJUSTED THE REAR END. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 250.

210.   Another incident involving a 2015 GMC Sierra was reported on

September 21, 2015:

VEHICLE RANDOMLY AND REPEATEDLY SHIFTS INTO NEUTRAL FROM DRIVE, WITOUT ANY INPUT FROM DRIVER, DURING NORMAL DRIVING CONDITIONS. VEHICLE RANDOMLY AND REPEATEDLY LOSES ACCELERATOR PEDAL CONTROL AND FUNCTIONALITY DURING NORMAL DRIVING CONDITIONS.

211.   Another incident involving a 2015 GMC Sierra was reported on

November 3, 2015:

THE TRANSMISSION SEEMS TO SLIP OR HESITATE AT TAKEOFF. THE RUNNING LIGHTS ARE TOO DIM TO SEE DOWN THE ROAD.

212.   Another incident involving a 2015 GMC Sierra was reported on July

22, 2016:

2015 GMC SIERRA HAS A DELAY THROTTLE RESPONSE. DOES IT AT ALL SPEEDS AND FROM TAKE OFF. TOOK TO DEALER AND SERVICE ADVISOR PULLED TRUCK IN SHOP. GOT OUT AND SAID IT DOES HAVE A DELAY. THE RAN VIN NUMBER THROUGH GMC DATA BASE AND TOLD ME. MANUFACTURE SAID IT WAS A NORMAL THING. IT'S NOT NORMAL AND NEVER HAD A VEHICLE WITH A THROTTLE DELAY.

213.   Another incident involving a 2015 GMC Sierra was reported on July

25, 2016:

DELAYED ENGAGEMENT IN DRIVE, TRANSMISSION CLUNKS, RPM FLARES AND TRUCK QUITS MOVING UNEXPECTEDLY. SHUDDER AT 3- 50 MPH, VIBRATES STEERING WHEEL AND LEAVES AN UNEASY FEELING THE TRUCK IS GOING TO QUIT MOVING.

214.  Another incident involving a 2015 GMC Sierra was reported on September 10, 2016:

… ALSO MY TRANSMISSION CLUNKS AND KNOCKS AND SHIFTS INCORRECTLY DEALER STATES ITS NORMAL I SPEND 40K ON A NEW TRUCK AND ALL I HAVE ARE PROBLEMS AND GM DOES NOTHING. IT DOWNSHIFTS HORRIBLE WHAT CAN I DO???

215.  Another incident involving a 2015 GMC Sierra was reported on December 2, 2016:

TL* THE CONTACT OWNS A 2015 GMC SIERRA 1500. WHILE DRIVING VARIOUS SPEEDS, THE TRANSMISSION VIBRATED AND CAUSED A HESITATION WHEN THE GEARS SHIFTED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER AND REPAIRED; HOWEVER, THE FAILURE RECURRED SEVERAL TIMES. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 50.

216.  Another incident involving a 2015 GMC Sierra was reported on December 8, 2016:

EXTREME LAG/DELAY- HARSH ENGAGEMENT WHEN SHIFTING FROM PARK TO REVERSE. ITS LIKE YOU ARE BACKING INTO SOMETHING? WHEN CRUISING 28-32 MPH AND RELEASING ACCELERATOR(AS IF YOU WERE COASTING INTO A TURN) WHEN SLOWING THE VEHICLE SEEMS TO SHIFT UP AND LUNGE ENTERING THE TURN.

CLUNKS AND SHIFTS HARD WHEN CRUISING NORMALLY WHEN YOU HAVE TO RELEASE THE GAS PEDAL AND SLIGHTLY REACCELERATE, CAUSING THE DRIVER TO HESITATE.

VEHICLE SHUTTERS AND HARD ACCEL 10X WORSE WHEN TOWING A 7000 # TRAILER (TRUCK IS RATED OVER 12,000 LBS. TOWING).

### 12.    *2016 GMC Sierra*

217.    On the NHTSA website, there are at least 108 consumer complaints for

"2016 GMC Sierra." As one example, the following incident was reported on March

21, 2016:

WHILE DRIVING MY TRUCK, IT HAS HAD 3 ALERTS ON DASH FOR "SERVICE STABILITRAK, POWER STEERING USE CAUTION AND TRAILER BRAKE." VEHICLE GAUGES ALL DROP TO ZERO WHILE OPERATING VEHICLE AND GO ON AND OFF. THE VEHICLE WHEN THIS OCCURS ALSO DISENGAGES FROM GEAR, VEHICLE IS AN AUTOMATIC. THEN ENGINE REVS UP WHEN IT SLIPS OUT OF GEAR AND GENERALLY GOES BACK IN GEAR AS GAUGES COME BACK ON. THE POWER STEERING SEEMS TO ALSO LOSE SOME POWER. WHEN THIS OCCURS, IF YOU DEPRESS THE GAS PEDAL, YOU DO NOT GET ANY MORE POWER. THIS IS TECHNICALLY THE 6TH OCCURRENCE. IT HAS BEEN BACK TO DEALER (GRIFFIN GMC OF MONROE, NC) AND COMPUTER CODES WERE CLEARED AND NOTHING REPORTED IE...TECHNICALLY FOUND THAT WOULD CAUSE THIS ISSUE PER THE DEALERSHIP AS UNABLE TO RE-PRODUCE THE CAUSE. I RETURNED THE TRUCK TODAY AFTER THIS 6TH OCCURRENCE DUE TO MY FEAR OF DRIVING THE VEHICLE WITH MY CHILDREN AND GETTING INVOLVED IN AN ACCIDENT. I HAVE VIDEO OF THIS LAST OCCURRENCE OF DASHBOARD GAUGES AND SHARED THEM WITH THE DEALERSHIP. FIRST OCCURRENCE PICTURES ARE FEB 29, 2016 AND SUNDAY, MARCH 20, 2016. VEHICLE HAS APPROXIMATELY 2000 MILES ON ODOMETER. ENTIRE TIME, VEHICLE HAS BEEN

RUNNING ON LOCAL ROAD, EITHER AT STOP OR DRIVING BELOW 45MPH MOVING STRAIGHT AHEAD. I COULD NOT REPLICATE OR CAUSE THE ISSUE TO HAPPEN AGAIN ON PURPOSE, VERY RANDOM.

218.   Another incident involving a 2016 GMC Sierra was reported on

September 8, 2016:

TL* THE CONTACT OWNS A 2016 GMC SIERRA 1500. WHEN THE SHIFTER WAS ENGAGED, THE VEHICLE DID NOT REGISTER THE CORRECT GEAR AND FAILED TO MOVE. WHEN THE VEHICLE DID RECOGNIZE THE CORRECT GEAR, IT ACCELERATED UNINTENTIONALLY. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION WAS DEFECTIVE AND PARTS IN THE TRANSMISSION NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED; HOWEVER, THE FAILURE RECURRED. THE VEHICLE WAS RETURNED TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 150. UPDATED 10/18/16*LJ

219.   Another incident involving a 2016 GMC Sierra was reported on May

3, 2017:

GM 8 SPEED TRANSMISSION IS FULL OF PROBLEM. IT CONSTANTLY HESITATES, HANG GEARS, BUCKS, AND POSES VARIOUS SAFETY CONCERNS. FOR INSTANCE IF MERGING ONTO THE HIGHWAY THE TRANSMISSION WILL HESITATE AND THE TRUCK WILL BE UNRESPONSIVE TO GAS PEDAL INPUT FOR A PERIOD OF TIME SOMETIMES UP TO 12 SECS. THIS HESITATION CAUSES A SAFETY CONCERN WHEN ATTEMPTING TO MERGE INTO TRAFFIC. GM ACKNOWLEDGES THESE CONCERNS BUT STATES THAT IT IS OPERATING AS DESIGNED BUT ARE WORKING

ON SOFTWARE UPDATES TO IMPROVE TRANSMISSION PERFORMANCE. THIS HAS BEEN A CONSTANT ISSUE SINCE I PURCHASED THE TRUCK.

220.   Another incident involving a 2016 GMC Sierra was reported on May 4, 2017:

8 SPEED TRANSMISSION BUCKS, HESITATES, LURCHES FORWARD, CLUNKS, WHILE IN DRIVE. THE CONTINENTAL TIRES ARE CUPPING, WHICH GM SAYS IS CHARACTERISTIC OF THE BRAND. THE TRUCK VIBRATES WHILE AT 25MPH, AROUND 50MPHM AND 65-75MPH. WHILE IN AWD/4WD AT 30 AND 50MPH, THE DRIVELINE MAKES A WHINING NOISE AND VIBRATES SOMETIMES.

221.   Another incident involving a 2016 GMC Sierra was reported on September 15, 2017:

THIS ISSUE STARTED A FEW MONTHS AFTER I PURCHASED THE TRUCK TOOK IT TO TWO DEALERS THEY SAY ITS NORMAL. CALLED GMC & THEY HAVE NO RECALL. WHEN DRIVING THE TRUCK & HAVE TO SLOW DOWN IN TRAFFIC THE AUTOMATIC TRANSMISSION DOWN SHIFTS & HAS A VERY NOTICABLE JERK. WILL ACTUALLY JERK THE HOLE TRUCK. PEOPLE WHO HAVE RODE WITH ME TELL ME I HAVE A TRANSMISSION PROBLEM. WHAT CAN I DO

222.   Another incident involving a 2016 GMC Sierra was reported on March 20, 2018:

PLEASE MAKE GM RESOLVE THE ISSUES WITH THE 8 SPEED TRANSMISSIONS IN THE TRUCKS. 2016 SL T Z71. I PURCHASED THE TRUCK NEW. IT'S NEVER SHIFTED PROPERLY. HESITATIONS, CLUNKING, JERKING, SHUTTER, HARD DOWN SHIFTS .... EVERYTIME I TAKE IT IN, THEY SAY IT'S DUE FOR AN UPDATE.

97

THE TRUCK HAS HAD 4 UPDATES AND NONE OF THEM HAVE FIXED A THING. I HAD IT IN BEFORE THE 36,000 MILE BUMPER TO BUMPER WARRANTY WAS UP AND WAS TOLD IT WAS UP TO DATE. THEN LAST WEEK, I TOOK IT IN AND WAS TOLD IT WAS "SEVERAL UPDATES BEHIND." (54,XXX) MILES. TO TOP IT OFF, GENERAL MOTORS WOULDN'T PAY FOR THE $400 UPDATE, WHICH DIDN'T FIX ANYTHING AT ALL!!! THE TRUCK JERKED BEFORE WE GOT A BLOCK FROM THE DEALERSHIP. GM SAYS THAT EVEN THOUGH THE TRUCK IS STILL UNDER A FACTORY 60,000 MILE POWERTRAIN WARRANTY, TRANSMISSION UPDATES ARENT COVERED. THE 120,000 EXTENDED WARRANTY WOULDN'T COVER IT BECAUSE THEY SAY IT SHOULD BE COVERED UNDER THE FACTORY POWERTRAIN WARRANTY! I ABSOLUTELY LOVE THE TRUCK OTHER THAN THE JUNK TRANSMISSION IN IT. I DON'T THINK IT'S SAFE OR MUCH FUN HAVING A VEHICLE THAT STARTS TO GO THEN FALLS FLAT ON ITS FACE FOR A FEW SECONDS BEFORE SLAMMING INTO THE NEXT GEAR. THIS IS A MAJOR PROBLEM WITH A HUGE NUMBER OF TRUCKS. DON'T BELIEVE ME? GOOGLE "2016 SIERRA TRANSMISSION ISSUE" OR ANYTHING OF THE SORT. YOU'LL SEE. l'M REALLY NOT ASKING FOR MUCH. I DIDN'T WANT TO PUT MY FAMILY IN A POTENTIALLY UNSAFE VEHICLE ..... YET HERE WE ARE. LIKE I SAID, l'M NOT ASKING FOR MUCH. ALL I WANT IS FOR MY TRUCK TO SHIFT NORMAL. TO GO WHEN IT NEEDS OR HAS TO. MY TRUCK HAS HAD 4 UPDATES AND WAS SEVERAL UPDATES BEHIND LAST TIME, THAT'S ROUGHLY AN UPDATE EVERY 10,000 MILES AND NOW THEY'RE NOT COVERED? ON TWO SEPARATE OCCASIONS, IT'S SHIFTED SO HARD THAT IT JARRED MY NECK AND MADE IT SORE FOR A FEW DAYS IVE EVEN PULLED OVER ON THE SIDE OF THE ROAD THINKING WE WERE REAR-ENDED. SO HAS MY WIFE. NOT SAFE-NOT NECESSARY!

223.   Another incident involving a 2016 GMC Sierra was reported on July 30, 2018:

TRUCK SHIFTS REALLY HARD AND IS UNPREDICTABLE. I
ALMOST DROVE THROUGH MY GARAGE DOOR THE OTHER DAY
SHIFTING TO DRIVE FROM REVERSE. TRUCK WILL LUNGE
FORWARD OR DELAY IN SHIFTING. THERE HAVE BEEN A FEW
TIMES IVE HAD TO SLAM ON THE BRAKES BEFORE I BACKED
INTO SOMETHING. I HAVE BROUGHT IT IN 3-4 TIMES FOR THE
ISSUE AND GMC WONT REMEDY THE PROBLEM.

224.   Another incident involving a 2016 GMC Sierra was reported on August

8, 2018:

8 SPEED TRANSMISSION BUCKS, HESITATES, LURCHES
FORWARD, CLUNKS, WHILE STARTUNG ACCELERATION OR
COMING TO A STOP. I TRY TO KEEP A BIG GAP BETWEEN MY
TRUCK AND CARS IN FRONT OF ME AT STOP SIGNS BECAUSE IT
RANDOMLY LURCHES FORWARD AND I ALMOST HAVE BUMPED
CARS IN FRONT OF ME. I HAVE HAD THE TRUCK INTO THE
DEALER SO MANU TIMES TO FIX THE VIBRATION ISSUES AS
WELL, THEY SAID 3 TIRES THAT CAME IN THE BRAND NEW
TRUCK WERE DEFECTIVE SO I HAD TO REPLACE THEM ALL AND
THE SHAKE IS STILL THERE, THE BALANCED, REBALANCED,
ROAD FORCE BALANCE AND NOTHING WORKS. LAST TIME AT
THE DEALER SAID IT IS PROBABLY THE TIRES, HE SAID DON'T
ROTATE THEM AGAIN AND WHEN THEY WEAR OUT HE WILL PUT
ME IN A BETTER TIRE. I AM PAST MY WARRANTY SO THE DEALER
SAYS ANY COSTS ARE MY RESPONSIBILITT, IF THE NHTSA
COULD PLEASE STEP IN TO ASSIST US TO MAKE GM FIC THEAE
VEHICLES WHICH ARE A SAFETY HAZARD.

225.   Another incident involving a 2016 GMC Sierra was reported on

September 21, 2018:

TRANSMISSION - WHEN DRIVING THE VEHICLE IT DOES A HARD
SHIFT WHEN ACCELERATING AND DECELERATING. I HAVE
TAKEN THE VEHICLE INTO THE DEALER TWICE. THEY ARE

SAYING THAT IS A "STATE OF THE ART" COMPUTER THAT NEEDS
TO BE RESET!!! I AM TAKING IT BACK IN FOR A 3RD TIME. THE
CARE IS 2 YEARS OLD WITH 31 K MILES.

226. Another incident involving a 2016 GMC Sierra was reported on

October 27, 2018:

TRANSMISSION SHIFTS ABRUPTLY AND TORQUE CONVERTER
CAUSES SHUDDER AT HIGHWAY SPEEDS. TRUCK HAS BEEN
SERVICED TWICE FOR THE SAME ISSUE BY DEALER AND DEALER
RECENTLY TOLD ME PROBLEM IS UNRESOLVABLE.

227. Another incident involving a 2016 GMC Sierra was reported on

November 6, 2018:

THE CONTACT OWNS A 2016 GMC SIERRA 1500. WHILE DRIVING
65 MPH IN STOP AND GO TRAFFIC, THE CONTACT DETECTED A
SHUTTER AND HEARD AN ABNORMAL NOISE WHEN SHIFTING
GEARS. THE VEHICLE WAS TAKEN TO MARTY'S BUICK GMC …
WHERE THE TRANSMISSION WAS REPROGRAMMED AND
FLUSHED. THE VEHICLE WAS THEN TAKEN TO BEST CHEVROLET
. . . WHERE THE CONTACT WAS INFORMED THAT THE CAUSE OF
THE FAILURE COULD NOT BE DETERMINED. THE VEHICLE WAS
NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF
THE FAILURE. THE FAILURE MILEAGE WAS 96,794.

### 13.   2017 GMC Sierra

228. On the NHTSA website, there are at least 58 consumer complaints for

"2017 GMC Sierra." As one example, on April 15, 2017, the following incident was

reported:

HEAVY VIBRATION BETWEEN 1200 RPM AND 1500 RPM
ANYWHERE BELOW 45 MPH AND ABOVE 70 MPH

100

229.   Another incident involving a 2017 GMC Sierra was reported on July

20, 2017:

THE CONTACT OWNS A 2017 GMC SIERRA 1500. WHILE DRIVING
30 MPH, THE TRANSMISSION FAILED AFTER A COMPLETE STOP.
WHEN THE ACCELERATOR PEDAL WAS DEPRESSED, THE RPMS
INCREASED. WHEN SHIFTING FROM SECOND TO FIRST GEAR, THE
TRANSMISSION SHIFTED INTO FIRST GEAR WITH EXTREME
FORCE AND CAUSED THE VEHICLE TO ABRUPTLY ACCELERATE.
THE CONTACT HAD TO ENGAGE THE BRAKE PEDAL WITH FORCE
TO AVOID A CRASH. THE FAILURE WAS EXPERIENCED
NUMEROUS TIMES. THE VEHICLE WAS TAKEN TO WALSH CHEVY
BUICK GMC (2330 NORTH BLOOMINGTON STREET, STREATOR, IL,
61364 815-673-4333) WHERE THE TRANSMISSION SYSTEM WAS
REPROGRAMMED TWICE AND THE ELECTRONIC CONTROL
MODULE WAS REPLACED. HOWEVER, THE FAILURE WAS NOT
CORRECTED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE
MILEAGE WAS 112. UPDATED 08/30/17*LJ

230.   Another incident involving a 2017 GMC Sierra was reported on July

27, 2017:

THE CONTACT OWNS A 2017 GMC SIERRA. WHILE DRIVING
APPROXIMATELY 5 MPH, THE VEHICLE FAILED TO SHIFT OUT OF
GEAR AND THERE WAS A DELAY OF THREE TO FOUR SECONDS
BEFORE SHIFTING INTO SECOND GEAR. THE FAILURE RECURRED
EVERY MORNING. THE VEHICLE WAS TAKEN TO THE DEALER
(JIM CAUSLEY, LOCATED AT 38111 GRATIOT AVE, CLINTON
TOWNSHIP, MI 48036) WHERE IT WAS CONFIRMED THAT GM WAS
AWARE OF THE ISSUE. THE VEHICLE WAS NOT DIAGNOSED OR
REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE
FAILURE AND INFORMED THE CONTACT THAT THERE WAS NO
RECALL ON HIS VIN. NO FURTHER ASSISTANCE WAS OFFERED.
THE APPROXIMATE FAILURE MILEAGE WAS 4,500. UPDATED
11/13/17 *BF

231. Another incident involving a 2017 GMC Sierra was reported on

October 17, 2017:

> UNINTENDED ACCELERATION – WHEN SLOWING DOWN TO COME TO A STOP THE VEHICLE WILL OCCASIONALLY ENGAGE A LOWER GEAR VERY SUDDENLY AND LURCH FORWARD. THE RESULTING FORCE IS ENOUGH TO OVERPOWER THE BRAKING EFFORT BEING PROVIDED BY THE DRIVER AND THE VEHICLE WILL MOVE FORWARD SEVERAL FEET BEFORE THE DRIVER CAN REACT AND APPLY MORE BRAKING FORCE TO STOP THE VEHICLE. THE ISSUE OCCURS RANDOMLY AND INFREQUENTLY AT VERY SLOW SPEEDS (5-10MPH). THERE HAVE BEEN SEVERAL OCCASIONS WHERE I'VE BEEN BRAKING TO STOP AT A STOP LIGHT AND BEEN FORCED INTO THE MIDDLE OF AN INTERSECTION. I'M CONCERNED THE ISSUE COULD CAUSE THE VEHICLE TO STRIKE THE CAR IN FRONT OF IT OR A PEDESTRIAN CROSSING IN FRONT OF THE VEHICLE AS IT STOPS FOR A CROSSWALK. MULTIPLE UNSUCCESSFUL REPAIR ATTEMPTS HAVE BEEN MADE BY THE DEALER. I ATTEMPTED TO FORCE THE MANUFACTURER TO BUY THE VEHICLE BACK FROM ME THROUGH THE MASSACHUSETTS LEMON LAW AND SINCE THAT TIME THEY HAVE DENIED THE EXISTENCE OF A PROBLEM. I HAVE SEEN SEVERAL INSTANCES ONLINE WHERE CONSUMERS WITH THE IDENTICAL VEHICLE (ALL WITH THE 8 SPEED TRANSMISSION) COMPLAINED OF THE SAME PROBLEM.

232. Another incident involving a 2017 GMC Sierra was reported on

October 25, 2017:

> VIBRATION 65+ MPH, FELT IN STEERING WHEEL AND SEAT.
> STEERING TRANSMISSIONS QUIVERS AT 65+ MPH.
> TRUCK FEELS VERY UNSTABLE AT HIGHWAY SPEEDS.
> DEALER STATES IT'S NORMAL.

233.   Another incident involving a 2017 GMC Sierra was reported on

February 23, 2018:

> TRANSMISSION HARSH 1-2 SHIFT WHEN IT IS UNDER LIGHT
> THROTTLE AND SOMETIME DOES NOT SHIFT OR MAKE NOSE.
> GMC DEALER ARE AWARE ABOUT THIS ISSUES ON ALL GM
> TRUCK MODEL OF 2015 TO 2017 WITH 8SPED TRANSMISSION
> SINCE APRIL 2017. I HAVE ATTACHED DOCUMENTS GIVEN BY
> DEALER.

234.   Another incident involving a 2017 GMC Sierra was reported on June

1, 2018:

> WHEN DRIVING AT SLOW PARKING LOT SPEEDS OR WHEN
> COMING TO A COMPLETE STOP THE VEHICLE INTERMITTENTLY
> LUNGES, SURGES OR JOLTS, CAUSING THE VEHICLE TO MOVE
> FORWARD OR BACKWARDS UNANTICIPATED. SOMETIMES THE
> JOLT FEELS LIKE ANOTHER VEHICLE HAS HIT THIS VEHICLE
> FROM THE REAR, AGAIN CAUSING IT TO LUNGE FORWARD.

235.   Another incident involving a 2017 GMC Sierra was reported on June

15, 2018:

> I BOUGHT THIS TRUCK USED WITH 12,918 MILES ON IT, APRIL
> 2018.   WHEN   DRIVING(ESPECIALLY   ON   HIGHWAY),   AND
> CHANGING SPEEDS, TRANSMISSION CLUNKS AND LURCHES-
> AUTOMATIC TRANSMISSION. IT SOUNDS AND FEELS AS IF DRIVE
> TRAIN WILL FALL OUT. I HAVE TAKEN IT TO DEALER TWICE. THE
> FIRST TIME, THEY KEPT IT FOR 3 DAYS, THE SECOND TIME, FOR
> ONE.   THE   MECHANIC   IS   ABLE   TO   REPLICATE   THE
> NOISE/LURCHING, BUT THEY ARE UNABLE TO FIND A CAUSE OR
> CORRECTION. THEY TELL ME IT IS NOT DANGEROUS, BUT I AM
> CONCERNED   THAT   THE   NOISE/MOVEMENT,   COULD   CAUSE
> MYSELF OR ANOTHER FAMILY MEMBER TO SWERVE OR BRAKE
> HARD AND CAUSE AN ACCIDENT. THE MECHANIC HAS TRIED

"UPDATING THE SOFTWARE" BUT THAT DID NOT FIX IT. SEVERAL OTHER GMC SIERRA OWNERS TELL ME THEY HAVE HAD SAME PROBLEM.

236.   Another incident involving a 2017 GMC Sierra was reported on August

28, 2018:

THE "CHEVY SAKE". AT SPEEDS OVER 70MPH EXCESSIVE VIBRATION INSIDE THE VEHICLE. THIS IS WELL DOCUMENTED ON-LINE, PARTICULARLY VARIOUS GM FORUMS AND YOU TUBE VIDEOS. IT IS MY UNDERSTANDING THAT GM DENIES IT IS A PROBLEM, BUT THEY HAVE BEEN DOING SOME BUY BACKS AND IF YOU READ SOME OF THE DEALER BLOGS IT IS EVIDENT THAT GM KNOWS IT IS A PROBLEM.

237.   Another incident involving a 2017 GMC Sierra was reported on

December 6, 2018:

THE TRANSMISSION SHIFTS EXTREMELY ROUGH FROM 1ST TO 2ND GEAR IN PARKING LOTS AT A SLOW SPEED AND ON NORMAL HIGHWAY OR STREET DRIVING AND EXPERIENCES THE SAME THING WHILE SLOWING DOWN TO STOP 2. THE ENGINE HAS RECENTLY BEEN HAVING A AWKWARD SHAKE TO IT WHILE IN IDEAL AFTER IT HAS BEEN RUNNING AND WARM 3. WHILE BACKING UP AND TURNING THE WHEEL, THE FRONT SUSPENSION WILL LET OUT A LOUD CLUNK SOUND AND THE SOUND WILL RETURN WHEN TURNING THE TRANSMISSIONS BACK FORWARD AFTER PUTTING IT INTO DRIVE.

238.   Another incident involving a 2017 GMC Sierra was reported on

December 18, 2018:

I HAVE HAD SEVERAL INSTANCES WHERE YOU PUSH THE ACCELERATOR AND YOU START TO GO AND THEN IT JUST STOPS MOVING LIKE THE TRANSMISSION HAS DISENGAGED. STARTED

TO TURN INTO ONCOMING TRAFFIC THIS MORNING AND HAD TO STOP AS IT DID THIS AND I WAS GOING TO GET HIT!!! IT DOES IT A LOT, FIRST TIME I WOULD HAVE BEEN HIT!!! GM SAYS THEY KNOW IT'S A PROBLEM, AT SHOP NOW AGAIN FOR IT! GOING TO GET SOMEONE KILLED!!!!

239.   Another incident involving a 2017 GMC Sierra was reported on

January 10, 2019:

TRANSMISSION HAS SURGING AND HESITATION. DEALER CANNOT FIX.

240.   Another incident involving a 2017 GMC Sierra was reported on

February 4, 2019:

TRUCK LAGS POWER WHEN PRESSING THE GAS PEDAL AT TIMES AFTER PUTTING TRANSMISSION INTO DRIVE FROM REVERSE. TRANSMISSION SHIFTS HARD INTO AND OUT OF FIRST GEAR AND AT TIMES FEELS LIKE IT IS SKIPPING 2ND GEAR DURING A DOWNSHIFT.

241.   Another incident involving a 2017 GMC Sierra was reported on March

12, 2019:

TRANSMISSION SHIFT FROM 1ST GEAR. THERE IS A PROBLEM IN THE GEAR SHIFT FROM 1ST TO 2ND IT SLAMS THE TRANSMISSION WHEN YOU STOP AND START. THERE IS A HEATER IN THE TRANSMISSION THAT PUTS EXTRA DEGRADATION ON THE OIL CAUSING IT TO NEED REPLACEMENT VERY EARLY. DEALER KNOWS OF THE ISSUE BUT HAS NO FIX FOR IT ONLY STATED THEY NOTED THE FILE IN CASE IT FAILS. UNACCEPATABLE FOR A 55,000. PLEASE LOOK INTO THIS.

### 14.    *2015 GMC Yukon Denali*

242.    On the NHTSA website, there are at least 292 consumer complaints for

"2015 GMC Yukon Denali." As one example, on June 14, 2015, the following

incident was reported:

> VERY CONCERNED ABOUT MY 2015 YUKON XLT. THE VEHICLE'S
> GEAR SHIFTED TO A NEUTRAL OF VERY LOW GEAR (NOT VERY
> SURE) AS I WAS DRIVING DOWN A LONG HILL NEAR
> BIRMINGHAM, AL. IT FELT LIKE IT WENT TO FIRST GEAR, BUT AT
> THE SAME TIME IT DID NOT SLOW THE VEHICLE DOWN, ALMOST
> FELT LIKE THE GEAR WAS GRINDING. THE TRUCK DID NOT
> CATCH BACK INTO NORMAL GEAR UNTIL THE VEHICLE LEVELED
> BACK AT THE BOTTOM OF THE HILL. (IT WAS EXTREMELY SCARY
> AND WORRISOME EVER SINCE THEN, THE TRANSMISSION WILL
> NOT SHIFT SMOOTHLY.

243.    Another incident involving a 2015 GMC Yukon Denali was reported

on June 29, 2016:

> I AM WRITING TO NOTIFY YOU ABOUT A PROBLEM WITH THE
> TRANSMISSION IN 2015 GMC YUKON XL.
>
> GM IS AWARE OF A PROBLEM. THEY ISSUED AN INTERNAL
> NOTICE TO DEALERS IN FEBRUARY 2016. HOWEVER, THEY HAVE
> NOT NOTIFIED TO OWNERS IN THE FORM OF A RECALL.
>
> ON SEVERAL OCCASIONS, MY VEHICLE JUMPED FORWARD,
> WHILE DRIVING IN THE CITY, WHEN IT WAS STOPPED, IN DRIVE,
> WITH BRAKE ENGAGED. I REPORTED TRANSMISSION PROBLEMS
> TO MY LOCAL DEALER BUT THEY REPEATEDLY IGNORED MY
> CONCERNS. THEY KEPT GIVING EXCUSES THAT DIDN'T MAKE
> SENSE. I FINALLY PRESSED ON, REFUSED TO TAKE MY VEHICLE
> BACK AND REPORTED THE PROBLEM TO SEVERAL EXECUTIVES.
> THE PROBLEM WAS FINALLY DIAGNOSED UNDER DIFFERENT
> CONDITIONS AS STATED IN THE FIRST INTERNAL DOCUMENT IN

MARCH 2016. THERE WAS A PROBLEM WITH THE TRANSMISSION. THEY FINALLY REPLACED THE TRANSMISSION FOR "ONE THAT DIDN'T HAVE A PROBLEM".

GM ADMITTED THERE ARE PROBLEMS WITH TRANSMISSIONS AND THE PROBLEM HAS BEEN CORRECTED IN NEWER VEHICLES. THEY HAVE YET TO ISSUE A NOTICE TO CURRENT OWNERS THAT THEIR VEHICLES ARE AT RISK.

I OWNED A 2015 GMC YUKON XL BUT CHOSE TO SELL IT OVER SAFETY CONCERNS AND LACK OF APPROPRIATE RESPONSE FROM GM CORPORATE. WITH 2 YOUNG CHILDREN, I SPEND A LOT OF TIME AROUND SCHOOLS (LIKE MOST OWNERS OF LARGE GM VEHICLES). I COULD HAVE INJURED OR KILLED SOMEONE. I FEEL IT IS MY OBLIGATION TO BRING THIS SITUATION TO YOUR ATTENTION. IF YOU INTERVENE, YOU CAN HELP TO AVOID ANY INJURIES IN THE FUTURE. IT IS CLEAR THAT GM WILL NOT VOLUNTARILY PROTECT THE PUBLIC.

244. Another incident involving a 2015 GMC Yukon Denali was reported

on July 19, 2016:

OUR VEHICLE HAS A SIGNIFICANT VIBRATION IN V4 MODE WHEN TRAVELING BETWEEN 45-65 MPH AND ABOVE. THE VIBRATION IS ALSO ACCOMPANIED BY INCREASED CABIN PRESSURE. THESE ISSUES ARE CAUSING HEADACHES, NAUSEA, DIZZINESS, AND ARE FURTHER EXACERBATING MY WIFE'S MULTIPLE SCLEROSIS. WE ALSO HAVE A POPPING SOUND COMING FROM THE REAR OF THE VEHICLE'S SUSPENSION WHEN TURNING THAT MAKES US FEEL UNSAFE. THE VIBRATION STARTED RIGHT AFTER WE TOOK DELIVERY OF THE CAR AND HAS ONLY GOTTEN WORSE. WE BOUGHT THE CAR IN APRIL 2015 AND THE ISSUE CONTINUES UNFIXED TO THIS DAY. THE POPPING NOISE STARTED ABOUT 3-4 WEEKS AGO AND IT SOUNDS LIKE A SUSPENSION COMPONENT. OUR AC RECIRCULATING FEATURE ALSO DOES NOT WORK AND IT ALLOWS HARMFUL EXHAUST SMOKE IN.

245.   Another incident involving a 2015 GMC Yukon Denali was reported on August 1, 2016:

> WHEN   APPROACHING   A   TOLL   BOOTH   ON   THE   MASS TURNPIKE,WITH SEVERAL LANES MERGING,
>
> WITH THE VEHICLE ALMOST STOPPED,IT DOWNSHIFTED TO 1ST GEAR AND IN THE PROCESS
>
> LURCHED FORWARD EXTREMELY VIOLENTLY TO THE POINT I ALMOST CRASHED INTO THE CAR
>
> MERGING IN FRONT OF ME-PROBABLY STOPPED SHORT BY SIX INCHES OR LESS !!!

246.   Another incident involving a 2015 GMC Yukon Denali was reported on August 30, 2016:

> TRANSMISSION   HAS   BEEN   CLUNKY   AND   JERKY   FROM PURCHASE. THE VEHICLE VIBRATES BETWEEN 30 - 35 MILES PER HOUR WHEN SHIFTING. THE VEHICLE LURCHES FORWARD WHEN ACCELERATING AS IF IT HAS DIFFICULTY DOWN-SHIFTING. THE PROBLEM IS PRESENT FROM SIMPLY BACKING UP OUT OF THE DRIVEWAY, MODEST SPEEDS ON CITY STREETS, OR ON THE HIGHWAY. WHEN BROUGHT BACK TO THE DEALER, THEY CLAIMED IT WAS A SOFTWARE ISSUE AND "REFRESHED" THE SOFTWARE. THE PROBLEM HAS NOT GONE AWAY AND DID NOT IMPROVE BY THIS SOFTWARE CORRECTION. MY INTERNET RESEARCH INDICATES THAT THIS IS A COMMON PROBLEM WITH THE NEW 8-SPEED TRANSMISSION FOR THE 2015 YUKON DENALI AND CADILLAC ESCALADE.

247.   Another incident involving a 2015 GMC Yukon Denali was reported on September 18, 2018:

VEHICLE CLUNKS OR HARD SHIFT WHILE SHIFTING VEHICLE FROM PARK TO DRIVE, OR PARK TO REVERSE. HAPPENS EVERY MORNING OR WHILE TRANSMISSION HAS COOLED DOWN. DEALER INDICATES THERE'S NO FIX FOR THIS CONDITION, NOT EVEN A UPDATE TO TRANSMISSION SOFTWARE.

### 15.    *2016 GMC Yukon Denali*

248.   On the NHTSA website, there are at least 73 consumer complaints for "2016 GMC Yukon Denali." As one example, on January 5, 2016, the following incident was reported:

WHEN THE VEHICLE REACHES 40-60 MILES PER HOUR A VIBRATION OCCURS... OFTEN SOUNDS LIKE A WINDOW IS DOWN AND CAN CAUSE NAUSEA AND HEADACHE...

249.   Another incident involving a 2016 GMC Yukon Denali was reported on May 25, 2016:

THE VEHICLE'S TRANSMISSION UNEXPECTEDLY SLIPS OUT OF GEAR BETWEEN 20 AND 35 MPH. WHEN THIS OCCURS, PRESSING THE ACCELERATOR MERELY REVS THE ENGINE, WITHOUT FORWARD MOTION. THIS OCCURRED 4 TIMES IN THE FIRST 600 MILES OF OPERATION. WITHOUT POWER, I CAN'T NAVIGATE OUT OF A DANGEROUS SITUATION.

250.   Another incident involving a 2016 GMC Yukon Denali was reported on June 2, 2016:

VEHICLE HAS VIBRATION & NOISE WIHEN IN 4 CYLINDER MODE OF OPERATION. GIVES HEADACHE ON LONG DRIVES. GM SAYS THAT THE VEHICLE IS OPERATING AS DESIGNED. MOST AGRIVATING.

251.   Another incident involving a 2016 GMC Yukon Denali was reported

on July 6, 2016:

> MY 2016 YUKON DENALI HAS A VIBRATION PROBLEM, WHICH I
> BELIEVE IS CAUSED BY THE MAGNETIC RIDE CONTROL. THE
> VIBRATION DOES NOT SPEED UP, NOR SLOW DOWN, DEPENDING
> ON SPEED. IT IS, HOWEVER, MORE NOTICEABLE WHEN THERE IS
> ANY ROAD IMPERFECTION.
>
> THE GMC SERVICE DEPT. HAS BALANCED AND ROTATED TIRES,
> EVEN SENT IT TO TWO OTHER BUSINESSES TO TRY AND FIX --
> ALIGNMENT, ETC. VIBRATION CONTINUES. I'VE HAD
> PASSENGERS WHO ASK "WHY DOES YOUR CAR HAVE THE
> SHIVERS?" GM DEALER DID GET AHOLD OF A GMC TECHNICIAN
> WHO FLEW IN, AND DROVE THE CAR AND SAID -- YES IT HAS A
> VIBRATION, BUT IT IS IN ACCEPTABLE PARAMETERS.
>
> MY DEALER HAS PROVIDED ME 3 DIFFERENT RENTAL CARS
> WHILE WORKING TO TRY AND FIX THE "SHIVERS" ... ALL THREE
> WERE FAIRLY NEW, SMALL BUICKS, AND ALL 3 RODE BETTER
> THAN THIS NEW $75,000 DENALI.
>
> I LOVE THE VEHICLE, HATE THE VIBRATION. GMC ITSELF HAS
> NOW TOLD ME -- YOUR CASE IS CLOSED! THE VIBRATION IS
> WITHIN ACCEPTABLE LIMITS.
>
> THE DEALER HAS LET ME DRIVE TWO OTHER YUKON DENALI'S ...
> BOTH HAVE SIMILAR VIBRATIONS... JUST NOT AS BAD AS THIS
> VEHICLE.
>
> VIBRATION IS NOTICEABLE AT 25 MPH, AS WELL AS AT 80 MPH;
> ALTHOUGH IT IS MORE NOTICEABLE ON ROUGHER ROADS.
>
> I AM HAPPY TO SHARE THE REPORTS FROM MY LOCAL GM
> DEALER, WHO COMPLETELY AGREES THAT THE CAR SHIMMIES.
> WE TRIED THE GMC BUYBACK PROGRAM, AND I WAS TOLD BY
> GMC THAT PROGRAM IS NOT AVAILABLE TO ME, EVEN THOUGH
> I TOOK THE CAR BACK TO THE DEALER WHEN I HAD LESS THAN

100 MILES ON IT. AND HAVE BEEN TAKING IT BACK REGULARLY SINCE.

252.   Another incident involving a 2016 GMC Yukon Denali was reported on October 27, 2016:

SINCE THE DAY I PURCHASED THIS 2016 GMC YUKON XL DENALI THERE HAS BEEN A VIBRATION IN WHAT I THINK IS THE PASSENGER REAR END. I'VE TAKEN IT IN 3 TIMES AND EACH TIME THE DEALER AND THE GM REPRESENTATIVE SAY IT IS "WITHIN SPEC." THIS PROBLEM HAS PERSISTED. THE VEHICLE IS NOW ALMOST UN-DRIVABLE DUE TO THE SHAKING. IT AFFECTS THE STEERING WHEEL AT ALL SPEEDS. THIS HAPPENS AT ALL SPEEDS ON ALL TERRAINS. THIS HAPPENS WHEN THE VEHICLE IS COLD AS WELL AS WARM/HOT. THE VEHICLE WILL SOMETIMES JERK TO THE LEFT OR RIGHT WHEN THE SHAKING GETS REAL BAD. THIS VEHICLE IS BECOMING DANGEROUS TO DRIVE BUT I HAVE TO USE IT. I AM NOT THE ONLY ONE WITH THIS ISSUE AND WOULD APPRECIATE SOME HELP.

### 16.   *2017 GMC Yukon Denali*

253.   On the NHTSA website, there are at least 7 consumer complaints for "2017 Yukon Denali." As one example, on September 22, 2018, the following incident was reported:

SHUDDER UNDER LIGHT, CONSTANT ACCELERATION AT 35MPH TO 55MPH, RPM UNDER 1,500. UPHILL GRADE IT IS ACCENTUATED. SHUDDER OCCURS FOR 1 SECOND ACROSS WHOLE VEHICLE, REOCCURS EVERY FEW SECONDS AT A CONSTANT INTERVAL. SEEMS TO BE SAME ISSUE WITH ALL 8L90 TRANSMISSIONS FROM GM/CHEVY/CADI.

### 17.   *2017 GMC Canyon*

254.   On the NHTSA website, there are at least 15 consumer complaints for

"2017 GMC Canyon." As one example, on February 5, 2018, the following incident was reported:

> THE GMC 2017 CANYON VIBRATES AT HIGHWAY SPEED 60MPH TO 70MPH. THE 2ND DAY AFTER I BOUGHT IT TOOK IT ON LONG TRIP FOUND IT HAD VIBRATION PROBLEMS. AFTER TAKING IT TO THE DEALERSHIP FOR TIRE BALANCE TWICE REPLACED FRONT WHEEL BEARING THEN TRANSMISSION FLUSH. THEN AFTER TRANSMISSION FLUSH HAD VIBRATION BETWEEN 40-45 THEY SAID IT WAS NORMAL THAT THERE WAS NOTHING ELSE THEY COULD DO. DUE TO VIBRATIONS OVER TIME THIS CONCERNS ME. FOR BEING STRANDED OR WORSE CAUSING AN ACCIDENT FROM SOMETHING COMING LOOSE. I`VE ALREADY HAD TO TIGHTEN UP MY SPARE TIRE. I BOUGHT THIS PICKUP FOR LONG TRIPS SINCE I`VE RETIRED. LIKE THE ONE MY WIFE AND I ARE GOING ON IN JUNE OF THIS YEAR. I ALSO FEEL IF THERE GOING TO SELL CRAP LIKE THIS THEY NEED TO PUT THE VIBRATION ISSUES ON THE ACCESSORY `LIST SO BUYERS WILL HAVE THE OPTION WHETHER TO BUY OR NOT. I WOULD HAVE NOT BOUGHT A $40,000.00 VIBRATOR!!

255.   Another incident involving a 2017 GMC Canyon was reported on August 1, 2018:

> TRANSMISSION BEGAN SHIFTING HARD. BEFORE LONG WHOLE TRUCK RATTLED WHEN SHIFTING. ALMOST A GRINDING SOUND. CHEVY DIAGNOSED TORQUE CONVERTER HAS GONE BAD. BACK ORDERED FOR 2 WEEKS.

256.   Another incident involving a 2017 GMC Canyon was reported on December 31, 2018:

> TORQUE CONVERTER FAILS AT 12000 MILES FOR MANY. THERE IS A GMC NOTICE OUT SINCE 2016. MINE FAILED AT 16000 MILES AND THE ONE THEY REPLACED WILL LIKELY FAIL AGAIN IN

ANOTHER 16K MILES. THIS IS BAD. I NOTICED IT WHEN I PRESSED ON THE ACCELERATOR AND AS I INCREASED SPEED UP TO 45 MPH. IT RATTLED AND ROCKED BADLY. THE GMC REPAIRMAN SAID, "YEAP.....EVER SINCE 2016 ALL THESE DAMN TORQUE CONVERTERS HAVE BEEN FAILING IN THE CANYONS AND COLORADOS BECAUSE GM AND CHEVY CHANGED THE SIZE AND STRENGTH OF THE METAL USED IN ORDER TO REDUCE THE WEIGHT OF TRHE VEHICLE. WE WILL REPLACE IT, BUT I CAN ASSURE YOU IT WILL FAIL AGAIN AND YOU'LL HAVE TO BRING IT BACK TO USE FOR CHANGE OUT AGAIN." WOW....WHAT A BUNCH OF CRAP.

### 18.    *2018 GMC Canyon*

257.   On the NHTSA website, there are at least 5 consumer complaints for "2018 GMC Canyon." As one example, on August 28, 2018, the following incident was reported:

TRANSMISSION JERKS FROM 4TH TO 5TH. SOMETIMES FEELS LIKE SOMEONE HIT YOU IN THE REAR ENDED.

258.   Another incident involving a 2018 GMC Canyon was reported on September 7, 2018:

TRANSMISSION CLUNKS FEELS LIKE YOUR HIT IN THE REAR END. I THOUGHT I WAS REAR ENDED 3 TIMES SO FAR. MY TRANSMISSION SURGES FORWARD FROM 4TH TO 5TH GEAR. VERY DANGEROUS TO WEAR I DON'T WANT TO DRIVE THE TRUCK.

259.   Another incident involving a 2018 GMC Canyon was reported on September 7, 2018:

THE AUTOMATIC TRANSMISSION SHIFTS AGGRESSIVELY THE FIRST GEARS FROM A COLD STARTED ENGINE AFTER ENGAGING

113

FROM PARK TO DRIVE. SLUGGISH SHIFTING AND ACCELERATION.

260. Another incident involving a 2018 GMC Canyon was reported on December 14, 2018:

RUMBLING OF TRANSMISSION. CLUCKY START. GM DEALER ACKNOWLEDGES THE PROBLEM AND HAS TRIED TO REPAIR VEHICLE. GM SAYS AT THIS TIME THE TRUCK 8 SPEED TRANSMISSIONS ARE NOT FIXABLE

**F.  Consumer Complaints on Internet Forums Also Demonstrate That GM Was Aware of the Transmission Defects**

261. Similarly, complaints posted by consumers in internet forums demonstrate that the Transmission Defects are widespread and dangerous and that they can manifest without warning and/or suitable repair. The complaints also indicate GM's awareness of the problems with the transmission and how potentially dangerous the Defects are for consumers. The following are some safety complaints specifically relating to GM's eight-speed transmissions. *See* gm-trucks.com (May 7, 2019), Edmunds.com (May 7, 2019), http://www.edmunds.com/; Cars.com (May 7, 2019), http://cars.com/; CarComplaints.com (May 7, 2019), http://www.carcomplaints.com/; http://gm-trucks.com (May 7, 2019), and http://cadillacforums.com (May 7, 2019) (spelling and grammar mistakes remain as found in the original).

### *1.  Complaints on Edmunds.com*

262. On Edmunds.com, a consumer of the 2015 Cadillac Escalade wrote on

September 29, 2016:

> We have owned our vehicle since August 2015. We have had problems since the first day. Bad airbags, steering wheel had to be replaced 3 times, steering column replaced, torque converter replaced, front camera replaced. The MAIN issue is still not fixed after many many many trips to Service. There is a rough idle at any stop. The engine idle is so rough that the RPM's bar is moving up and down while the car is stopped. At times it feels like the car is going to shut off. Cadillac is not accepting responsibility and is saying this is NORMAL. So...if you like a rough idle in a $100,000 Luxury vehicle go ahead and buy this SUV. Otherwise, I would suggest you go down the road and find a different luxury vehicle.

263.   On Edmunds.com, a consumer of the 2016 Cadillac Escalade wrote on July 22, 2016:

> This is our third Escalade to own. I couldn't be more disappointed in the quality of the car this time. They really cut corners in the interior and it shows from parts coming unglued to the interior leather peeling. On the outside of the car the Chrome transmission on the door popped off and all four doors transmission work between the doors had to be replaced. My car had less than 8k miles and they replaced the transmission. For a vehicle costing almost 100k very disappointed Cadillac. This will be our last.

264.   On Edmunds.com, a consumer of the 2016 Cadillac Escalade ESV wrote on January 12, 2016:

> Having owned the 2007 ESV I thought long and hard about buying a new 2016. Keeping in context we have owned Lexus since 1990, total of five LS models over the years. Best single auto manufacturer in the world for quality, value, cost of ownership. Unless you need the size of the ESV for family, road travel, don't buy one. Your hard earned $80K+ needs to go elsewhere because of the workmanship, quality issues. It LOOKS awesome, rides great, it is the fitment, vibration, flutter of plastic parts rubbing against each other that will drive you crazy. The center CUE had a vibration as if a wiring harness had been flopping around. The sunroof decided just this morning that

something up in there, needed to be jostling around, and these things happen only when they want to.  We have only owned her 3 weeks, she has 735 miles on her.  We got her for the room, size to accommodate family.  If LEXUS ever decides to make one similar in size, we are in.

Nothing in my review changes except that I will never own another.  It is GM junk at the highest level.  Last May 22, 2016 we finally got help from the BBB in Washington DC to help replace the original 2016 we bought in Dec. 2015.  It took us 6 months to get rid of that pile of junk, replaced it with another pile of junk.   Folks other than the dealer experience being so stealor and supportive, I will never own another.   PERIOD.   From problems with transmission shifting at times I cant understand, to the dye color of the leather already wearing away.  Plastic parts look like wood and yet vibrate into a frenzy at times.  Listen carefully, you do what you want.  If you want to toss money into a pit loaded with stress and problems, then buy this thing.  If you want to save yourself the grief, buy Lexus or something else.   UPDATE: JUNK it is OVERPRICED JUNK  Would love to sell it if you know of anyone interested.  DO NOT BUY ANYTHING CADILLAC

265.   On Edmunds.com, a consumer of the 2017 Cadillac Escalade wrote on September 25, 2017:

Transmission is horrible. I feel unsafe in this car. It jerks or lunges on me at a stop or slow speed at least once a day. The dealership has had my car 7 times and has not fixed it yet. I filed a lemon law complaint.

266.   On Edmunds.com, a consumer of the 2016 Cadillac ATS wrote on August 21, 2016:

When I got the got a few months ago, I was more excited about the electronics than the feel of the car.  A few weeks into driving I discovered how erratic the transmission shifting was--you can actually feel the car going into gear and ,in some instances, the engine downshifts, which I consider unsafe.  Even with disabling the "stop engine" mode, you can feel the noticeable changes in shifting.  It is an unsatisfactory ride and I have owned or leased over 40 GM cars.

116

267.   On Edmunds.com, a consumer of the 2016 Cadillac CTS wrote on July

23, 2016:

> Complex cue system, maybe need. Cd tutorial for visual learners, engine designed to stop when brakes applied to stop. Explanation of no spare tire!
>
> Passenger door hard to close due to handles too far forward. Transmission seems to shift hard at times, has refused to change when accelerating hard into traffic

268.   On Edmunds.com, a consumer of the 2016 Chevrolet Corvette wrote

on October 21, 2016:

> Many owners of 2016 Chevrolet Corvettes (some 2015's) are reporting on various internet sites IE: Corvette Forum. Stingray Forum, that their new Corvettes, primarily base models with automatic transmissions produce a 'WARBLE' type noise at exactly 1500 RPM under light throttle load , as when going up a slight grade. I am one of said owners. Go to these internet sites and look up 'WARBLE' and even view the video / audio of the issue / complaint. Currently I understand that owners are invoking the lemon law process; GM 'supposedly' has taken back vehicle (s). Basically there is no proven correction at this time. I too have contacted GM and like many others, I was given a "case number". It's been awhile; GM has been involved deeply; taken cars back in exchange...under pretense of studying them. However; GM IS REMAINING VERY QUIET about this serious issue. WHY ? Dealing with this corporation; their possibly covert approach to this serious matter will make GM owners uncomfortable...if they care to listen. Meanwhile, my C7 Stingray, auto has had the differential changed; a improvement is noted but the "WARBLE" goes on.................. and on.....................!

269.   On Edmunds.com, a consumer of the 2016 Chevrolet Silverado 1500

wrote on May 18, 2016:

For 43K, and purchased brand spanking new, at 3k miles i should not have vibration issues, hard downshifting, and terrible dealer denial.  I am so fed up with the lack of quality, and attention to detail.  All the bells and whistles don't mean a thing if the vehicle shifts poorly, lunges when placed in gear, and makes terrible noises when it downshifts.  The dealer was helpless (i kinda feel for the dealer, they are not the manufacturer. This is an engineering and quality issue).

I DO NOT recommend you waste your money on the 2016 chevy silverado crew, 5.3l.  Chevy CANNOT get the basic functionality of what a vehicle is supposed to be correct.  Don't buy into the look, or the commercials, these vehicles are nothing but polished poop.  purchasing this chevy truck was a major mistake and i hope you learn from my mistake, but at my cost.   God bless.

270.   On Edmunds.com, another consumer of the 2016 Chevrolet Silverado 1500 wrote on June 5, 2016:

Vibration problems started within two weeks of owning the truck. The dealer knows there are vibration problems but there is not a fix. I was told that's the way they are, deal with it. The transmission is sluggish and slow to keep up with the driving situations. The electronics crash frequently. The dealership said it was due to subpar and cheap Chinese made memory chips and control boards. Please do not waist your money on this truck. I traded the truck for a Dodge Ram after only 2200 mile. Worst of all the dealership fully understands the problems but will not mention them during the sales process. They will gladly take your money and give you a piece of junk in return.

271.   On Edmunds.com, another consumer of the 2016 Chevrolet Silverado 1500 wrote on November 23, 2016:

Have owned two Chevy Vans last 18 years never an issue.  Wanted a truck to pull my boat.  Chose to stay with Chevy given the track record. Truck shifts hard in the low gears.  Cold starting the truck jerks into gear and when down shifting it is harder than it should be.  Should not feel it down shift.  Took it

to the dealer and their mechanic got it to down shift hard in parking lot but he said thinks it will smooth out over time.

272.   On Edmunds.com, another consumer of the 2016 Chevrolet Silverado

1500 wrote on December 13, 2016:

2016 truck has 2400 miles on it. Is the roughest  ride I have ever had in a chevy pickup. Cant travel it because wife feels the truck is going to break down due to the vibration. Had it in the shop 7 times for shimmy(vibration) at medium and highway speeds. Shop changed tires , balanced several times. Nothing they did helped. Dealer told me it was the best they could do. I had several friends drive it and they came to the same conclusion.  We all agreed to never purchase a Silverado and pass that statement on to others.

273.   On Edmunds.com, a consumer of the 2016 GMC Sierra 1500 wrote on

June 9, 2016:

I have had this truck into the dealer twice and I have 6500 miles on the truck. They have done a reprogramming both times and it is fine for a week or two and then starts shifting hard again.   I purchased the truck with the larger engine so that I can tow my 22 foot Airstream. When the AS is in tow it is great but not when you have to daily drive. This should not happen for the money paid for the truck.

274.   On Edmunds.com, a consumer of the 2016 GMC Sierra 1500 wrote on

December 28, 2016:

I've owned my sierra for roughly 8 months now and am very happy with the truck overall. Classy interior, quiet and comfortable ride, strong acceleration and great mpg's (for a truck). One complaint that I do have is with the transmission. From time to time, the tranny will seemingly slip. Other times, shifting is very rough. These issues aren't consistent, but when they do occur, they seem to occur when shifting from 1st to 2nd gear. These issues seem to be common and I've read that they are less about the transmission itself and more about the programming that determines shift points and other

119

transmission related operations. Apparently these things have been programmed for max gas mileage and the result is less than desirable shifting. This is a tough pill to swallow considering I paid 50,000+ for the truck. I'd gladly give up 1mpg for a transmission that doesn't act like its about to fall out of the truck.

275.   On Edmunds.com, a consumer of the 2015 GMC Yukon Denali wrote on January 18, 2015:

Almost all 2015 Yukons/Denalis with AWD are having severe problems with the transmission.

Basically, if you used the AUTO setting on the drive selector the trans will lock into 4WD and never come out.  GM has no fix for this problem yet. Driving the vehicle like this is unsafe and makes a horrible racket.  It might also damage the vehicle.

Avoid any Yukon or Tahoe until the fix is found.

You can google this problem to read more about it

276.   On Edmunds.com, another consumer of the 2015 GMC Yukon Denali wrote on August 9, 2016:

Bought the 2015 Denali w/ all the bells and whistles in October 2014.  At that time, the new body style was very hard to find, because it was so new.  I have owned for over 2 years & have 49,000 miles on it.   Have major problems when going 65 to 70-75 mph on freeway with the transmission-- while driving and increasing the speed on highway, it feels like the car "jerks" as it accelerates.  Its horrible!  Have taken to dealership 3X's complaining about it & they look @ me like I am crazy.  I am getting ready to trade it in due to high mileage...other complaint is the usb ports--always tearing up my iphone cords. Miserable!  When you plug your phone in into the usb, it automatically connects phone to vehicle...if you aren't paying attention, end up missing texts, phone calls, directions.  I do love that you can use OnStar w/ directions,

& remote start from your iphone...great little perk.  Love the 3rd row seats and cargo...haul kids & dogs

277.   On Edmunds.com, a consumer of the 2016 GMC Yukon Denali wrote

on September 26, 2016:

I am so disappointed with my purchase of the 2016 Yukon XL Denali. The issues with this vehicle in just 1 month are endless. The main one being the brakes are sooo bad. I got in an accident after 1 week, because the brakes on the car just dont work. The quality of the seats are so poor, you can feel the springs in the seats. The transmission keeps slipping. I hate this vehicle. DO NOT BUY.

### 2.      *Complaints on Cars.com*

278.   On Cars.com, a consumer of the 2016 Cadillac ATS wrote a review

titled "One week after I bought my new ATS 2016" on September 8, 2016:

The transmission control module was faulty, I purchased the vehicle for piece of mind now I worry about more problems arising. So disappointed in the quality

279.   On Cars.com, a consumer of the 2015 Chevrolet Corvette wrote a

review titled "Automatic sucks" on July 2, 2017:

Happy to get rid of car!! Car stumbled like had bad gas. 93 octane same problem. CHEVROLET would not return my call

280.   On Cars.com, a consumer of the 2016 Chevrolet Camaro wrote a review

titled "Rear diff and trans issues TSB" on September 28, 2017:

I have less than 6k miles on my Camaro 2ss and it has had the transmission flushed 3 times, the rear diff flushed 9 times and the shudder is back. There is a TSB for this issue and for some reason Chevy can't get it worked out. Other

then that I love the car! It is a beast it has good seating, explosive power with 455 hp 455 tq, the interior is much better than my 2010 2ss. Overall I would buy this car again it is a great handling car, with more tech features than I need.

281.   On Cars.com, another consumer of the 2016 Chevrolet Camaro wrote

on August 16, 2018:

THE CAR LOOKS FANTASTIC INSIDE AND OUT. INTERIOR IN THE 2LT/2SS IS AWESOME. THE V6 IS FASTER THAN MOST PEOPLE THINK IT ALSO HAS GREAT HANDELING. HOWEVER IF YOU ARE A CAR ENTHUSIAST THIS PROBABLY ISNT THE CAR FOR YOU. THE STEERING IS NUMB, SEATS ARE MORE FOR COMFORT RATHER THAN SUPPORT, 8 SPEED AUTO CAN BE A BIT DIMWITTED AND SLOW, AND THE DRIVE MODE SALECTOR CHANGES ABSOLUTLY NOTHING EXCEPT THE STEERING WEIGHT (BUT ITS STILL NOT HEAVY ENOUGH) AS A STYLISH COMFORTABLE COUPE IT IS FANTASTIC, BUT AS A SPORTS CAR ITS A BIT TOO NUMB AND DIALED DOWN. I ALSO HAD ISSUES WITH BUILD QUALITY. THE INTERIOR HAD SEVERAL RATTLES MAKING IT ALMOST IMPOSSIBLE TO DRIVE WITHOUT MUSIC ON. THE EXTERIOR ALSO HAD A FEW PANNEL GAPS. ALSO IF YOU WANT SOMETHING UNIQUE THIS IS NOT THE CAR FOR YOU!

282.   On Cars.com, another consumer of the 2016 Chevrolet Camaro wrote

on March 22, 2019:

I love the style inside and out, but only owned a month and had problem with 8 speed automatic. It started slipping in and out of gear and felt like running over a wash board. The dealer did a transmission flush and added special fluid and told to drive 200 miles to see if fixes. If not bring back. I understand chevy has a problem with this tranny and trying to correct short of a new transmission. What a bad situation for the owner and feeling of realiabilty when driving.

283.   On Cars.com, a consumer of the 2015 Chevrolet Silverado 1500 wrote

on August 14, 2017:

> There seemed to be something wrong with this truck from the time we bought
> it till we got rid of it. It had really funny sounds, it wouldn't go when we tried
> accelerating, it was almost like a putt putt truck. Was So Happy we traded it
> in on a New Ram!

284.   On Cars.com, another consumer of the 2015 Chevrolet Silverado 1500

wrote on November 24, 2017:

> we feel we decided wrong to select the dealer they do not check the vehicles.
> I do not trust anymore, this vehicle presents problem with the transmission....,
> think so it's a shame

285.   On Cars.com, another consumer of the 2015 Chevrolet Silverado 1500

wrote on January 31, 2018:

> 2015 Z71 standard cab 4x4. This is the worst shifting truck I ever owned it
> also had a 308 rear axle made for highway not towing. I bought a 2017 with
> same motor 5.3 but with a 342 rear axle, What a major difference! The 2015
> also had Goodyear tires and major vibrations, The 2017 has Bridgestones and
> it rides and shifts awesome like a truck should, So if your looking for a New
> truck definitely check the difference on 308 vs 342. With the 308 it shifts and
> bangs and gets confused when to shift.... 342 imo is the only way to go!!

286.   On Cars.com, another consumer of the 2015 Chevrolet Silverado 1500

wrote on August 28, 2018:

> I but a brand new 2015 crew cab Silverado from the 2 months I have problems
> I never buy another one is my last one first all the lights in the dashboard at
> 25000 miles the transmission went out And now at 94000 miles my engine
> making all this noises is not a safe truck to drive I talk to couple of my friends
> they're having problems too '

123

287.   On Cars.com, a consumer of the 2016 Chevrolet Silverado 1500 wrote

on December 16, 2017:

> Nice extirier and intirier but engine knock and problem with vibation when
> driveing down the road take it to dealer to be repair and thay said its normal

288.   On Cars.com, a consumer of the 2016 Chevrolet Silverado 1500 wrote

on April 28, 2019:

> The transmission is shuttering and slamming into gear it's just over its 41,000
> Chevy said they know that there is a problem they have tried to fix it at 980
> dollar bill and it is still doing it. It doesn't matter shifting up or slowing down
> it feels like it's going to fall out. They won't stand behind the transmission,
> even though it a known problem.

289.   On Cars.com, a consumer of the 2015 GMC Sierra 1500 wrote on

December 14, 2018:

> I got a lemon. Roof leaking, received damaged spare tire/equipment,
> transmission is slipping, heated seats failed already, the dealerships/service
> are awful. I will never buy another GMC ever. Not to mention, second model
> from top Denali... no heat to the backseat!!!

290.   On Cars.com, a consumer of the 2016 GMC Sierra 1500 wrote on

October 1, 2017:

> 61000 for a old tractor like ride. They can't fix it. They tried. Don't think even
> manufacture knows the cure. Poor quality. Better drive one at freeway speeds
> before buying cause they can't fix if it shakes or vibrates

291.   On Cars.com, a consumer of the 2015 GMC Yukon wrote on January

17, 2019:

My 2015 Yukon Denali is 4 whl drive, the transmission when put in reverse seems to have a second engagment a couple second after putting in reverse which is troublesome. Anyone else have this issue?

292.   On Cars.com, a consumer of the 2015 GMC Yukon wrote on February

7, 2019:

DO NOT BUY THIS VEHICLE NOTHING BUT TROUBLE ONE THING AFTER ANOTHER $70,000 pcs of junk AIR COND COMPRESSER FRONT REAR STRUTS TRANSMISSION PARKING SENSOR ALL KINDS OF RATTLES BUY SOMETHING ELSE YOU WILL BE THANKFUL

293.   On Cars.com, a consumer of the 2017 GMC Canyon wrote on

September 13, 2018:

Save your money and buy something else. The seriously flawed 8 speed transmission will leave shuddering and vibrating due to a faulty torque convertor design. It feels like you are driving over rumble strips. Worse yet, when you accelerate the transmission bogs down and is a serious safety issue. GM is clueless. I understand they may have a new design torque convertor but you are put on a waiting list. Meanwhile, makes you wonder what all in the transmission is being damaged as they will not pay for a loaner vehicle until the parts come in, even under their own warranty. So you simply drive the piece of junk and hope for the best.

294.   On Cars.com, another consumer of the 2017 GMC Canyon wrote on

June 23, 2018:

This 2017 slt vehicle is a disappointment. Bought it new April 26 2017, today is June 22, 2018. I have 4500 miles on it. Had it in the shop 2 times for a total of 43 days for transmission problems. It would down shift very hard from 3 rd to first. Felt like something was grabbing the rear rend. 1st visit the dealer had for 3 days and , after 'tweaking the software' , said the hard shifting was normal. Second time I requested a ride along. That dealer employee happened

to have a 2018 canyon, which was good because he could make a legitimate comparison. When the problem demonstrated itself, he said ' whoa, mine does that but not THAT bad'. Then the wait started. Service mgr had to discuss with GMC big boys. They wanted to keep 'tweaking the software'. Then they wanted technician to 'tear it down' . Fortunately the tech said was stupid and the Gmc big boys finally authorized a new transmission. Then it took 14 days to 'find' a transmission and install. Total of 43 days. In January 2018 I started to experience a feeling/sound like going over rumble strips. I waited until it finally got so frequent and pronounced that when I took it in the dealership could not deny experiencing it. Or say 'that is normal'. I took it in June 11. It is now June 22. Decision is that it is the torque converter. But they haven't even started to replace it because there are no torque converters available. But, I should be glad to know that I am first on the list. Whoopee!! 55 days total in the shop for transmission and torque converter and counting. And this is assuming they will not find any other problems once they start. After this is resolved then they have to address the suspension. The ride has progressively gotten worse. It is like riding over cobblestones regardless of speed or road surface. This is already on my problem list at the dealership. Very much regret giving up my 2005 midsized foreign truck. I am making payments but cannot use my truck. I will say the service mgr did give me a compensation after my transmission saga. Soothes the pocketbook a little, But sure hasn't taken away the frustration, irritation, disappointment, aggravation we are experiencing. Don't know if I will every feel comfortable with this vehicle b [review cut off]

295.   On Cars.com, a consumer of the 2017 GMC Yukon XL wrote on

February 5, 2019:

The 8-speed transmission is horrible and doesn't drive smoothly. I've never spent so much money on a car and been so unhappy with a car. We are in the process of trying to get it bought back...

### 3.   Complaints on CarComplaints.com

296.   On CarComplaints.com, a consumer of the 2017 Chevrolet Silverado

1500 High Country V8 with and automatic transmission wrote on September 1,

2017:

> I found hundreds of complaints about a transmission slip, bump feeling when starting to drive or slowing to a stop with no solutions or suggestions. Took it in last week for the third time and after hearing the previous 2 times that it was a "programming issue" they told me it might be the drive shaft.
>
> When I went to pick it up at Chevy they told me the drive shaft was fine and gave me the following bulletin (#PIT5161F). Basically states that if you do not have a full or empty tank - the shifting in fuel can cause these characteristics. So here I am thinking that I have a $56,000 truck (high country 4x4) with no rear a/c and now I have to deal with a feeling of getting rear ended if I do not have a full tank of gas. Rear AC - my fault for not noticing...but not sure how GM thinks this gas tank issue is acceptable. Its a truck that weighs over 5,000 lbs and a couple hundred pounds of gas "shifting" can make it feel like it has transmission issues. Owned it about a year and has 15,000 miles on it. Wish I could just return it at this point.

297.   Also, on CarComplaints.com, a number of NHTSA complaints appear, documenting consumers complaining about the 2015 Chevrolet Corvette repeated their Transmission Defects issues, including one at https://www.carcomplaints.com/Chevrolet/Corvette/2015/drivetrain/power_train.sh tml (last accessed February 29, 2024).

(a)    On May 1, 2015:

> 8 speed automatic transmission down shifts at a stop with such force it feels as you have been hit from behind by another car while coming to a stop. Transmission also will not always engage properly and will over rev and slam into gear possibly causing an accident. Transmission at times will disengage while going forward then slam into gear with great force. I was told by a GM insider that GM is aware some transmissions are defective and is working on a kit to fix the fluid starvation problem internally but has done nothing to inform owners of the potential dangers of erratic shifting that it's causing

127

while driving. This also causes the transmission to over heat and to illuminate a warning lamp.

- Downers Grove, IL, USA

(b)     On February 27, 2016:

8-speed automatic transmission always shifts erratically when starting out cold (lazy shift, slow shift, etc.) and occasionally does not downshift when car comes to a stop, only to slam hard into 1st when gas pedal is pressed to resume travel. Dealer says GM claims this is "normal, " but no car I've ever owned behaves like this. Appears to be fluid starvation internally. Any fix/replacement would be costly for GM, so given their history w/faulty ignition switches, not surprised they're trying to avoid it. Transmission is definitely not normal and behavior is unpredictable + unacceptable -- especially at this price. When car is moving & transmission is in drive and trying to lazily shift gears, you temporarily lose ability to apply power, which is both dangerous and unnerving. Clearly, this transmission was put into production w/inadequate testing & development. A recall is necessary to fix properly.

- Kansas City, MO, USA

(c)     On November 22, 2015:

Automatic 8 speed transmission had to be replaced at 2000 miles on the odometer due to hard shifts and shifting automatically to low gear at highway speeds nearly bringing the car to a stop in interstate traffic, now 700 miles and 4 months later the transmission is stuck in second gear and you cant drive fast enough to get out of the way of traffic. And I know of several other cars like it that have similar problems. This is a real safety problem and GM seems to ignore it, probably until someone gets hurt or killed.

- Lexington, KY, USA

(d)     On January 7, 2016:

The A8 automatic transmission in the 2015 Corvette is prone to occasional hard downshifts from 2nd to 1st gear when driving at slow speeds (less than 10 mph). Sometimes the downshifts are so violent that the car jerks forward several feet. The first time it happened I thought I had been rear ended by another car. The unpredictable behavior of the transmission is especially dangerous in proximity to pedestrians or other vehicles.

- Salado, TX, USA

(e)     On July 25, 2016:

Automatic A8 transmission has the following issues: 1) morning shift from reverse to drive severely delayed, bangs in eventually. 2) erratic shifting in normal traffic 3) the 2-1 downshift when coming to a stop results in severe bang, lurches forward and is very unsafe in a parking lot situation. Also in stop and go traffic, same lurching forward. Feels as if someone hit you from behind 4) torque converter lockup in 5th and 6th gear. Dealer tore apart the car to replace the stator, performed software update - neither solution worked.

-Murphy, TX, USA

(f)     On October 16, 2017:

I had my vehicle serviced at dan vaden Chevrolet in savannah, ga on 16 Oct 2017 at (12,200 miles). My main concern was a shudder and jerky motion the car starts demonstrating while in motion, accompanied by fluctuating engine rpms. After researching on the internet there are 1000's of issues with these torque converters and who knows what accidents these failures have caused. There should be a total recall on these transmissions. A service department technician test drove my vehicle and confirmed and documented my concerns and stated it was okay to drive ? I am scheduling another service at (13000 miles). A search of the internet will fill you full of facts on these failures. Problems with the torque converters with these high end vehicles are well on the way to become another Corvette issue of epidemic proportions. Please assist.

- Hinesville, GA, USA

129

(g)    On March 22, 2016:

2015 Corvette stingray Z51 - 8 speed automatic transmission torque converter. With only 7,500 miles on the car it started to run jerky and rpms would fluctuate for no reason (especially at highway speeds when fully warmed up). Often felt like driving on a washboard dirt road. After a cold start, there was a delay after shifting into drive. When it engaged after several seconds it would do so violently, lurching the car forward suddenly. Dealer diagnosed faulty torque converter as defective and a known problem with these transmissions. After less than 2,000 miles the symptoms returned and the dealer again replaced the torque converter. So now I'm on my 3rd defective tc. After 1,700 miles, symptoms returned again! dealer said that Chevrolet and GM have ordered a stop on replacing the tc's since no fix was available. GM advised to drain and flush tranny, refilling with mobil1 transmission fluid. This seemed to work (only for a little longer) but is worrisome because in the future service, a technician will likely refill with GM fluid, not mobil1. Especially if a second owner. Now at 16,100 miles the symptoms are returning! jerkiness, slamming into gear after a delay on cold starts. GM seems to have turned their back on stingray owners by kicking the can down the road beyond warrantee (with the mobil1 "band-aid fix"). on the forums there are so many owner complaining about this same issue. I am amazed that there is no official investigation resulting in a recall. This Z51 LT3 stingray was $75,000 otd! for this cost we should be able to expect a quality vehicle and a motor company that stands behind it! can somebody please help us with this serious and potentially dangerious problem?

- Wellington, FL, USA

298. Also on CarComplaints.com, a consumer of the 2015 Chevrolet Silverado commented on November 1, 2015 at https://www.carcomplaints.com/Chevrolet/Silverado_1500/2015/transmission/transmission_shifts_poorly.shtml (last accessed February 28, 2024). The complaint stated:

I've been researching hoping to find a solution to the 8 speed transmission in my 2015 Silverado LTZ Custom Sport Z71 with 6.2 l. It does the same as many others have described on here. The shifting is horrible, feels like its going to rip the drive line out at times. I've taken it back to the dealer at least 5-6 times, I've been told it needed to be reprogrammed, that it needs to get used to the way I drive, and poor gas. Finally the dealership replaced the transmission and this was great, my truck was driving and shifting like it should and then after a couple of months it went right back to doing the same thing, it even surges at times when you first put it in gear so you best have a good foot on the brake.

I'm at a loss now, I don't know what to do. I got a price to trade it in but it was going to cost me a great deal more and I honestly don't see why I should have to spend more to get a vehicle that is mechanically sound when my truck only has 15,000 miles on it. I love my truck, the 6.2 has excellent power but what happens when my warranty runs out.

I've watched and hoped someone would start a class action lawsuit against GM for knowingly selling vehicles with problems. Or have they fix the problem in the 2017's. I know some of the corvettes have the 6.2 motor do they have the 8 speed transmission also? If so do they have the same problems?

As for the lemon law, I'm in Louisiana and honestly not sure if that would work here. I just know when you pay 56,000 dollars for a vehicle you expect to have zero trouble out of it.

If anyone finds a solution please post it here for us all to see.

- Lando S., Anacoco, LA, USA

299. Also on CarComplaints.com, consumers of the 2017 Chevrolet Silverado commented on their Transmission Defect issues, including the following complaint                                                                                     at https://www.carcomplaints.com/Chevrolet/Silverado_1500/2017/transmission/surg

131

es_and_jerks.shtml (last accessed February 29, 2024).

(a)     On November 22, 2016:

My problem is like a lot of the other complaints that I've been reading. I purchased my 2017 LTZ Z71 with a 5.3 and 8 speed transmission in late 2016 and after driving it for a month or so I really started to notice surges and jerks mostly at low speeds and sometimes slowing down coming to a stop. The jerks sometimes feels like I got hit from behind. After several visits to the dealer and long discussions with service management, I was first told it had to learn my driving habits. Then I was told it is a characteristic of the transmission. I recently took it back and they replaced the transmission fluid and told me they were going to replace the torque converter early next year when the new design came out. So I guess have to just put up with it, I just don't know for how long.

- Rudy D., Corpus Christi, US

(b)     On January 3, 2018:

Purchased 2017 Silverado 5.3 w/8 speed auto on Dec 20 2017. At approx 535 miles, transmission began shifting hard at speed under 15 miles per hour, included a "clunk" similar to a universal joint going bad. Problem exists with both up shift and down shift. At 2066 miles truck started to surge as I slowed to stop. A heavy clunk and surge gave me the impression I was hit from behind. I stopped at selling dealer and service advisor assured me that this transmission had a "learning" curve that adjusted to my driving habits and i should drive for 10,000 miles to allow the system to "learn" my habits. Deciding that sounded like a great story I Googled for Silverado's with 8 speed transmission issues and found more than I cared to.
I have seen all the complaints and concerns but no solution from GM. I fear I have invested a bunch of money into a disaster. Having owned over 7 GM products over 57 years I am disappointed with this one. That said I'm heading back to dealer today.

Any GM service people monitoring this or anyone that has a definitive solution I'd appreciate a reply.

132

- Gary L., Cumming, US

(c)     On February 4, 2018:

$62,000.00 truck including the new CORSA 3.5" exhaust and COLD AIR INDUCTIONS sealed cold air intake box. This truck shifts horribly throughout the 1-2 shift and especially the 2-3 shift. How can these 8 speed transmissions function this poorly. I had a 2012 AUDI Q7 S-LINE with over 110K miles on it. The 8 speed transmission worked flawlessly the entire time I owned it. Every single shift whether flooring it or accelerating as slowly as humanly possible, were seamless and exuded quality engineering and workmanship. How can this transmission shift as poorly as it does with only 4637 miles on my truck. GM big wigs need to start taking some pride and responsibility in their most profitable and best selling vehicle that they sell.

- 98supra6spd, YPSILANTI, Michigan, United States

300.   In another comments page on CarComplaints.com for the 2017 GMC Sierra, consumers stated at https://www.carcomplaints.com/GMC/Sierra_1500/2017/transmission/hard_shift_i n_and_out_of_first_gear.shtml (last accessed February 29, 2024).

(a)     On April 3, 2017:

When going slow it will shift hard and clunks sometime worse then others when shifting from 1st to 2nd and other times it works right. I have had it to the dealer at least 3 times. 1st time they said it was too new and had to learn my driving habits. At about 3500 miles they did a adaptive relearn. The third time they found an update and did a relearn, no change. Now there is around 7500 miles on it and I was told there is nothing else they can do and this normal for this 8 speed transmission. At 58000 dollars it is ridiculous to think this is OK. They need to come up with a fix for this. I'm not the only one with this problem go on GMC trucks.com. There are 9 pages of complaints for this problem. I would be afraid to buy the new 2019 truck coming out, as they can't even get the current model right.

133

(b)     In January 2019:

January 4, 2019: I dropped my truck off at the dealership service department and informed the sales staff that I was having a significant engine/transmission related problem that I did not feel comfortable driving the vehicle. I made an appointment and left the vehicle. It is current being troubleshot; the mechanic informed me that an ejector must be replaced and the transmission must be further analyzed to determine what is going on with the vehicle. I was informed that a loaner vehicle may be provided if they can not repair my truck in the near term. I am currently renting a car for getting to/from work. This problem was noticed on the first day of purchase but I was informed that it was normal, but the problem has gotten worse and more intense.

Update from Jan 9, 2019 I purchased the 2017 GMC Sierra, Crew Cab, SLT 1, truck from Sam Taylor Buick/GMC/Cadillac in Fort Walton Beach FL. I noticed a faint shifting problem immediately, but was told it was normal and it would go away eventually. The problem has become extremely noticeable and severe at times. I do not feel that the vehicle is reliable to drive outside my immediate commuting area until it is repaired by certified GMC mechanics. Sam Taylor Buick, GMC, Cadillac is now under new ownership and they are trying to resolve the mechanical issues with my vehicle. I will give the a fair opportunity to do right by their GM product. I will update this post as more information comes to light.

Update from Jan 14, 2019 Step One Buick GMC of Fort Walton Beach, FL has been working on my 2017 GMC Sierra 1500, 6.2 L truck for almost 1 week now. I rented a car during the first week and now waiting to get a loaner. The Service Department says its put back together but requires a road test; its now1:52 pm --apparently the road test must be a length process. No calls yet. Why hasn't the State of Florida, Texas, and other Consumer Affairs agencies gotten involved with this GMC Sierra vehicle issue? (Rhetorical) The public always get lip service and NO ACTION but when it comes to enforcing product standards and laws to protect the public. These vehicles should be classified as lemons after Big GMC fails to correct the defects!

Update from Jan 15, 2019 Step One Automotive Group, aka Sam Taylor Buick Cadillac, returned my 2017 Sierra after 1 week of troubleshooting the check engine light, vibrating steering column, as well as the shuddering and knocking in low gears. The remedy was to replace an ejector, clean the trans pan, and replace the transmission fluid. I still feel the shifts during the

transition through the lower gears, but its a bit smoother....no banging from the rear differential. The Service staff could have followed through with providing the loaner vehicle once I returned my rental car. The good part is that I was not charged for the repairs. The Service Department staff was on point and the mechanic work acceptable, however, I do not believe the issues have been permanently resolved. Time will tell. If there is a recurrence of the same issues, I will likely trade the GMC Sierra for another brand that is more reliable.

### 4.    *Complaints on gmauthority.com*

301.    Similar comments have been posted in threads on gmauthority.com, including the following comments discussing the 2016 GMC Sierra at http://gmauthority.com/blog/topic/2016-sierra-8-spd-issue/ (last accessed February 28, 2024). One commenter began the thread on February 1, 2016 as follows:

> I took delivery of a 2016 Sierra Denali (5.3 V8, 8-Spd, 3.42) in November and had to take it into the dealer a week later for a transmission issue (coming to a stop the truck would shudder as though the transmission was shifting hard into first gear or as though the engine was about to stall). 3 weeks after taking it into the shop, GMC engineers determined that there was a torque converter problem that was staying engaged too long causing the engine to nearly stalling out when coming to a stop. They okay'd replacing the entire transmission for a new one. I finally got the truck back (a MONTH after first taking it into the shop – and yes, the truck spent 30 days of its first 39 days of ownership in the hands of my dealer) and figured that would be the last of my problems. Since then, I've noticed that when yielding – or in traffic/congestion – when I'm slowing down almost to a stop (around 5 mph or lower), then stepping on the accelerator, there will be a long (1 to 2 seconds) delay between me stepping on the accelerator to move and the truck shifting into first and beginning to accelerate. I took it to the dealer again, and they claimed the delay and even "hard" little shifts are normal for this transmission because it is "adaptive" and constantly learning… What? I at first bought it (they are the pros), but I'm beginning to hate not having the confidence of pulling out of a driveway, side street, etc. and being able to immediately get the power and acceleration I need to get out of the way (or better yet to get on my way). Is anyone else here having similar issues with their new GM 8-spd?

135

(a)     A consumer responded on this thread on February 11, 2016:

First post. Hate to see you are having problems. Thought I might be the only one after hearing what service department is telling me. I just bought a 2016 Silverado LTZ with an eight speed and it shifts horrible. Love the truck but not fun to drive while taking off and stopping. Truck has 1400 miles on it because according to service department I have to get my truck to learn my driving habits. I am either a bad driver or have a truck with a learning disability. When truck sits over night or going home from work it always jerks a couple times taking off. Never fails. When I first bought, every time I would stop it would do something that felt like it was still shifting down when I should be stopped and actually feel like a double stop or surge forward. May sound crazy but really is the only way I can explain. There has been a couple times when I pulled into a parking spot to where it felt like I hit a curb because of the way it would stop. I have never experienced anything like this with any vehicle I have ever had. Seems like the computer is not in sync with the transmission at all. I will make turns and vehicle don't seem to downshift when it should. I truly feel like I am driving a manual shift truck without using clutch. Love the truck and hope enough people speak up so this problem can be fixed. According to my service department vehicle runs as it should. If this is the case I wish I would have kept my perfect running 2013 Ford F-150 4×4.

(b)     A consumer responded on this thread on November 15, 2016:

I purchased a 2015 Sierra SLT with 6.2l and 8 Speed in August 2015 and when it is cold meaning its been setting a day or so, you will almost always get a slip in the transmission causing a several second delay. I had went to a show for my company in Atlanta GA and almost got hit because, I backed out onto the street and when I put it in forward it would not go for several seconds because it just revs up the stairs shudders going forward. I have taken it back to my dealer twice and they cannot recreate the problem so, they have done nothing. I ran into a man at my dealership who was in the process of describing the exact same problem and gave him my business card to see if they fixed his issue. The dealership told him the same thing and he called me yesterday to let me know he and his wife got hit in the Highland NC because, he backed out and could not go forward just like I do weekly in mine. I now have a couple phone videos of mine doing it to show my dealer again but, I am wondering what to do as they have not done anything yet.

(c)     A consumer responded on this thread on December 5, 2016:

I just bought a 2017 silverado ltz 6.2/8-speed and I'm experiencing similar issues! If I'm driving 35-55mph every once in a while I get a shudder in the wheel for a brief 1-3sec on and off while I'm at these speeds it's so frustrating!! The truck has 500 miles on it and my old 1995 silverado with 185k drove with no shudder or vibration issues.

(d)     A consumer responded on this thread on December 5, 2016:

I purchased a 2017 GMC Sierra 5.3 with the 8 speed transmission two weeks ago. (This is my 5th GMC truck) no previous problems.

I now have 1000 miles on this truck.

I noticed the truck shudders and seems to have a hesitation between gears, especially at low end. I went in on Dec 2nd 2016 and talked with the dealer who said it takes a while for the transmission to learn my driving habits. What? . It also clunks when taking off. Was told the clunk is normal. This morning Dec 5th i warmed the truck up for ten minutes put it in reverse and the truck would not move. just revved up. 10 seconds later it slowly starts to back up onto the street. I put it in drive and it still won't go .just reeves up for another 10 seconds before it finally jumps into gear. Made an appointment to bring it back to the dealer.

This can not be normal for a commercial grade pickup.

(e)     A consumer responded on this thread on December 19, 2016:

I bought it brand new Dec 2015 (2015 High Country 4×4, 6.2ltr V-8) with the new eight-speed Hydra-Matic 8L90 transmission. So I've had it a year now and have put 19k + miles it. I noticed about a month ago when the engine was cold and I went from park to drive it felt as if I was parked on a hill and the trans was in a bind, taken 1-2 seconds before roughly engaging in gear. Then it started doing it more often even when the transmission fluid temp was above 130. Well last week it began to shudder almost like driving over road strips before a stop sign. I also noticed that if I had it on cruise control between 40-60mph the tachometer would rev up every time it shuttered/vibrated. It took it back to the dealership as it is still under warranty and had the mechanic ride with me so he could see for himself what my Chevrolet was doing. He knew immediately as to what he thought was causing the vibration…torque

137

converter he says! So as of right now it is in the shop to replace the torque converter with an upgraded one per this bulletin 15389 which provides a service procedure to reprogram the transmission control module (TCM) on certain 2015 model year Cadillac Escalade, Escalade ESV, Chevrolet Silverado, GMC Sierra, Yukon Denali and Yukon Denali XL vehicles equipped with an 8L90 8-Speed (M5U) transmission and 6.2L (L86) engine. These vehicles may have a condition in which transmission calibration allows a higher than target energy input to the torque converter clutch (TCC) under certain conditions. This may lead to faster than expected torque converter clutch material wear, and a shudder feeling.

(f)    A consumer responded on this thread on November 15, 2017:

Good day to you all. I have a 2016 Sierra with the 8 speed transmission. At 18300 miles I took the local dealer because of a vibration at low RPM throughout the gear range; rough idle; and jerking gear changes from 1st to 2nd at low speeds.

The dealer had the truck for 5 days. They had to await the back-ordered tranny flush juice. They did the "triple flush" of the tranny and also replaced all 4 engine mounts. They claimed they updated the software on the truck engine management control and they also updated the software on the infotainment system.

I now have 19300 miles on the truck, and it is now going back for the exact same reasons – rough idle (not as bad as the first time), and the start of the vibrations.

I expect them to keep the truck for a week, as I dont wish to continue going back there every 6-8 weeks.

I was advised that they are short handed WRT transmission specialists. This is a common excuse in Fort Lauderdale, with at least 5 dealers all "sharing" the same transmission specialists.

My humble advise is to have them do the tranny flush and confirm there is a warranty on these services. I assume the flush is good for +- 1500 miles MAXIMUM.

As soon as I have my truck back, i shall report the dealers explanation.

(g)     A consumer responded on this thread on December 12, 2017:

bought a 17 Denali 6.2 w/ 8-spd in march of 17. I finally got around to taking to the dealer for a shifting issue from first to second gear (19k miles). If I was accelerating slowly it would shift very hard into second. It appeared as though the RPMs would go too high before shifting, then slam in to second. They replaced my transmission, and now I have a whole new set of problems. Its sluggish and hesitant between gear 1-3 or maybe 1-4 when accelerating, and sometimes clunks into first coming from second upon stopping. Needless to say I'm on the verge of trading it in.

(h)     A consumer responded on this thread on August 16, 2018 and on

        August 21, 2018:

I purchased a pre-owned 2017 GMC Z71 with the 6.2 and 8spd in April this year. It had 10,500 miles on it at the time and I really like/liked the truck. Great power, fuel economy and very comfortable. Last moth while traveling on the interstate (on vacation 250 miles from home) it started exhibiting the same problems mentioned above (like someone flipped a switch). At first I thought I was riding on rumble strips and tried swapping lanes, no change. Next I noticed the engine RPM's were fluctuating and it felt like it was hunting for the right gear. It also exhibited the same problem mentioned in another post above when going uphill. We were not towing anything, the hitch had never been used when I purchased the truck and I have not pulled anything heavier then our 16ft boat. The truck had 16,700 miles on it when this started. Once we arrived at our vacation destination I did a search to see if other people had been experiencing problems with these transmissions and after viewing all the post I wished I had done more research before purchasing this truck.

I was finally able to get it to the dealership and left it with them on August 6th. They still have it and can not correct the problem. They did the flush and replaced the engine mounts. They also commented that they know there are problems with this transmission. I was told yesterday that they are trying to contact GM to see what to do next. I have purchased 6 new GM vehicles over the years and 7 pre-owned GM vehicles and never experienced anything like this before with them where the problem couldn't be corrected. If they don't get this corrected I will be done with GM.

[August 21, 2018:]

The dealership called Friday (August 17th) and stated they had the problems resolved. I picked the truck up around noon and initially it performed great. After about 40 miles of driving I made a stop and upon starting the truck the shudder came back while idling as well as the rpm fluctuations. At highway speeds the shudder comes and goes and a couple of times it acted like it was hunting for the right gear which was one of the problems it had before the repair attempt. I contacted the dealership and they stated they would look further into the issue. If the TCM is really "learning" my driving habits then I will have to agree with an earlier post that the computer has a learning disability.

After a couple more days of driving the truck it is starting to look like all of the original issues may be returning.

I will say the dealership has been very cooperative and wants to resolve the problem. They even picked up the extra cost of the rental beyond what GM covers.

I have also contacted GM priority care. Below is their response and I will keep posting updates.

"We understand how you like to have this issue resolved and we would like to work closely with you along with the GMC dealership in resolving this issue. Due to the nature of your concern we will endorse your case to a Senior Advisor who will continue to work directly with you and your dealership to review your vehicle and concerns. Please know that all the information you have provided will be available to both your dealer and Senior Advisor as well. We will forward your case to them and the Advisor and Dealer will review your case and vehicle details, and one of them will be in contact you within 2 business days to assist you further."

### 5.     *Complaints on gminsidenews.com*

302.   On gminsidenews.com, a consumer posted on September 12, 2017:

2018 8 speed transmissions

Does anybody know if the 2018 model GMC 1500 trucks have upgraded - improved the 8 speed transmissions? My 2016 has only 10000 miles and at the lower speeds it has always shifted funny and sometimes hard. Out on the highway it shifts good in the higher gears. I have to let it warm up a little or it

jumps into gear. I was going up the driveway the other day and the transmission just quit for a second and jumped back into gear. I have contacted the dealer but he says that all the 8 speed trans act that way. Wish now that I would have stayed with the 6 speed trans as my 2014 Tahoe has never given me a problem and shifts smooth.

### 6. Complaints on gm-trucks.com

303.   Similar comments have been posted in threads on gm-trucks.com. One commenter began a thread titled "My own 8 speed problems & resolution" on March 1, 2016, at https://www.gm-trucks.com/forums/topic/184117-my-own-8-speed-problems-resolution/ (last accessed February 29, 2024) as follows:

**I wanted to post up my own experience with my 8 speed transmission in my 2015 SILVERADO HIGH COUNTRY 6.2L 8 SPEED 8L90**

I bought the truck brand new in July 2015. Manufactured date of April 2015. I purchased it from a dealer in NH and they have been great to deal with.

So here is the story-->

July 2015 --> At first the truck was flawless. It shifted butter smooth and on a very rare occasion (once a week maybe) it would clunk slightly when downshifting. It was totally negligible.

***As time went on and the mileage increased it got worse. Here is a list and description of what it was doing once I hit about 3500~ miles. It didn't clunk and act sloppy all the time. HOWEVER, there is a good 65% chance the truck was going to shift poorly.

• It clunks (HARD) into lower gears when slowing down/downshifting. This is the biggest issue and has continued to happen up to now.

• Taking off from a stop with smooth, consistent acceleration, it has trouble deciding the correct gear and vibrates.

• Same scenario as above, the rpm's fluctuate.

• It makes clicking noises constantly when shifting. If you manually shift it, you can hear clicks in almost every gear.

• I can MAKE it clunk hard if I coast in gear 7 and manually shift it into gear 6. **NO RELATION TO AFM/DoD WITH THIS.**

• For some reason, turning into another road or turning in a slight corner and accelerating will make it downshift and clunk hard.

• Going from Park to Reverse either cold or after driving it would slight clunk, then engage a second or two after the initial clunk is heard/felt.

December 2015 --> I took it to my dealer at the 5000 mile oil change/scheduled maintenance and I had the service manager ride with me to hear the clunking. The truck was really acting up that day, and it was clunking like crazy. The service manager said he heard the noises clear as day. He told me the 8 speeds have some clunks, and because they are so new people need to get used to them. He gave me the whole they need to learn and EPA demands greater fuel mileage talk. I disagreed with him and we had a long conversation. I mentioned to him when the truck was new it did not do this.

When we returned to the dealership, this is exactly what he told me: "this is normal operation, we are not going to do anything about this issue"

I asked him to at least check for updates and go over the truck top to toe and check motor mounts, transmission mounts, spring shackles, etc. Just to rule out any possible 'looseness' that could cause the clunks. The work order said they checked for updates and looked the truck over. They found nothing out of place and no updates available.

Around two weeks later, with 7200~ miles on the truck, I was talking to my uncle about the transmission issues and he called his local Chevy dealer on my behalf. The service manager said the 8 speeds have a couple updates available, and to bring my truck up to see if they apply to it. He said the update had really helped a couple 8 speeds they had recently sold. So I drove up to their dealer (an hour in the opposite direction of MY dealer) and they hooked my truck up. I figured MY dealer had done the updates, but there was an available update. They updated it and it really didn't help much. It seemed to make the truck hold a little higher RPM cruising, but I didn't notice anything besides that.

142

March 2016 --> Just yesterday I dropped my truck off at my purchasing dealership with 9800~ miles. I asked them to do the scheduled maintenance, and look into the transmission one more time. Especially considering it hasn't gotten better, it got worse. I specifically asked them to drop the pan and look at the fluid, valve body, etc. They called me Monday afternoon and told me they took an extensive look at my transmission and they are going to put a new transmission in it. They said after driving it/taking a look that it is "A GM candidate for a new transmission" because of the "symptoms it exhibits"

In 5-8 days the transmission will arrive from Detroit and then they will put in a new transmission.

I will keep you all posted on the results and we will see if over the next 10k miles the new transmission stays smooth.

…

I am giving GM a chance to fix the problem. Out of all the 8 speeds they have manufactured, they can't ALL be bad.

If this doesn't fix it I will ask them to buy it back. If they wont buy it back, then I will trade it in. Lesson learned.

**On March 22, 2016**

I just dropped the truck off at the dealer this evening. I just hit 10000 miles. The tech wanted to hear it. I drove, and I got it clunking quite a bit. He told me the way my transmission was clunking was NOT normal. He also said they have had a lot of concerns with 8 speeds. He said most of the 8 speeds have slight clunking that is due to tolerances/backlash which is understandable. He also mentioned the torque converters have been known to 'shred' themselves and create a lot of debris. Either way the 8 speed is not doing so hot. GM is working on it a permanent fix, but no absolute fix yet.

I can't say enough good things about my dealer though. They told me if it can't be fixed, or it comes back from GM I 'have to live with the clunk' that they will help with either trade assistance or buy it back. I really hope they can figure out a fix. It's a damn nice truck.

To those of you having any kind of doubt, bring it in to the dealer and at least have them document it. I live an hour away from the dealer, so I know how

much of a pain it is going to the dealer. These trucks cost too much to settle for these transmission issues.

**On March 24, 2016**

[In response to the question "Are people with 2016 models and the 8 speed transmission having the same issues?"] Not sure if the 2016 8 Speeds are quite as bad. The tech told me the transmissions currently being put into the trucks have an updated torque converter. That was one problem. My tech was very friendly and did say they have had a 'slew' of problems with the 8 Speed.

HERE IS ANOTHER UPDATE:

I picked the truck up last night after a 24hr turn around from my dealership. They took the truck for a four hour drive as they called it and did the relearn adapt while driving around. They had one guy drive, and another with the computer monitoring the transmission.

\*\*\*

The drive home seemed to be much smoother. I will let you all know how it goes. I have spoken with the service manager, my sales man, and the manager of my dealer and if this doesn't meet my satisfaction they have agreed to buy it back. I have been ultra patient with this whole thing, and they have been more than willing to help me this. At least there are some dealers out there that care about the customer. Believe me, I have had my fair share of different dealerships treat you like crap.

I hope this fixes it because I do enjoy driving this truck around.

**On April 12, 2016**

Alright everybody. Here is the verdict.

I have an appointment tomorrow morning to bring the truck back to my dealer. The 'reprogram' did not help at all. They told me to drive 500 miles after the program to help it 'learn' further. I drove it 1000 and it still does the same clunks. All low speed clunks. I know exactly when it will clunk now, so riding with my dealer should show them my issues.

At this point I am planning on getting rid of the truck. I tried multiple times to have GM fix this damn 8 speed/clunk fiasco and they have failed so far. Really disappointing as this was my first new truck.

I know I am not the only one with this issue, and I know not every truck built has this issue. I wish all of you luck with your trucks moving forward.

(a)     A consumer responded on this thread on March 14, 2016:

Subscribed…I'm having problems with my 8 speed as well. Tranny doesn't engage well especially going from park to reverse and if you give it gas before it's ready, it will hammer into reverse and jerk the whole truck violently. Makes you look like an idiot driver when it happens. Truck just lurches backwards. Also clunks when stopping or starting from stop. Also clanks between most shifts. This tranny was definitely not ready for prime time. If it had done this when I test drove it.. I would not have bought the truck.

(b)     Another consumer responded on April 16, 2016 and April 20, 2016:

Well I'm another victim of GM's great 8sp. trans. Actually mine wasn't really giving me too much trouble until I took it in for the TCS update and my truck went crazy. I think they corrupted my computer. Drivers assist back up and all went bad. My RPM's were jumping 1500 to 2000 rpms at 45 mph with the cruise. Not 5 miles down the road it shuttered so bad it jerked the steering wheel out of my hand.

Now my truck has been in the shop all week with no reply except they tried to blame it on me for putting Denali 22in transmissions on the truck. Said it would change the dynamics of the transmission. Needless to say my words weren't that great. Its a 4 wheel drive what the hell has happened. Wanted to know if I had a programmer for changing the tire size. I know what they are trying too pull on me, and told them so. They are really reaching for any excuse.

I could be another lemon victim. Really sucks I love the truck. I have a 30ft off shore racing boat and the 6.2 pulls it with ease.

I know now my truck will never be the same. I'm getting too old for this crap.

Also heard the Dodge 8sp was having issues also. An older gentleman I work with told me they are cramming too many gears in a small case and it won't work. Kinda makes since. I will keep updates if or when I get my $60,000 rolling turd back.

…

145

Lets face it all lie's and deception. My dealer is trying everything in the book to blame me. Its really pathetic they would stoop so low for GM.

They still have my truck, this is week 2. So lets think about that, truly how long does it take to program the computer. That just tells me that there is NOT a cure for our transmissions. It's going to take us the consumer to stand up for our rights and make GM figure something out. I smell a recall but the only one's suffering is us. Who knows how long it will take. Folks don't settle push it to the end, they expect us to give up and walk away. Lets face it the easy solution is to trade it in on something else but that's not the cure. I will ride my dealers ass till something is done. I don't give up.

I have no clue when I'm getting my truck back, but I told the service manager I want my truck shifting like it was right off the lot, that's what I paid for not a test machine. I'm 6' 6" and they gave me a regular cab with no gas at all. I'm so glad their on my side. The 2016 truck I'm driving around in shutters, not sure the tranny size but its a v6. So that tells me there's no fix in sight. My dealer says its a software problem and not the trans. Humm!!!!!!

I will let everyone know what happens if I ever get my truck back.

(c)     Another consumer responded on May 13, 2016:

I'm taking my truck in for the second time with 8 speed transmission issues. I took it in about 2 weeks ago and the performed all of the TSB updates for the programming and it shifted worse than ever. Clunking on upshifts like it was a 1980 Camaro with a stage 25,839,874,329,876,443 shift kit.

The last straw which made me call in for a second service appointment was me starting from a stop on a 3% decline at less than 5mph it felt like I was rear ended hard. I looked back behind me and there was no car. I'm guessing there was no pre-load on the pinion gear and it was between shifts when I started to roll forward and then locked up with some backlash. This is strike #2. If I get it back next Tuesday and I have one more tranny fart, I'm going to be looking to do the same as the OP.

(d)     Another consumer responded on November 2, 2016:

2016 gmc sierra 6.2 8 speed. I too am big gm fan. Have had many. This truck with the exception to the power of 6.2 is a p.o.s ... transmission is garbage. Engine is very noisy and idles like it wants to stall. Rides like a horse. All for

146

almost 60 grand. I'm sure it's not all of them but too many where there is a big problem here. On my second converter. Many relearns. I too would rather drive my old car than this new one. Headed for lemon law. Gm has had their shot.

(e)     Another consumer responded on July 25, 2017:

OK truck has been at dealership (not from where truck was purchased) for about a week now because of steering wheel vibration and clunky transmission and also when left over night you start up in the morning it takes a few seconds for the reverse to grab. The dealership allowed me to drive a brand spanking new Tahoe Platinum so guess I cant complain. So the first time me and service personal talked he said the Torque Converter would be replaced and that GM wanted them to empty out the transmission fluid and refill with different type. I will let him know about the 16-NA-014 Bulletin. I am sure he knows about it. Since I'm not going to mention the dealership at this point the technician told me they were have alot of issues with the 8 speeds. I love my truck and the power of the 6.2.

(f)     Another consumer responded on September 1, 2017:

I just had my torque converter replaced for shutter for the 2nd time. Both time they lasted roughly 16k miles. Does anyone have high miles on their 8sp as i am very concerned about long term reliability. I see now why they decreased the powertrain warranty.

(g)     Another consumer responded on October 20, 2017:

My 2017 GMC sierra 1500 6.2/ 8 speed with 4k miles just had TSB done on relearn of C3 return spring, i took it in because of the clunky noise on downshifts when coming to a stop. At first i thought it was fixed only to discover it wasn't, still clunky. It seems to downshift normally half the time and clunky the other half UNDER THE SAME EXACT DRIVING CONDITIONS. Also took in for rough idle, they adjusted the motor mounts then replaced them, no fix either, giving the truck some more time then I'm trading it in and never buying a GM truck again, what a damn joke this is for the amount i paid for this truck. Also forgot to mention they had my truck 14 days, i got lucky and they gave me a little Buick car for loaner, talked with others who had to endure longer times without getting a loaner. i hope

147

eventually a class action lawsuit against GM is created for this transmission mess and the way they are handling it.

304. Another thread on gmtrucks.com titled "2017 Canyon 8 Speed Absolutely Horrible" began with a post by a consumer named Ron on June 27, 2018 at https://www.gm-trucks.com/forums/topic/213033-2017-canyon-8-speed-absolutely-horrible (last accessed February 28, 2024):

It shifts way to quick into high gears, press on the gas its like you have a standard trans and forgot to down shift, its starts doing the chug a lug.

Press a little more and you get the dreaded torque convertor shudder. Press a little more on throttle and it drops 3 or 4 gears and is screaming!

Then there is the slow reverse engagement in the morning after it sits over night. And the next reverse engagement is so hard it shakes the whole drivetrain! I bought a new truck so I wouldn't have any issues. I dread going to the dealer for transmission issues at 7 thousand miles. I would trade it but ill loose thousands. I am really amazed GM would let this transmission out the door with all these problems. There are a few bulletins out with the issues I have. Anyone have any fixes done that solved the problem? One of the bulletins involves a transmission flush with mobil 1 trans fluid, im not buying that. The shudder is slowly getting worse, has to be wrecking the torque convertor clutch!

(a)   A consumer responded on this thread on June 27, 2018:

Welcome to the 8 speed world. It's the land of confusion for sure. No one knows how to fix them and if you're lucky enough to get one issue fixed another pops up.

When it works right it's a great transmission...or so I hear.

(b)   Another consumer responded on June 27, 2018:

No one can fix it because it is a pisspoor design that should never have been released to the public in the condition it was. Rushed out to keep up with other

8 speeds out there already. I am the guy who gets to try and fix the unfixable. I am the transmission guy at a GMC Buick dealer and I can tell you from experience in dealing with this piece of shit since 2014- cut your losses and get rid of it now. You will never be happy with it. Fast adapts, calibration update after update, valve body replacements and the triple flush on Canyon and Colorado and the one time flush on everything else. Band aid at best. Hopefully the ten speeds will be better. Haven't had one complaint yet and they have been out for a while now and the eight speeds were bad from day one.

(c)    Another consumer responded on July 19, 2018:

Gary, lots of the same issues in the forum with the 8 spd. My 'shudder' issues started around 8 thousand miles and got worse up until they found the technical service bulletin detailing the trans flush. The flush fixes the shudder, temporarily. My shudder is back with a vengeance at 23K miles. Taking it in again for an oil change and the transmission issue will be brought up again. It's under warranty.. yeah... but like you, I think there is probably some long term damage being done to the transmission and torque converter. I'll address that in my next visit with the service manager. All the other issues you listed with the transmission... lazy gear changes, quick to find the top gear, slow to downshift when you need power are all characteristics of a transmission built to get high mileage at the expense of performance. All cars and trucks are going that way I think. That's the world we live in. You're on the right track knowing about the TSB on the trans flush. Let us know how your service visit turns out. Good luck.

(d)    Another consumer responded on March 12, 2019:

It is well known, and even acknowledged by GM, that the problems with this transmission cannot be fixed. Therefore, as soon as possible and with as few miles on the vehicle as possible, take it back to a dealer and request the defect be repaired. Do this several times, keeping all records of when, where, action taken (even if none), any advice or comments made by dealer persons, and if possible, record everything on video with sound. Remember it's not the dealers fault you bought a vehicle with a problem that cannot be fixed by any means, but the dealer is the one that's stuck with trying to fix it. Obtain all the information you can find on this problem, and even similar problems in other models (because the same transmission is used in multiple other vehicles), obtain all applicable GM TCB's (such as TCB 18-NA-177 and TCB 18-NA-

149

355) that have any bearing on the problem, and then after a "reasonable number" of repair attempts apply for Arbitration according to the requirements applicable in your state. In Arbitration, which is free to the vehicle purchaser, present all evidence regarding nature of the problem, past history and the manufacturers inability to correct these serious defects, evidence that the issue exists in the vehicle you purchased, and the history of repeated attempts by dealer(s) to fix the problem but that the problem still exists. When is all is said and done, you may be given a refund of the vehicle purchase price, a replacement vehicle having the same configuration and options, a decision to return to a dealer for further repair attempts, or no other action or remedy. In the case of the 8L45 / 8L90 transmission issues, arbitration in many states has already ordered refunds and replacement vehicles, as the problems with this model transmission have been around for so long and are so well documented. In any event, Good Luck.

305.    In yet another thread on gmtrucks.com, a consumer explained his issues with the Transmission Defects on May 10, 2018, at https://www.gm-trucks.com/forums/topic/211930-8l90-can-it-ever-be-fixed/ (last accessed February 28, 2024) as follows:

I have a 2015 6.2 with the 8 speed with 58k miles I have had a new transmission put in then a stator shaft recall done then a new torque converter and now once again the shutter is coming back seams like they just throw parts at it until the warranty runs out. Also wen the engine is in V4 mode around 40 mph the valves sound like there about to come apart but no problems yet with that. Has anyone had this much trouble and any luck with a fix I read on another form that they went to a mobile 1 fluid and it helped a lot. I wonder what a new converter and flush is going to cost me after the warranty runs out?

    **7.    *Complaints on cadillacforums.com***

306.    Another set of consumers of the Cadillac-brand vehicles discussed their issues in a thread titled "GM's 8L45 Cadillac Automatic Transmission" on cadillacforums.com at https://www.cadillacforums.com/forums/cadillac-forum/t-

974121.html (last accessed February 28, 2024). One consumer began the thread on

June 19, 2017, as follows:

> GM's 8L45 Eight-Speed Cadillac CT6 Automatic Transmission: Recall, Replace, Re-tune or Deny
>
> GM's 8L45 Eight Automatic Transmission is a clunker. GM's customer assistance center acknowledges that the reviews are 'mixed' and one service bulletin has been issued. The 'mixed' aspect of the feedback shows that this 8L45 works normally for a while for some owners. Internet forums are heating up with discussions about otherwise fine cars cursed with this crude, confused and embarrassingly bad 8 speed lemon.
>
> General Motors has managed to take its customers back several decades to an unpleasant time in the early development of the automatic transmission. The GM 8L45 Hydramatic Transmission is part of the powertrain in the Cadillac CT6, CTS, ATS, Chevrolet Camaro and perhaps more vehicles under a different name. This questionable feat of backwards design and engineering was accomplished with variable force solenoid technology, speed sensors and a processor executing hundreds of calculations and commands every 6.25 milliseconds. Clearly, this is not often enough, as evidenced by the ride experience inflicted on the driver and passengers when the thing desperately hunts for the proper gear and any gear will do … to lurch forward. With all that technology it performs far worse than the bands and torque converters of that our grandparents enjoyed in the 1960's and later. In 2016, General Motors was simply not ready to evolve past the 6 speed transmission but that didn't stop it from going ahead and cursing entire fleets of its new vehicles with the crudest powertrain component in its history. And yes indeed, it weighs over 30 lbs. less than its predecessor (one that actually works, though evidently grossly overweight). Perhaps the elusive 2nd, 3rd and 4th gears each weigh 10 lbs., accounting for both the weight loss and crude performance.
>
> The 8L45 is a mess. Its crude state of performance sometimes rears its ugly head on a new GM vehicle on its way home from the dealership, or lurks deep inside its innards for a later outbreak of hard shifts, flares, thunks, and head jerking downshifts at random times in the early lives of the fleet. GM's confidence with this clunker drove it to install it in the Cadillac CT6, CTS and ATS models. Dealerships are forced to appease customers with such phrases as 'performs as designed' and 'performed adaptive fast learn' as a way to force owners to get used to it. The other line of defense is that the transmission is

learning and adapting to the driver's style. Enduring the explanations and excuses of GM service technicians and service managers can be tiring. Confidentially, they'll admit that the thing is a disaster.

Other than a single service bulletin, GM is ignoring this failure as of Spring 2017. To admit there's a problem would be a devastating blow to the marketability of its current unsold inventory. There is also a lot of ego at stake here. GM promoted the 8L45 in its literature in a series of puffed up articles with statements like this:

 "The 8L45 was designed to enhance the CT6's driving experience, offering a strong balance between performance and efficiency," said Bill Goodrich, GM's assistant chief engineer for eight-speed automatic transmissions "Perhaps its best attribute will be that customers really won't notice it – they'll simply enjoy the CT6's seamless, smooth driving experience and on-demand performance."

Read more: http://gmauthority.com/blog/2015/03/new-8l45-eight-speed-automatic-to-debut-in-2016-ct6/#ixzz4k4cZAecM

The owner of a vehicle cursed with this clunker will know there's a problem when passengers ask why the brakes are being pumped when coasting to a stop. That's the 8L45's attempt at downshifting. When the driver gingerly feathers the accelerator to coax the thing into gear after an auto-stop shutdown it may skip several gears and slam into 4th or 5th with a violent shutter. The driver and passengers all feel it as the entire vehicle shutters. At times it may seem like the driveshaft is going to come up through the cupholder and cellphone battery charger. Its performance is indefensible. If it's shifting like an average GM vehicle and it hasn't yet slipped into this confused state, it soon will. No amount of learning, adaptive fast learns or software tunes can apparently help it find the right gears, other than reverse or park, which, luckily seem to work. Dealer lots are filling up with unsold inventory and returned vehicles, many with less than 2000 troubled miles on the odometer. Apparently, frustrated owners were not able to adapt and learn along with the car's stuttering, clunking, and confused transmission.

So, what is the future of the 8L45? Maybe a software tune can bring it under control. If this is not possible, and clearly, GM is in no hurry to resolve this issue, the fate of the 8L45 has these possible futures:

1. It will quietly disappear in 2018, leaving the current fleet in an abyss of wildly unpopular clunkers. The CT6 is becoming known as the shimmying, stuttering, lurching flagship that looks nice.

2. It can finally break in at 40,000 miles or so and can then find the correct gears at appropriate times after a few years of learning and adapting.

3. Third party after-market companies will offer a way to replace and retrofit it with a nicely functioning transmission, like the 6L45, thus salvaging the resale value of the CT6 and others.

Corporate denial doesn't help the brand. Blaming the customer for expecting better shifting insults the brand loyalists. It's clear that the 8L45 was rushed into production without quality engineering and design. Hopefully, GM and its Cadillac division can conjure up a solution that can make its attractive CT6 flagship drive as nicely as it looks parked.

(a)     A consumer responded on this thread on June 21, 2017:

The 8L90 is not any better. My 8L90 in my CT6 with turbo 3.0 is terrible. Worst transmission I have ever had. The 1-2 shift is hard. It also depends on outside temperature whether it acts up to a greater extent. I think the 8L90 could use better fluid or better pressure sensors. . . .

(b)     The original poster added to this thread on June 25, 2017:

To be clear, my article is not about those barely perceptible quivers and shift sequences experienced with most of the 8 speed transmissions in the market. What I am addressing are the violent shifts, head lurching downshifts and abysmal performance of GM's 8L45 transmission that is the curse of the Cadillac CT6.

The perspective formed, as presented in my post is based on two 8L45's, one exhibiting all of its faults on the day of delivery and the second one performing relatively normally until mile number 2435, when all hell broke loose. Again, this pertains to the 8L45 in two Cadillac CT6's that I have owned. Additionally, an internet search of other GM discussion forums brings up similar complaints wherever the same transmission is part of the powertrain. Following through with Cadillac customer support and GM corporate discussions it's clear that the customer base is not universally pleased with this crude transmission. As one would expect, the people in these two GM

153

areas are very polite, helpful and proactive and admit there are concerns. It's not about customers who not quite ready for fuel saving technology that needs to shift constantly. My issue with GM is its slowness in dealing with the CT6's problems and the pompous pre-sale promotion of a transmission that 'makes the driver unaware that it's shifting.' Believe me, when your CT6 issues loud thunks, can barely get through a busy intersection after an auto start/stop lurch as it searches for a gear, you'll want to get rid of the thing. The CT6, with its eye-catching edgy design, can be an extremely unpleasant car to drive when its transmission can't shift correctly, in a violent fashion.

The notion that these things are highly sophisticated and require a long break-in period is silly. Some arrive from the factory in a confused state while others don't lapse into their failure mode until much later. And again, it's not about those common 8 speed transmissions' slight quivers and shakes. Apparently 8, 9 and 10 speed transmission technology is driven by fuel economy and acceptable performance from a piddly little 4 or 6 cylinder engine. I realize that the current fleet of Cadillacs are budget luxury cars and expectations have to be adjusted to these price points, but can you imagine telling this to customers in the real luxury car market? 'Get used to it! or You're not driving it right', 'Performs as designed' or 'You're expecting too much' and other arguments would not set well with affluent owners. . . .

(c)     Another consumer responded on June 27, 2017:

My 2016 CTS now has 20K miles on it, and the transmission is totally unpredictable. At times, especially first thing in the morning, the car drives great - quick smooth shifts and excellent acceleration. However, after the car sits for a few hours, most of the time the transmission is terrible. Harsh shifts and a bogged down feeling like the car is in too high of a gear. Give it some gas, and it lurches forward to the point that the car is hard to control. Usually I will then put the car in manual mode and use the shift paddles, and this helps a bit. I recently drove 2 Malibus with the 2.0L turbo and 9 speed transmission, and these cars drove MUCH better than the CTS (with a sticker price of $20K less). I will never buy a GM vehicle with the 8 speed again...

(d)     The original poster added on October 15, 2017:

So at this time there has not been a complete resolution to this problem?

Well, GM is still in the 'Deny' stage. There's no word on any recalls, unit re-design, or retuning. This poorly designed cheap piece of crap called a transmission is providing headaches for service departments and owners. I've been told that service departments are giving up on the 'performs as designed' excuse, along with the 'relearning shift adapts' attempts and complete fluid changes. The current solution is a complete transmission replacement, which is an extensive gut of these relatively new vehicles. It's a $4,300 (dealer cost) warranty claim. The problem is that when the trauma is complete, this otherwise nice vehicle is cursed with another 8L45 transmission. I have now owned three (yes, 3) of these transmissions over the past 10 months and the most recent replacement is shifting the best it can. Transmissions #1 and #2 failed at 1480 and 2500 miles respectively, with harsh flares, clunky 1-2 upshifts and NO gear after coasting through turns and intersections. When in that state, it's an unsafe vehicle. . . .

(e)   Another consumer responded on April 1, 2018 and July 4, 2018:

Today the shift was so hard I actually thought I had been rear ended. This is the first time that I have ever experience the shift being this hard and yes it was so rough that it jerked my body. Cadillac really needs to address this issue in the 8L45 8 Speed before they venture off into a 10 Speed as my guess is at this rate it will be no better.

…

[W]hat may come back to haunt GM/Cadillac is how this transmission was promoted and advertised. There are also Cadillac models that cost less than the CT6 whose transmission to not exhibit this sometimes harsh shift issue. The last word I received from the Cadillac Customer service rep is that Cadillac Quality Brand is pursuing this issue and something still may yet get done. My advice to all who are reporting this issue is to keep the pressure on and do not back off. IMO Cadillac/GM needs to find a permanent fix, replace with a better transmission or consider financial compensation, to do other wise IMO is not acceptable

## G.   Criticism of the Transmission Defects in Trade Publications Also Demonstrate GM's Knowledge of the Defects.

307.   GM was also made aware of the Transmission Defects through

criticisms of automotive journalists, who identified the problems described above in online trade publications. In an article on gmauthority.com describing updates to its 2019 transmission, the publication emphasizes:

> In prior-generation, K2 platform Silverado and Sierra, the GM 8-speed was often criticized for its jerky and unexpected shifting behavior that ultimately worsened the satisfaction of driving and/or riding in the pickup. Whether the improvements made to the 8-speed gearbox in the all-new T1 platform 2019 Sierra and Silverado will address these issues is unknown.

*See* Alex Luft, *GM 8-Speed Automatic Enhanced For 2019 Silverado, Sierra*, GM Authority (July 18, 2018) http://gmauthority.com/blog/2018/07/gm-8-speed-automatic-enhanced-for-2019-silverado-sierra/.

308.   And a January 11, 2018 article on the truthaboutcars.com described the ongoing problems associated with the Transmission Defects reporting:

> The 1-2 shift sounds and feels like it's going to rip the diff out of the axle, which is a common complaint about the eight-speed transmission in these vehicles. The AWD mode, which lives between 2WD and 4-High and which is basically the "4WD" in the Escalade/Denali, is laughably slow to respond to spinning rear transmissions.

*See* Jack Baruth, *2017 Silverado LTZ Long-term Test – 10,000 Miles and Counting*, (January 11, 2018) https://www.thetruthaboutcars.com/2018/01/long-term-test-2017-silverado-ltz-10000-miles/.

309.   Finally, the automotive journalists at motortrend.com highlighted the flaws GM's eight-speed transmission in comparison with its new 10-speed transmissions:

Simply put, . . . . we were unimpressed by how the Silverado's volume 5.3-liter DFM V-8 and its eight-speed automatic performed. We're disappointed to find that GM didn't fix the old 5.3's biggest flaws: its sloppy throttle response at low speeds and its transmission's over eagerness to get to its top gear. The truck feels powerful enough once it's moving, but getting there is frustrating. 'The engine has power, but it's being tag-teamed by the unholy GM duo of a lazy throttle pedal and a transmission that hates to downshift,' features editor Scott Evans said. 'Every time you want to move, you've got to get deep into the throttle before anything useful happens. The shifts aren't as smooth as the 10-speed automatic, either, so you notice every time it's forced to drop two gears to maintain speed up a hill.'

The 6.2-liter V-8 and its 10-speed auto, which is only available as an option on the top-level Silverado LTZ and Silverado High Country, improves things immensely. The big V-8 has plenty of power on tap, and it sounds especially great when you bury your foot into the throttle. The 10-speed automatic is worlds better than the eight-speed, too. It feels modern and well sorted—basically the polar opposite of the eight-speed automatic. Its shifts are seamless and nearly unnoticeable, and it doesn't display the hunting behavior of the other transmission, either.

*See* Christian Seabaugh, *2019 Chevrolet Silverado First Test: Pencils Down*, (September 14, 2018) https://www.motortrend.com/cars/chevrolet/silverado-1500/2019/2019-chevrolet-silverado-first-test-review/.

310. These well-publicized criticisms disclosing the Transmission Defects, in addition to GM's own documents and hundreds of consumer complaints, show GM's awareness of the Transmission Defects.

## H.   Plaintiffs' Experiences

### 1.   *Paul Aiello*

311. Plaintiff purchased a used, certified pre-owned 2016 Cadillac CT6 from Herb Chambers of Lynnfield, Inc., in Lynnfield, Massachusetts. The vehicle was

equipped with an 8L90 or 8L45 transmission.

312.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

313.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

314.   At the time of purchase, Plaintiff reviewed marketing materials for the vehicle online, including visiting GM's website. Plaintiff also discussed the purchase with an authorized dealer. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

315.   In addition, prior to purchasing the Class Vehicle, Plaintiff reviewed the Class Vehicle's window sticker at the Dealership.

316.   Plaintiff, acting as a reasonable consumer, relied on the materials he reviewed, and the discussions he had, before making his purchase.

317.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

318.   Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, lurching, surging, clunking, and jerking. The Transmission Defects reduced, and continue to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

319. On or about August 19, 2020, when the Class Vehicle had approximately 19,281 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Aiello brought the vehicle back into Herb Chambers of Lynnfield, Inc. in Lynnfield, Massachusetts because of the transmission problems causing the Class Vehicle to hump and pulse when accelerating.

320. On or about September 30, 2020, when the Class Vehicle had approximately 19,619 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Aiello brought the vehicle back into Herb Chambers of Lynnfield, Inc. in Lynnfield, Massachusetts because of the transmission problems causing the Class Vehicle to shake and shudder with light throttle applications.

321. On or about November 23, 2021, when the Class Vehicle had approximately 23,460 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Aiello brought the vehicle back into Herb Chambers of Lynnfield, Inc. in Lynnfield, Massachusetts because of the transmission problems causing the Class Vehicle to feel like it always was catching up when accelerating.

322. On or about December 6, 2021, the OnStar Notification Customer Service advised Plaintiff of issues with the Engine and Transmission System and to

have the vehicle serviced within 7 days. The On-Demand Diagnostic report from OnStar indicated an issue had been detected in the Transmission System that transfers power from the engine to the drive wheels. The report further indicated the vehicle may experience reduced power or shifting issues. The Module and Diagnostic Codes for those notifications were ECM-Engine System P0700 and TCM Transmission System P0711.

323.   On or about December 16, 2021, when the Class Vehicle had approximately 23,718 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Aiello brought the vehicle back into Herb Chambers of Lynnfield, Inc. in Lynnfield, Massachusetts because of the transmission problems causing the Class Vehicle to shake, shudder, and vibrate when accelerating.

324.   On or about May 10, 2022, when the Class Vehicle had approximately 25,250 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Aiello brought the vehicle back into Herb Chambers of Lynnfield, Inc. in Lynnfield, Massachusetts because of the transmission problems causing the Class Vehicle to hesitate and move back and forth when accelerating.

325.   On or about November 15, 2022, when the Class Vehicle had approximately 27,163 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Aiello brought the vehicle back into Herb

160

Chambers of Lynnfield, Inc. in Lynnfield, Massachusetts because of transmission problems causing the Class Vehicle to hesitate when accelerating.

326.   On or about November 30, 2022, Plaintiff contacted the Cadillac Customer Assistance  Center advising of the Transmission Defects, to no avail.

327.   On or about August 8, 2023, Plaintiff Aiello brought his Class vehicle to Herb Chambers Cadillac of Lynnfield for service.  Plaintiff Aiello stated the transmission was shifting heavy and vibrating at highway speeds.  The dealership reprogrammed the transmission control module, then took it on a test drive, claiming to be unable to reproduce the vibrations or heavy shifting.

328.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiffs' vehicle, which continues to exhibit the Transmission Defects.

329.   GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiff, acting as a reasonable consumer, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

330.   As a result of the Transmission Defects, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase another

161

vehicle from GM in the future, though he would like to do so.

331.   Plaintiff has not received the value for which he bargained when he purchased the Class Vehicle. Further, the value of the Class Vehicle has diminished, including without limitation, the resale value of the Class Vehicle.

### 2.   *Angela Bailey*

332.   Plaintiff purchased a used, 2017 Chevy Silverado from Billion Auto, Inc., in Sioux Falls, South Dakota. The vehicle was equipped with an 8L90 or 8L45 transmission.

333.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

334.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

335.   At the time of purchase, Plaintiff has reviewed marketing materials for the vehicle online, including visiting GM's website. Plaintiff also discussed the purchase with an authorized dealer. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

336.   In addition, prior to purchasing the Class Vehicle, Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership.

337.   Plaintiff, acting as a reasonable consumer, relied on the materials she reviewed, and the discussions she had, before making her purchase.

338.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

339.   Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, lurching, and jerking. The Transmission Defects reduced, and continue to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

340.   On or about October 28, 2022, when the Class Vehicle had approximately 115,187 miles on the odometer Plaintiff provided notice to GM about the Transmission Defects when Ms. Bailey brought the vehicle into Billion Auto, Inc. in Sioux Falls, South Dakota for service relative to the problematic hard shifting, growling, and jolting of her vehicle's transmission.

341.   On or about February 2, 2023, when the Class Vehicle had approximately 117,744 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Ms. Bailey brought the vehicle back into Billion Auto, Inc. in Sioux Falls, South Dakota because of the transmission problems causing the Class Vehicle's engine warning light to illuminate. A pipe, gasket, and pump were installed on the vehicle.

342.   On or about March 20, 2023, when the Class Vehicle had

approximately 118,771 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Ms. Bailey brought the vehicle back into Billion Auto, Inc. in Sioux Falls, South Dakota because of the transmission problems causing the failure of the Class Vehicle's engine to start. Technicians found setting codes P0172 and P0175 Fuel Trim and Mass Air Flow sensors were reading on the vehicle.

343.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit the Transmission Defects.

344.   GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiff, acting as a reasonable consumer, would have learned of that material information, and would not have purchased the vehicle or paid the price she paid for it.

345.   As a result of the Transmission Defects, Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase another vehicle from GM in the future, though she would like to do so.

346.   Plaintiff has not received the value for which she bargained when she purchased the Class Vehicle. Further, the value of the Class Vehicle has diminished,

including without limitation, the resale value of the Class Vehicle.

### 3.     *Dale Bland*

347.   Plaintiff purchased a new, 2018 Chevrolet Colorado from Hulett Chevrolet-Buick-GMC, Inc., in Camdenton, Missouri. The vehicle was equipped with an 8L90 or 8L45 transmission.

348.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

349.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

350.   At the time of purchase, Plaintiff reviewed marketing materials for the vehicle. Plaintiff also discussed the purchase with an authorized dealer. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

351.   In addition, prior to purchasing the Class Vehicle, Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership.

352.   Plaintiff, acting as reasonable consumers, relied on the materials he reviewed, and the discussions he had, before making his purchase.

353.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

354.   Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, lurching, surging, clunking, and jerking. The Transmission Defects reduced, and continue to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

355.   On or about November 2, 2022, when the Class Vehicle had approximately 37,607 miles on the odometer Plaintiff provided notice to GM about the Transmission Defects when Mr. Bland brought the vehicle into Hulett Chevrolet-Buick-GMC, Inc. in Camdenton, Missouri for service relative to the problematic hard shifting and shuddering of his transmission. The dealership charged Mr. Bland $484.22 to complete a transmission fluid exchange.

356.   On December 12, 2022, Mr. Bland filed a complaint with the Better Business bureau regarding his vehicle's Transmission Defects including shuddering and jerking. In his BBB complaint, Mr. Bland noted how he was deeply disappointed that he had to pay $484.22, out of pocket, for this transmission fluid exchange.

357.   On or about December 23, 2022, Defendant's Customer Assistance Center sent a letter and a reimbursement check for $435.80 to Plaintiff to offset the repair, leaving Mr. Bland out of pocket $48.42.

358.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit Harsh Shifts.

359.   GM did not disclose the Transmission Defects in its advertising

166

materials or on its websites, or to its dealers. Had GM done so, Plaintiff, acting as a reasonable consumer, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

360.   As a result of the Transmission Defects, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase another vehicle from GM in the future, though he would like to do so.

361.   Plaintiff has not received the value for which he bargained when he purchased the Class Vehicles. Further, the value of the Class Vehicle has diminished, including without limitation, the resale value of the Class Vehicle.

### 4. *Jacob and Britney Brellenthin*

362.   Plaintiffs purchased a new, 2018 Chevrolet Silverado 1500 from Ben Davis Chevrolet Buick, in Auburn, Indiana. The vehicle was equipped with an 8L90 or 8L45 transmission.

363.   At all times, like other Class Members, Plaintiffs have driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

364.   Prior to purchasing the Class Vehicle, Mr. Brellenthin reviewed marketing materials for the vehicle, including Kelly Blue Book's website, as well as

the websites of Kelley Automotive Group, another local GM authorized dealer, and the website for Ben Davis Chevrolet Buick. Upon information and belief, Plaintiffs' dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as GM.

365.   In addition, prior to purchasing the Class Vehicle, Mr. Brellenthin reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at Ben Davis Chevrolet Buick.

366.   Plaintiff Jacob Brellenthin, acting as a reasonable consumer, relied on the materials he reviewed, and the discussions he had, before making his purchase.

367.   None of the information provided to Plaintiffs disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiffs.

368.   Plaintiffs' vehicle transmission exhibited, and continues to exhibit shuddering, and hard shifting. The Transmission Defects reduced, and continues to reduce, Plaintiffs' satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

369.   On or about December 6, 2022, when the Class Vehicle had approximately 33,602 miles on the odometer, Plaintiffs provided notice to GM about the Transmission Defects when Mr. Brellenthin brought the vehicle into Ben Davis Chevrolet Buick in Auburn, Indiana for service relative to the problematic hard shifting and shuddering of the vehicle's transmission. During that service visit, the

vehicle was road tested, and it was verified that the transmission does shift hard on 1-2 shift for 4-5 times. Plaintiffs had to pay $582.93 out of pocket for the transmission to be flushed and refilled with updated fluid.

370. On or about February 15, 2023, when the Class Vehicle had approximately 34,325 miles on the odometer, Plaintiffs provided notice to GM about the Transmission Defects when Mr. Brellenthin brought the vehicle into Ben Davis Chevrolet Buick in Auburn, Indiana for service relative to the problematic hard shifting and shuddering of his transmission. On this visit fluid levels were checked, and the technician checked for updates regarding the transmission. The Dealership referenced bulletin number 16-NA-361 and stated that the harsh shift is normal on first shift due to clutch fill times and that no repairs were needed at that time.

371. Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiffs' vehicle, which continues to exhibit the Transmission Defects.

372. GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiffs, acting as reasonable consumers, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

373. As a result of the Transmission Defects, Plaintiffs have lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its

ordinary and advertised purpose and are, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiffs do not intend to purchase another vehicle from GM in the future, though they would like to do so.

374.   Plaintiffs have not received the value for which they bargained when they purchased the Class Vehicle. Further, the value of the Class Vehicle has diminished, including without limitation, the resale value of the Class Vehicle.

### 5.   *Daniel and Lynn Davis*

375.   Plaintiffs purchased a new, 2017 Chevy Silverado from Karl Chevrolet, in Ankeny, Iowa. The vehicle was equipped with an 8L90 or 8L45 transmission.

376.   Plaintiffs purchased the vehicle primarily for personal, family, or household use.

377.   At all times, like other Class Members, Plaintiffs have driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

378.   At the time of purchase, Plaintiffs had reviewed marketing materials for the vehicle, including visiting GM's website online and viewing a 2017 Silverado brochure that Plaintiff got from McGrath Chevrolet. Plaintiff also discussed the purchase with an authorized dealer. Upon information and belief, Plaintiffs' dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

379.   In addition, prior to purchasing the Class Vehicle, Plaintiffs reviewed the Class Vehicle's window sticker and test drove a Class Vehicle at the Dealership.

380.   Plaintiffs, acting as reasonable consumers, relied on the materials they reviewed, and the discussions they had, before making their purchase.

381.   None of the information provided to Plaintiffs disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiffs.

382.   Plaintiffs' transmission exhibited, and continues to exhibit shuddering, hard shifting, lurching, surging, clunking, and jerking. The Transmission Defects reduced, and continue to reduce, Plaintiffs' satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

383.   On or about September 13, 2019, Plaintiffs provided notice to GM about the Transmission Defects when Mr. Davis brought the vehicle into McGrath Chevyland in Cedar Rapids, Iowa for service relative to the problematic hard shifting and shuddering of his transmission. At that time, Plaintiffs had approximately 23,320 miles on the vehicle.

384.   On or about September 23, 2019, when the Class Vehicle had approximately 23,690 miles on the odometer, Plaintiffs provided notice to GM about the Transmission Defects when Mr. Davis brought the vehicle back into McGrath Chevyland in Cedar Rapids, Iowa because of the transmission problems causing the Class Vehicle to shift hard, shudder when accelerating, lurch forward, jerk and make

clunking sounds. A fluid flush was performed per TSB 18-NA-355.

385.   On or about June 8, 2023, Plaintiffs also sent a notice letter to GM advising of the Transmission Defects, to no avail.

386.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiffs' vehicle, which continues to exhibit the Transmission Defects.

387.   GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiffs, acting as reasonable consumers, would have learned of that material information, and would not have purchased the vehicle or paid the price they paid for it.

388.   As a result of the Transmission Defects, Plaintiffs have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiffs do not intend to purchase another vehicle from GM in the future, though they would like to do so.

389.   Plaintiffs have not received the value for which they bargained when they purchased the Class Vehicles. Further, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

### 6.    *Duane Egge*

390.   Plaintiff purchased a used, 2015 Chevrolet Corvette Stingray from

Gateway Chevrolet, in Fargo, North Dakota. The vehicle was equipped with an 8L90 or 8L45 transmission.

391.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

392.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

393.   Prior to purchasing the Class Vehicle, Plaintiff test drove the vehicle at the dealership. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as GM.

394.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

395.   Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, and surging when driving on the highway. The Transmission Defects reduced, and continues to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

396.   On or about August 22, 2019, when the Class Vehicle had approximately 9,652 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Egge brought the vehicle into Gateway Chevrolet in Fargo, North Dakota for service relative to the problematic hard shifting and shuddering of the vehicle's transmission. Mr. Egge complained about there

being a chatter in his vehicle's transmission, and the dealership found that the transmission shuddered at highway speeds. Per Bulletin No. 18-NA-355, the dealership performed a Corvette Rear Wheel Drive Triple Drain and Fill.

397.    On or about August 7, 2023, when the Class Vehicle had approximately 10,634 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Egge brought the vehicle back into Gateway Chevrolet in Fargo, North Dakota for service relative to the problematic harsh shifting of the vehicle's transmission. During this service visit, the vehicle was test driven and the dealership found a vibration similar to a shudder when the engine was near 2000 RPMs. The shudder was verified while the vehicle was at a stop as well as in motion. Pursuant to Bulletin No. 18-NA-268 document 5137811, the dealership performed a propeller shaft examination and diagnostic and found that the front bearing had recessed into the driveline support assembly housing. The flexplate was also removed and replaced in accordance with bulletin 18-NA-268. Additionally, the driveline support assembly was replaced.

398.    Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiffs' vehicle, which continues to exhibit the Transmission Defects.

399.    GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiffs, acting as

reasonable consumers, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

400.   As a result of the Transmission Defects, Plaintiffs have lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and are, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiffs do not intend to purchase another vehicle from GM in the future, though they would like to do so.

401.   Plaintiffs have not received the value for which they bargained when they purchased the Class Vehicle. Further, the value of the Class Vehicle has diminished, including without limitation, the resale value of the Class Vehicle.

### 7.   *Paul Northup*

402.   Plaintiff purchased a new, 2018 Chevrolet Colorado from Paul Masse Chevrolet, in Wakefield, Rhode Island. The vehicle was equipped with an 8L90 or 8L45 transmission.

403.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

404.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

405.   At the time of purchase, Plaintiff reviewed marketing materials for the vehicle online, including visiting GM's website. Plaintiff also discussed the purchase

with an authorized dealer. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

406.   In addition, prior to purchasing the Class Vehicle, Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership.

407.   Plaintiff, acting as reasonable consumers, relied on the materials he reviewed, and the discussions he had, before making his purchase.

408.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

409.   Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, lurching, surging, clunking, and jerking. The Transmission Defects reduced, and continue to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

410.   On or about October 2, 2018, when the Class Vehicle had approximately 3,267 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the problematic hard shifting and shuddering of his transmission. Paul Masse Chevrolet removed the transmission pan, drained the fluid, replaced the filter, cleaned the pan and magnets,

removed the transmission, and replaced the torque converter per TSB 18-NA-177.

411.   On or about February 8, 2019, when the Class Vehicle had approximately 9,226 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the problematic hard shifting and shuddering of his transmission. A fluid flush was performed per TSB 18-NA-355.

412.   On or about March 28, 2019, when the Class Vehicle had approximately 11,124 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the problematic hard shifting and shuddering of his transmission. Paul Masse Chevrolet performed a transmission service fast learn procedure and a transmission clutch travel and return spring.

413.   On or about February 28, 2020, when the Class Vehicle had approximately 25,958 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the problematic hard shifting and shuddering of his transmission. Paul Masse Chevrolet performed a transmission service shift learn procedure as outlined for C1, C2, C3, C4, and C5.

414.   On or about November 10, 2020, when the Class Vehicle had approximately 37,609 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the check engine light. Paul Masse Chevrolet found data count misfire-low count misfire 1, 2, and 5 with a high count on 3. On start up 1, 2, 3, and 5 were low count and 2-3 misfires for each. Paul Masse Chevrolet replaced injectors 1, 2, 3, and 5 and re-seated 4 and 6.

415.   On or about December 4, 2021, when the Class Vehicle had approximately 54,673 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the check engine light. Paul Masse Chevrolet replaced the exhaust camshaft solenoid valve.

416.   On or about January 13, 2022, when the Class Vehicle had approximately 56,589 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the problematic hard shifting and vibrating of his transmission. Paul Masse Chevrolet performed a Transmission Service Fast Learn procedure via GDS2 special function per TSB 16-NA-019.

417.   On or about May 9, 2022, when the Class Vehicle had approximately

61,500 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the problematic hard ignition key. Paul Masse Chevrolet replaced the transmission shifter control assembly.

418.   On or about August 1, 2022, when the Class Vehicle had approximately 64,808 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Northup brought the vehicle into Paul Masse Chevrolet in Wakefield, Rhode Island for service relative to the problematic hard shifting and shuddering of the transmission. Plaintiff Northrup took back the class vehicle and stated would return to perform a road test with a technician in order to provide accurate data to affect a proper repair.

419.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit the Transmission Defects.

420.   GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiff, acting as reasonable consumers, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

421.   As a result of the Transmission Defects, Plaintiff has lost confidence in

the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase another vehicle from GM in the future, though he would like to do so.

422.   Plaintiff has not received the value for which he bargained when he purchased the Class Vehicles. Further, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

### 8.   Cole Ulrich

423.   Plaintiff, Cole Ulrich, purchased a new 2017 Chevrolet Silverado 1500 from Paradise Chevrolet Cadillac, Temecula, California. The vehicle was equipped with an 8L90 or 8L45 transmission.

424.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

425.   At all times, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

426.   At the time of the purchase, Plaintiff had reviewed marketing materials for the vehicle and also discussed the purchase with an authorized dealer.

427.   Plaintiff relied on the materials he reviewed before making his purchase.

428.   Shortly after purchase, Plaintiff's transmission was shifting harshly and

hesitating while accelerating. These Transmission Defects reduce Plaintiff's satisfaction with the vehicle and also raises a safety concern.

429.   Plaintiff provided notice to GM about the Transmission Defects when he informed authorized GM dealerships about the transmission problems on or around August 17, 2017, December 13, 2018, June 28, 2019, July 17, 2019, September 19, 2019, May 8, 2020, and October 18, 2021. At that time, Plaintiff had, respectively, only 8,830 miles, 21,620 miles, 25,900 miles, 25,976 miles, 27,703 miles, 31,959 miles, and 44,993 miles on the vehicle.

430.   Despite seven (7) attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, and it continues to exhibit the Transmission Defects.

431.   GM did not disclose the Transmission Defects in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

### 9.    *Ryan Volmert*

432.   Plaintiff purchased a used, 2018 GMC Sierra from Jim Butler Linn Chevrolet, LLC in Linn, Missouri. The vehicle was equipped with an 8L90 or 8L45 transmission.

433.   Plaintiff purchased the vehicle primarily for personal, family, or

household use.

434.  At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

435.  At the time of purchase, Plaintiff reviewed marketing materials for the vehicle online, including visiting the dealership's website. Plaintiff also discussed the purchase with an authorized dealer. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

436.  In addition, prior to purchasing the Class Vehicle, Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership.

437.  Plaintiff, acting as reasonable consumers, relied on the materials he reviewed, and the discussions he had, before making his purchase.

438.  None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

439.  Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, lurching, surging, clunking, and jerking. The Transmission Defects reduced, and continue to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

440.  On or about May 7, 2020, when the Class Vehicle had approximately

41,358 miles on the odometer Plaintiff provided notice to GM about the Transmission Defects when Mr. Volmert brought the vehicle into Jim Butler Linn Chevrolet in Linn, Missouri for service relative to the problematic hard shifting and jerking of his transmission. The dealership indicated the condition is related to driveline free play pursuant to TSB 99-04-20-002K.

441.   On or about October 20, 2021, when the Class Vehicle had approximately 63,753 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Volmert brought the vehicle back into Jim Butler Linn Chevrolet in Linn, Missouri because of the transmission problems causing the Class Vehicle to shift hard, shudder when accelerating, lurch forward, jerk and make clunking sounds.

442.   On or about February 6, 2023, when the Class Vehicle had approximately 84,389 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Volmert brought the vehicle back into Jim Butler Linn Chevrolet in Linn, Missouri because of the transmission problems causing the Class Vehicle to shift hard, shudder when accelerating, lurch forward, jerk and make clunking sounds. Plaintiff was told the noise was normal.

443.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit the Transmission Defects.

444.   GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiff, acting as reasonable consumer, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

445.   As a result of the Transmission Defects, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase another vehicle from GM in the future, though he would like to do so.

446.   Plaintiff has not received the value for which he bargained when he purchased the Class Vehicles. Further, the value of the Class Vehicle has diminished, including without limitation, the resale value of the Class Vehicle.

### 10.   *Kenneth James Wilkinson*

447.   Plaintiff purchased a used, 2018 Chevrolet Colorado ZR2 from Kendall Chevrolet GMC Buick of Eugene in Eugene, Oregon. The vehicle was equipped with an 8L90 or 8L45 transmission.

448.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

449.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

450.   Prior to purchasing the Class Vehicle, Plaintiff reviewed marketing materials for the vehicle online, including on the Kendall Chevrolet GMC Buick of Eugene's website. Plaintiff also discussed the purchase with an authorized dealer who assured him that the vehicle was reliable. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

451.   In addition, prior to purchasing the Class Vehicle, Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership.

452.   Plaintiff, acting as reasonable consumers, relied on the materials he reviewed, and the discussions he had, before making his purchase.

453.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

454.   Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, and vibration. The Transmission Defects reduced, and continue to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

455.   On or about July 8, 2022, when the Class Vehicle had approximately 35,476 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Wilkinson brought the vehicle into Kendall

Chevrolet GMC Buick of Eugene for service relative to the problematic shuddering and hard shifting of his transmission. During this visit the shudder was confirmed during a test drive and a transmission fluid exchange that was covered under warranty was performed.

456.   On or about March 8, 2024, when the Class Vehicle had approximately 45,879 miles on the odometer Plaintiff provided notice to GM about the Transmission Defects when Mr. Wilkinson brought his vehicle into Kendall Chevrolet GMC Buick of Eugene for service relative to the problematic hard shifting and shuddering of his transmission. During this visit, the vehicle was road tested, and codes and transmission fluid levels were checked; however, the dealership found that the transmission was operating as designed.

457.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit the Transmission Defects.

458.   GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiff, acting as a reasonable consumer, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

459.   As a result of the Transmission Defects, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its

ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase another vehicle from GM in the future, though he would like to do so.

460.   Plaintiff has not received the value for which he bargained when he purchased the Class Vehicles. Further, the value of the Class Vehicle has diminished, including without limitation, the resale value of the Class Vehicle.

### 11.   Sean Joseph Zimmett

461.   Plaintiff purchased a new, 2018 GMC Canyon from D'Addario Buick GMC Cadillac, in Shelton, Connecticut. The vehicle was equipped with an 8L90 or 8L45 transmission.

462.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

463.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

464.   Prior to purchasing the Class Vehicle, Plaintiff reviewed marketing materials for the vehicle, including a brochure at D'Addario Buick GMC. Plaintiff also performed individual research online, including google searches, and discussed the purchase with an authorized dealer. Upon information and belief, Plaintiff's dealer did not have the same information about the Transmission Defects, nor the duty to disclose it, as did GM.

465.   In addition, prior to purchasing the Class Vehicle, Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership. Plaintiff also visited Chevrolet of Milford to test drive Class Vehicles.

466.   Plaintiff, acting as reasonable consumers, relied on the materials he reviewed, and the discussions he had, before making his purchase.

467.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

468.   Plaintiff's vehicle transmission exhibited, and continues to exhibit shuddering, hard shifting, and shaking. The Transmission Defects reduced, and continue to reduce, Plaintiff's satisfaction with the vehicle. Also, the Transmission Defects raise a safety concern.

469.   On or about February 27, 2023, when the Class Vehicle had approximately 42,869 miles on the odometer, Plaintiff provided notice to GM about the Transmission Defects when Mr. Zimmett brought the vehicle into D'Addario Buick GMC Cadillac for service relative to the problematic hard shifting and shuddering of his transmission. During this visit, the technician stated that the transmission shudders when shifting. The technician checked for technical service bulletins and found document 16-NA-019 related to Mr. Zimmett's concern. The technician observed that the transmission required a transmission relearn. A complete transmission service was performed, along with other procedures as per

the service bulletin, including complete transmission C1, C2, C3, C4 and C5 learn procedures. The technician also attached the automatic transmission fluid exchange equipment and performed a complete transmission fluid power exchange as per the 18-NA-355 TSB. The vehicle was road tested to verify repairs.

470.   On or about March 28, 2023, when the Class Vehicle has approximately 43,131 miles on the odometer, he again brought the Class Vehicle to D'Addario Buick GMC Cadillac for service relative to the problematic hard shifting and shuddering of his transmission. Plaintiff referred to service bulletin and previous service of February 27, 2023, and how the issue was still present. Management test drove the vehicle and noted how on second test drive, he was able to get a noticeable/harsh 1-2 shift under hard acceleration. Management referenced Bulletin numbers 20-NA-187 & 16-NA-361 and noted how he characterized this as normal operating characteristic and no further repair attempts were made.

471.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit the Transmission Defects.

472.   GM did not disclose the Transmission Defects in its advertising materials or on its websites, or to its dealers. Had GM done so, Plaintiff, acting as a reasonable consumer, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

473.   As a result of the Transmission Defects, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase another vehicle from GM in the future, though he would like to do so.

474.   Plaintiff has not received the value for which he bargained when he purchased the Class Vehicles. Further, the value of the Class Vehicle has diminished, including without limitation, the resale value of the Class Vehicle.

## TOLLING OF THE STATUTES OF LIMITATIONS

475.   Any applicable statute(s) of limitations has been tolled by 1) GM's knowing and active concealment and denial of the facts alleged herein; 2) principles of estoppel, as GM, through dealers, continued to "repair" the Class Vehicles while under warranty without disclosing the Transmission Defects; and 3) operation of the discovery rule as Plaintiffs could not have learned of the Transmission Defects pre-purchase, and only after press reports of the *Speerly* class certification did they learn of a potential lawsuit.

### A.   GM Has Actively Concealed the Transmission Defects

476.   Most of Plaintiffs' claims arise out of GM's fraudulent concealment of the Transmission Defects and the problems they cause, and its representations about the quality, durability, and performance of the Class Vehicles, including their 8L90

and 8L45 transmissions.

477.   Plaintiffs contacted counsel involved in the *Speerly* action after press reports of the class certification in that action occurred after March 20, 2023. In the District Court's order, the Court rejected GM's argument that it could not be decided class-wide whether it had concealed the Shudder and Harsh Shift Defects. The court noted GM's attempts to keep many of the documents listed in this Complaint sealed as further evidence that the full scope of GM's knowledge of the transmission problems remain hidden from the public:

> The defendant contends that the question of what it concealed cannot be resolved on a class-wide basis because public knowledge about the defect varied throughout the relevant class period. But that argument is disingenuous considering the defendant's recent efforts to conceal from public disclosure vast portions of the record offered by the plaintiffs to show the existence of the defect and the defendant's historical knowledge of the same. …

> The record so far presented discloses ample proofs that could be offered in every instance to establish concealment. Most conspicuously, the defendant repeatedly argued in its motions to seal that hundreds of pages of reports produced by GM covering engineering investigations of the transmission problems and compilations of warranty service data were its "confidential information." The defendant further insisted that it had made concerted efforts to keep the information private, and that none of the documents previously had been disclosed by the defendant to the public. Whether the defendant disclosed the substance or conclusions of the hundreds of pages of investigative reports and engineering diagnoses of the transmission issues is a question that can be addressed by proofs common to the entire subclasses. The defendant insists that none of the information from its defect investigations ever was seen by the public prior to this litigation. Based on the record before this Court, it appears to be beyond dispute that none of that

191

> information ever came to light publicly until it was disclosed as part of the recent filings in this litigation. The defendant's determined efforts to maintain the "confidentiality" of the information defies any suggestion that any of the relevant information previously was disclosed by GM or its dealers to any buyers of class vehicles.

ECF No. 284, PageID.20434-345. *See also* ECF No. 265 (rejecting GM's motion to keep its internal documents regarding the Shudder and Harsh Shift Defects under seal).

478.   Plaintiffs listed herein how GM had knowledge of the Shudder and Harsh Shift Defects prior to the first 8L vehicles sold in 2014, which it actively concealed. For instance, GM saw shift quality and shudder issues in the 2013 Corvette; GM knew every 8L model was at "yellow" or "red" status every year before that model was introduced because of shift quality or shudder issues; GM personnel made misleading forum posts about fixes or public statements touting the durability and smoothness of the transmissions; GM withheld what it knew about high and extremely high warranty rates and a long-planned redesign from customers as well as dealers; GM opted not to do a broad field action – or even alert customers to Mod1a – when GM finally developed a ATF that would correct the Shudder Defect in late 2018. Instead, GM opted to do a "fix as fail" service plan, even though it knew customers could further damage the friction materials in their transmissions by driving with the defective 212b and Option B fluids.

479.   To this day, GM has refused to fully admit to its previous customers,

and prospective buyers on the secondary market, what it knew about the Shudder and Harsh Shift Defects.

480. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Class Vehicles, GM knew of the Transmission Defects; GM was under a duty to disclose the Transmission Defects based upon its exclusive knowledge of it, its omissions about it, and its concealment of it, and GM never disclosed the Transmission Defects to Plaintiffs or the public at any time or place or in any manner.

481. Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to GM:

482. **Who**: as noted in Parts A-H, *supra*, GM personnel knew of but actively concealed the Transmission Defects from Plaintiffs and Class members while simultaneously touting the quality, durability and performance of the Class Vehicles and their 8L90 and 8L45 transmissions. In addition to management, the GM personnel at issues include former GM Assistant Chief Engineer Bill Goodrich, and former GM Chief Engineer Kaveh Kavoos, who participated in public appearances or were quoted in press releases touting the 8L transmissions, when they were well aware they suffered from Defects. This also includes Cadillac President Johan de Nysschen who had heard from dealers about the Transmission Defects and did not

inform customers, and Tim Turvey, Dan Nicholson and Tony Francavilla, who were identified as persons responsible for the addressing the problems with the 8L rollout. Similarly, Brand Quality Manager Mark Gordon who apprised dealers to tell customers the Transmission Defects were normal, when it knew it was not, and a redesign for the 8L was needed but would not be ready until MY23.

483.  **What**: GM knew that the Class Vehicles suffer from Transmission Defects. GM concealed the Transmission Defects and made contrary representations about the quality, durability, performance, and other attributes of the Class Vehicles.

484.  **When**: GM concealed material information regarding the Transmission Defects at all times and made representations about the quality, durability, and performance of the Class Vehicles, starting no later than 2014, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day. GM has not disclosed the truth about the Transmission Defects in the Class Vehicles to anyone outside of GM. GM has never taken any action to inform consumers about the true nature of the Transmission Defects in Class Vehicles. And when consumers brought their Class Vehicles to GM complaining of the symptoms associated with the Transmission Defects, GM denied any knowledge of, or responsibility for, the Transmission Defects, and called it a "normal" characteristic.

485.  **Where**: GM concealed material information regarding the true nature

of the Transmission Defects in every communication it had with Plaintiffs and Class members and made contrary representations about the quality, durability, and performance of the Class Vehicles and their 8L90 and 8L45 transmissions. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on GM's website.

486.  **How**: GM concealed the Transmission Defects from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles. GM actively concealed the truth about the existence and nature of the Transmission Defects from Plaintiffs and Class members, even though it knew about the Transmission Defects and knew that information about the Transmission Defects would be important to a reasonable consumer, and GM promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

487. **Why**: GM actively concealed material information about the Transmission Defects in Class Vehicles, and simultaneously made representations about the quality, durability, and performance of the Class Vehicles and their 8L90 and 8L45 transmissions, for the purpose of inducing Plaintiffs and Class members to purchase the Class Vehicles, rather than purchasing or leasing competitors' vehicles.

488.   Had GM disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of the Transmission Defects and would not have bought the Class Vehicles or would have paid less for them.

489.   Despite its knowledge of the Transmission Defects in the Class Vehicles, Defendant actively concealed the existence and nature of the Transmission Defects from Plaintiffs and Class Members. Specifically, Defendant failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase or repair, and thereafter:

(a)   Any and all known material defects or material nonconformities of the Class Vehicles, including the Transmission Defects;

(b)   That the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

(c)   That the Class Vehicles were defective, even though GM learned of the Transmission Defects before it placed the Class Vehicles in the stream of commerce.

490.   More troubling, Defendant did not issue any recall and otherwise refuses to acknowledge the Defects, despite TSBs as early as 2014 recognizing the Defects, and did not apprise buyers of a redesign underway since 2018 ("Gen 2") specifically to address the Harsh Shift Defect.

196

491.   GM has also directed its authorized dealerships to inform Plaintiffs and members of the Class that the jerking, hesitation, surging, and lurching are "normal" or "characteristic" and that no repairs are necessary. ECF No. 206-15, PageID.12536-540. This result in customers and dealers often trying unnecessary repairs or changes, like tires, suspension, etc., that does not correct the Transmission Defects.

492.   Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Transmission Defects, and caused them to expend money at their dealerships and/or be unable to drive their vehicles for stretches of time, while they are being constantly repaired.

493.   Any applicable statute of limitations has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein. Defendant is further estopped from relying on any statute of limitations because of its concealment of the Transmission Defects.

**B.      Estoppel**

494.   GM was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. GM actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class Members reasonably relied upon

GM's knowing and affirmative representations and/or active concealment of these facts.

495.   Defendant has not recalled all the Class Vehicles to repair the Transmission Defects, has not offered to its customers a free suitable repair or free replacement of parts related to the Transmission Defects, under the recall or otherwise, and has not reimbursed all Class Vehicle owners who incurred costs for repairs related to the Transmission Defects.

496.   Moreover, when vehicles are brought to Defendant's dealers for repair, whether covered by warranty or not, many Class Members were not provided with effective repairs as defective parts or fluids were replaced with other defective parts, as experienced by Plaintiffs.

497.   GM, through its words and actions, obfuscated the Transmission Defects, lulling Plaintiffs and purchasers into not filing suit earlier against GM over the Transmission Defects. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

C.   **Discovery Rule**

498.   Plaintiffs and the Class Members had no realistic ability to discern that the GM 8L45 and 8L90 Transmissions in Class Vehicles were defective before purchase. The Defects are intermittent and not detectable until they manifest, and GM failed to disclose or intentionally concealed the Transmission Defects. Plaintiffs

and Class Members were not reasonably able to discover the problems until after purchasing the Class Vehicles, despite exercise of due diligence. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and the Class Members.

499. The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles could suffered from the Transmission Defects. Plaintiffs and the Class Members had no realistic ability to discern that the GM 8L45 and 8L90 Transmissions in Class Vehicles were defective until (at the earliest) after the Transmission Defects manifested in their 8L90 and 8L45 transmissions and/or component parts failed.

500. Even then, Plaintiffs and Class Members had no reason to know that such manifestations were caused by defects in the Class Vehicles because of GM's active concealment of the Transmission Defects. Not only did GM fail to notify Plaintiffs or Class members about the Transmission Defects, GM, in fact, denied any knowledge of, or responsibility for, the Transmission Defects when directly asked about it.

501. Thus, Plaintiffs and Class Members were not reasonably able to discover the Transmission Defects until after they had purchased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that Transmission Defects existed that caused the failures

in the 8L90 and 8L45 transmissions of their Vehicles.

502.   In March of 2023, the class certification ruling in *Speerly v. General Motors, LLC* was picked up in the press, including the USA Today, Detroit Free Press, and other publications. Not until this event had Plaintiffs learned that the problems with their 8L transmissions were not unique to them and the result of design defects hidden by General Motors.

503.   Pursuing to the foregoing the Discovery Rule tolled any statute of limitations for the Plaintiffs.

## <u>CLASS ACTION ALLEGATIONS</u>

504.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and (c)(4). As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rules 23(a) and 23(b)(3). This action also satisfies the requirements of Rule 23(c)(4).

505.   Pursuant to Fed. R. Civ. Proc. 23(a), (b)(3) and/or (c)(4), Plaintiffs assert classes based on the applicable state law of where the Plaintiff purchased a Class Vehicle.  Class Vehicles are GM vehicles from MY 2015-2019, equipped with

8L45 or 8L90 automatic transmissions.[6] The proposed Classes include:

(a) **California Class**: All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in California.

(b) **Connecticut Class**: All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Connecticut.

(c) **Indiana Class**: All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Indiana.

(d) **Iowa Class:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Iowa.

(e) **Massachusetts Class:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Massachusetts.

---

[6] "Class Vehicles" include General Motors Model Year ("MY") 2015-2019 vehicles with 8L transmissions, specifically: the 2015-2019 Chevrolet Silverado; 2017-2019 Chevrolet Colorado; 2015-2019 Chevrolet Corvette; 2016-2019 Chevrolet Camaro; 2015-2017 Cadillac Escalade and Escalade ESV; 2016-2019 Cadillac CTS; 2016-2018 Cadillac CT6; 2015-2019 GMC Sierra; 2015-2017 Yukon and Yukon XL; and 2017-2019 GMC Canyon.

(f) **Missouri Class:**  All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Missouri.

(g) **North Dakota:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in North Dakota.

(h) **Oregon Class**: All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Oregon.

(i) **Rhode Island Class:**  All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Rhode Island.

(j) **South Dakota Class:**  All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in South Dakota.

506.   Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who

have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to seek certification under a different Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

507. **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

508. **Typicality**: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective GM 8L45 or 8L90 transmissions. The representative Plaintiffs, like all Class Members, have been damaged by GM's misconduct in that they have overpaid for Class Vehicles that would be priced lower had consumers and competitors knew of the Transmission Defects; they have purchased vehicles of diminished value due to the Transmission Defects; they did not receive the benefit of their bargain, as GM's own service proposals recognize. Furthermore, the factual bases of GM's misconduct are

203

common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

509. **Commonality**: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting only individual Class Members. These common legal and factual issues include the following:

(a) Whether Class Vehicles contain Defects relating to the GM 8L45 or 8L90 Transmission;

(b) Whether the Defects relating to the GM 8L45 or 8L90 Transmission constitute an unreasonable safety risk;

(c) Whether the defective nature of the GM 8L45 or 8L90 Transmission constitutes a material fact;

(d) Whether Defendant has a duty to disclose the defective nature of the GM 8L45 or 8L90 Transmission to Plaintiffs and Class Members;

(e) Whether Defendant knew or reasonably should have known of the Defects relating to the GM 8L45 or 8L90 Transmission before it sold Class Vehicles to Plaintiffs and Class Members and, if so, how long Defendant has known of the Defects;

(f) Whether Defendant breached the implied warranty of merchantability pursuant to the laws of the Class jurisdictions; and

(g)     Whether Defendant breached express warranties pursuant to the laws of the Class jurisdictions;

(h)     Whether and how much Defendant's misconduct and the Defects have inflicted economic harm upon purchasers of the Class Vehicles.

510.     **Adequate Representation**:     Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

511.     **Predominance and Superiority**:     Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages because of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct. Absent a class action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the

litigants and will promote consistency and efficiency of adjudication.

512.   In the alternative, the common issues regarding GM's liability and the existence of the Transmission Defects can be decided class-wide under Rule 23(c)(4).

513.   Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action. In fact, claims for 26 other states regarding these same Transmission Defects has already been certified for class treatment in *Speerly v. General Motors, LLC,* 19-11044-DML-DRG, ECF No. 284.

## <u>CAUSES OF ACTION</u>

### COUNT 1
### BREACH OF WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2303, ET SEQ

514.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

515.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of all Class Members.

516.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

517.   Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

518.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

519.   GM's express warranty is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

520.   GM provided all purchasers of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

521.   GM provided all purchasers of Class Vehicles with the Cadillac Warranty or the Chevrolet/GM Warranty.

522.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

523.    Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

524.    On information and belief, GM breached the express warranty by:

(a)    Extending the Bumper-to-Bumper Limited Warranties and the Powertrain Warranties with the purchase of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject transmission, at no cost to the owner;

(b)    Selling Class Vehicles with transmissions that were defective in material and workmanship, requiring repair or replacement within the warranty period;

(c)    Refusing to honor the express warranty by repairing or replacing, free of charge, the transmission or any of its component parts or

208

programming and instead charging for repair and replacement parts; and

(d)     Purporting to repair the Class Vehicles and/or performing inadequate, illusory repairs, including by falsely informing Class Members that there was no problem with their Class Vehicles, performing ineffective procedures including software updates, and/or replacing defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

525.    Furthermore, GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

526.    Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective.

527.    GM's breach of express and implied warranties has deprived Plaintiffs

and Class Members of the benefit of their bargain.

528.   The amount in controversy of the individual claims of each Plaintiff and Class member meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

529.   GM has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the transmission.

530.   As a direct and proximate cause of GM's breach of express and implied warranties, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial. GM's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

531.   As a result of GM's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

**COUNT 2**
**UNJUST ENRICHMENT**

532.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

533.   Plaintiffs bring this cause of action on behalf of themselves and on

210

behalf of the Class, against Defendant.

534.   As a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects, Defendant has profited through the sale of said vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

535.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

536.   Defendant has therefore been unjustly enriched due to the known defects in the Class Vehicles through the use of funds that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

537.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

## COUNT 3
## FRAUDULENT OMISSION

538.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

539.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class, against Defendant.

540.   GM omitted material facts concerning the Class Vehicles.

541.   As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

542.   GM knew these representations were false when made.

543.   The vehicles purchased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the Transmission Defects in the 8L90 and 8L45 transmissions causes unsafe conditions, including, but not limited to, Class Vehicles shuddering, suddenly lurching forward, suddenly accelerating, delayed acceleration, and suddenly losing forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration.

544.   GM had a duty to disclose that these vehicles were defective, unsafe and unreliable, in that the Transmission Defects in the 8L90 and 8L45 transmissions causes unsafe conditions, because Plaintiffs relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

545.   The aforementioned omission was material, because if it had been disclosed Plaintiffs would not have bought or retained their vehicles.

546.   The aforementioned representations were also material because they

212

were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

547. Plaintiffs relied on GM's reputation-along with their failure to disclose the Transmission Defects and GM's affirmative assurances that their vehicles were safe and reliable and other similar false statements—in purchasing or retaining the Class Vehicles.

548. GM had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiffs and the Class. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.[4]

## COUNT 4
## VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT
## CAL. CIV. CODE § 1750, ET SEQ.

549. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

550.    Plaintiff Cole Ulrich ("California Plaintiff") brings this cause of action on his own behalf and on behalf of the Class.

551.    Defendant is a "person" as defined by California Civil Code § 1761(c).

552.    California Plaintiff and members of the California Class are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

553.    By failing to disclose and concealing the defective nature of the transmissions from California Plaintiff and members of the California Class, Defendant violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their transmissions had characteristics and benefits that they do not have and represented that the Class Vehicles and their transmissions were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

554.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

555.    Defendant knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

556.    Because of their reliance on Defendant's omissions, owners of the Class

214

Vehicles, including California Plaintiff and members of the California Class, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Transmission Defects California Plaintiff and members of the California Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

557. Defendant was under a duty to California Plaintiff and members of the California Class to disclose the defective nature of the transmissions and/or the associated repair costs because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

(b)    California Plaintiff and members of the California Class could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

(c)    Defendant knew that California Plaintiff and members of the California Class could not reasonably have been expected to learn of or discover the safety defect.

558. In failing to disclose the defective nature of transmissions, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

559. The facts Defendant concealed from or failed to disclose to California Plaintiff and members of the California Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay less. Had California Plaintiff and members of the California Class known that the Class Vehicles' transmissions were defective, they would not have purchased the Class Vehicles or would have paid less for them.

560. California Plaintiff and members of the California Class are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit problems such as the Transmission Defects. This is the reasonable and objective consumer expectation relating to a vehicle's transmissions.

561. Because of Defendant's conduct, California Plaintiff and members of the California Class were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Transmission Defects.

562. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California Plaintiff and members of the California Class suffered and will continue to suffer actual damages.

563. California Plaintiff and members of the California Class are entitled to equitable relief.

564. California Plaintiff and members of the California Class provided

216

Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). Defendant has failed to provide appropriate relief for its violations of the CLRA within 30 days, Plaintiffs now seek monetary, compensatory, and punitive damages.

## COUNT 5
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
## CAL. BUS. & PROF. CODE § 17200, ET SEQ.

565.    Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

566.    California Plaintiff bring this cause of action on his own behalf and on behalf of the members of the California Class.

567.    Because of their reliance on Defendant's omissions, owners of the Class Vehicles, including California Plaintiff and members of the California Class, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Transmission Defects, California Plaintiff and members of the California Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs of repair.

568.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

569.   California Plaintiff and members of the California Class are reasonable consumers who do not expect their transmissions to be defective.

570.   Defendant knew the Class Vehicles and their transmissions were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

571.   In failing to disclose the Transmission Defects, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

572.   Defendant was under a duty to California Plaintiff and members of the California Class to disclose the defective nature of the Class Vehicles and their transmissions because:

a)     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions; and

b)     Defendant actively concealed the defective nature of the Class Vehicles and their transmissions from California Plaintiff and members of the California Class.

573.   The facts Defendant concealed from or failed to disclose to California Plaintiff and members of the California Class are material in that a reasonable person would have considered them to be important in deciding whether to purchase the Class Vehicles. Had they known of the Transmission Defects, California Plaintiff

and members of the California Class would have paid less for Class Vehicles equipped with the subject transmissions or would not have purchased them at all.

574.    Defendant continued to conceal the defective nature of the Class Vehicles and their transmissions even after Class Members began to report problems.

575.    Defendant's conduct was and is likely to deceive consumers.

576.    Defendant's acts, conduct, and practices were unlawful, in that they constituted:

a)    Violations of California's Consumers Legal Remedies Act;

b)    Violations of the Song-Beverly Consumer Warranty Act;

c)    Violations of the Magnuson-Moss Warranty Act; and

d)    Breach of Express Warranty under California Commercial Code § 2313.

577.    By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

578.    Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

579.    As a direct and proximate result of Defendant's unfair and deceptive practices, California Plaintiff and members of the California Class have suffered and

will continue to suffer actual damages.

580.   Defendant has been unjustly enriched and should be required to make restitution to California Plaintiff and members of the California Class under §§ 17203 and 17204 of the Business & Professions Code.

## COUNT 6
## BREACH OF IMPLIED WARRANTY PURSUANT TO THE SONGBEVERLY CONSUMER WARRANTY ACT CAL. CIV. CODE §§ 1792 AND 1791.1, ET SEQ.

581.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

582.   California Plaintiff brings this cause of action on his own behalf and on behalf of the members of the California Class.

583.   California Plaintiff and members of the California Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

584.   GM is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

585.   The Class Vehicles are and were at all relevant times "are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

586.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

587.   GM knew or had reason to know of the specific use for which the Class

Vehicles were purchased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom California Plaintiff and members of the California Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiff and members of the California Class, with no modification to the defective transmissions.

588.   GM provided California Plaintiff and members of the California Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

589.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

590.   Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiff and members of the California Class with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their

transmissions and the existence of the Transmission Defects at the time of sale and thereafter. GM knew of this defect at the time these sale transactions occurred.

591.   As a result of GM's breach of the applicable implied warranties, California Plaintiff and members of the California Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects, California Plaintiff and members of the California Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs of repair.

592.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of violation of California Civil Code §§ 1792 and 1791.1.

593.   California Plaintiff and members of the California Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

594.   California Plaintiff and members of the California Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from California Plaintiff and members of the California Class, from repairs and/or

replacements of the transmissions or components thereof, and through other internal sources.

595.   Nonetheless, California Plaintiff provided notice to GM of the breach of implied warranties when he repeatedly took his vehicle to an authorized GM dealership for service related to the Transmission Defects on or around August 17, 2017, December 13, 2018, June 28, 2019, July 17, 2019, September 19, 2019, May 8, 2020, and October 18, 2021.

596.   GM provides warranties directly to California Plaintiffs and the members of the California Class and California Plaintiff and the members of the California Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

597.   As a direct and proximate cause of GM's breach, California Plaintiff and members of the California Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles,  and costs for repair.

598.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, California Plaintiff and members of the California

Class have been damaged in an amount to be proven at trial.

## COUNT 7
## BREACH OF EXPRESS WARRANTY
## CAL. COM. CODE § 2313

599. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

600. California Plaintiff brings this cause of action on his own behalf and on behalf of the members of the California Class.

601. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1), and a "seller" of motor vehicles under § 2103(1)(d).

602. The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1).

603. GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under California state law.

604. GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

605. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or

other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for Chevrolet or GMC-branded Class Vehicles and for up to 4 years or 50,000 miles for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

606.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC-branded Class Vehicles, and for up to 6 years or 70,000 miles for the Cadillac-branded Class Vehicles (the "Powertrain Warranties").

607.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and

225

8L45 transmissions and their component parts are covered by the express Warranties.

608.   The Transmission Defects at issue in this litigation was present at the time the Class Vehicles were sold to California Plaintiffs and members of the California Class .

609.   California Plaintiff and members of the California Class relied on GM's express warranties, which were a material part of the bargain, when purchasing their Class Vehicles.

610.   Further, California Plaintiffs and members of the California Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform California Plaintiffs and members of the California Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

611.   Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by California Plaintiff and members of the California Class.

612.   Although GM was obligated to correct the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect..

613.    Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

614.    GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

615.    Moreover, GM's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

616.    GM provided warranties directly to California Plaintiffs and the members of the California Class and California Plaintiffs and the members of the California Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

617.    Any attempt by GM to disclaim or limit recovery to the terms of the

express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect California Plaintiff and members of the California Class. Among other things, California Plaintiff and members of the California Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM and members of the Class.

618.   California Plaintiff and members of the California Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

619.   California Plaintiff and members of the California Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from California Plaintiff and members of the California Class, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

228

620.   Nonetheless, California Plaintiff provided notice to GM of the breach of implied warranties when he repeatedly took his vehicle to an authorized GM dealership for service related to the Transmission Defects on or around August 17, 2017, December 13, 2018, June 28, 2019, July 17, 2019, September 19, 2019, May 8, 2020, and October 18, 2021.

621.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

622.   Because GM has not been able to remedy the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

623.   As a direct and proximate cause of GM's breach, California Plaintiff and members of the California Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, California Plaintiff and members of the California Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

624.   California Plaintiff and members of the California Class have been damaged in an amount to be determined at trial. California Plaintiff and members of

the California Class are entitled to legal and equitable relief against GM, including

actual damages, consequential damages, specific performance, attorneys' fees, costs

of suit, and other relief as appropriate.

**COUNT 8**
**VIOLATION OF THE CONNECTICUT UNLAWFUL TRADE**
**PRACTICES ACT**
**CONN. GEN. STAT. § 42-110A, ET SEQ.**

625.    Plaintiffs incorporate by reference and re-allege the allegations

contained in paragraphs 1-513 of this Complaint.

626.    Plaintiff Joseph Zimmett ("Connecticut Plaintiff") brings this cause of

action on behalf of himself and the Connecticut Class.

627.    GM, Connecticut Plaintiff, and Connecticut Class Members are

"persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut

Unfair Trade Practices Act ("Connecticut UTPA").

628.    GM engaged in "trade" or "commerce" within the meaning of Conn.

Gen. Stat. § 42-110a(4).

629.    The Connecticut UTPA provides: "No person shall engage in unfair

methods of competition and unfair or deceptive acts or practices in the conduct of

any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

630.    GM's acts and practices, as described throughout this Complaint,

constitute "unfair methods of competition or deceptive acts or practices in the

conduct of any trade or commerce" by GM, which are unlawful, as enumerated in

230

Conn. Gen. Stat. § 42-110b(a)

631.   In violation of the Connecticut UTPA GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles by representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

632.   GM intentionally and knowingly mislead Connecticut Plaintiff and the Connecticut Class.

633.   GM knew or should have known that its conducted violated the Connecticut UTPA.

634.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

635.   GM had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Connecticut UTPA. Specifically, GM owed Connecticut Plaintiff and the Connecticut Class Members a duty to disclose all material facts concerning the Class Vehicles because it possessed exclusive knowledge, intentionally concealed such material facts from Connecticut Plaintiff

231

and the Connecticut Class Members; and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

636.   By failing to disclose the Transmission Defects, GM knowingly and intentionally concealed material facts and beached its duty not to do so.

637.   The facts concealed or not disclosed by GM to Connecticut Plaintiff and the Connecticut Class Members are material because a reasonable person would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains defects causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern.

638.   Connecticut Plaintiffs and the Connecticut Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

639.   Had Connecticut Plaintiffs and the Connecticut Class Members known that the Class Vehicles suffered from the Transmission Defects described herein, they would not have purchased the Class Vehicles or would have paid less for them.

640.   All owners of Class Vehicles suffered ascertainable loss injury-in-fact and/or actual damage in the form of the diminished value of their vehicles and require repairs or replacement, as a direct and proximate result of GM's deceptive

and unfair acts and practices made in the course of GM's business.

641. Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Class Members seek an order enjoining GM's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

## COUNT 9
## BREACH OF EXPRESS WARRANTY
## CONN. GEN. STAT. § 42A-2-313

642. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

643. Connecticut Plaintiff brings this cause of action on behalf of himself and the Connecticut Class.

644. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1).

645. The Class Vehicles are "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

646. GM provided all purchasers of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

647. GM provided all purchasers of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

648.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

649.   Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the

"Powertrain Warranties").

650.    GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

651.    The Transmission Defects at issue in this litigation were present at the time the Class Vehicles were sold to Connecticut Plaintiff and the Connecticut Class Members.

652.    Connecticut Plaintiff and members of the Connecticut Class relied on GM's express warranties, which were a material part of the bargain, when purchasing their Class Vehicles.

653.    Further, Connecticut Plaintiff and members of the Connecticut Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Connecticut Plaintiff and members of the Connecticut Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

654.    Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by Connecticut Plaintiff and Connecticut the Class Members.

235

655. Although GM was obligated to correct the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect.

656. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Connecticut Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

657. GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

658. GM provided warranties directly to Connecticut Plaintiff and the members of the Connecticut Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

659. Any attempt by GM to disclaim or limit the terms of the express Warranties is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold a defective product without

informing consumers about the defects. The time limits are unconscionable and inadequate to protect Connecticut Plaintiff and the Connecticut Class Members. Among other things, Connecticut Plaintiff and the Connecticut Class Members did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties,  the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM and the Class members.

660.   Connecticut Plaintiff and the Connecticut Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

661.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

662.   Because GM has not been able to remedy the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Connecticut Plaintiff and Connecticut Class Members whole, rendering them null and void.

663.   Connecticut Plaintiff and the Connecticut Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Class Members, including formal complaints submitted to NHTSA, and through other internal sources.

664.   Nonetheless, Connecticut Plaintiff provided notice to GM of the breach of express warranties when he took his vehicle in for servicing related to the Transmission Defects on February 27, 2023 and March 28, 2023.

665.   As a direct and proximate cause of GM's breach, Connecticut Plaintiff and the Connecticut Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and the Connecticut Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

666.   As a direct and proximate result of GM's breach of express warranties, Connecticut Plaintiff and the Connecticut Class Members have been damaged in an amount to be determined at trial.

**COUNT 10**
**VIOLATION OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER**
**FRAUDS ACT**
**IOWA CODE §714H.1, ET SEQ.**

667.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

668.   Plaintiffs Daniel and Lynn Marie Davis ("Iowa Plaintiffs") bring this count on behalf of themselves and the Iowa Class against Defendant.

669.   Iowa Plaintiffs and the Iowa Class members of are "consumers" within the meaning of Iowa Code §714H.2(3).

670.   Defendant, Iowa Plaintiffs and the Iowa Class members are "person[s]" within the meaning of within the meaning of Iowa Code §714H.2(7).

671.   The sale of the Class Vehicles by Iowa Plaintiffs and the Iowa Class members were for personal, family or household purposes and are "sale[s]" as defined by Iowa Code §714H.2(8).

672.   The Class Vehicles are "consumer merchandise" as defined by Iowa Code §714H.2(7).

673.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false

promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code §714H.3.

674.   GM participated in unfair or deceptive trade practices that violated the Iowa CFA. As described below and alleged throughout the Complaint, by failing to disclose the Transmission Defects by concealing the Transmission Defects by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transmission Defects in the course of its business.

675.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

676.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

677.   GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

678.   GM knew or should have known that its conduct violated the Iowa CFA.

679.   Defendant was under a duty to Iowa Plaintiffs and the Iowa Class Members to disclose the defective nature of the Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the Class Vehicles from Iowa Plaintiff and the Iowa Class Members at the time of sale and thereafter.

680.   By failing to disclose the Transmission Defects Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

681.   The facts concealed or not disclosed by Defendant to Iowa Plaintiffs and the Iowa Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase Defendant's

Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains a defect causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had Iowa Plaintiffs and the Iowa Class Members known that the Class Vehicles suffered from the Transmission Defects described herein, they would not have purchased the Class Vehicles or would have paid less for them.

682.  Iowa Plaintiffs and the Iowa Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

683.  As a result of Defendant's misconduct, Iowa Plaintiffs and Iowa Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

684.  As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Iowa Plaintiffs and the Iowa Class Members have suffered and will continue to suffer actual damages.

685.  GM's violations present a continuing risk to Iowa Plaintiffs and the Iowa Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

686.  Pursuant to Iowa Code § 714H.5, Iowa Plaintiffs and the Iowa Class Members seek an order enjoining GM's unlawful conduct, actual damages,

attorneys' fees, costs, and any other just and proper relief available under the Iowa CFA. Because Defendants' conduct was committed willfully, the members of the Class also seek treble damages as provided in Iowa §714H.5(4).

**COUNT 11**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**IOWA CODE §§ 554.2314 AND 554.2315**

687.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

688.   Iowa Plaintiffs bring this count on behalf of themselves and the Iowa Class against Defendant.

689.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Iowa Code §§554.2104(1), and a "seller" of motor vehicles under § 554.2103(1)(d).

690.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§554.2105(1).

691.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Iowa Code §§554.2314.

692.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Iowa Plaintiffs and

243

members of the Iowa Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Iowa Plaintiffs and members of the Iowa Class, with no modification to the defective Class Vehicles.

693.   GM provided Iowa Plaintiffs and members of the Iowa Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from inherent defects at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

694.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

695.   Contrary the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Iowa Plaintiffs and members of the Iowa Class with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of

244

sale and thereafter as more fully described above. GM knew of the Defects at the time these sale transactions occurred.

696.   As a result of GM's breach of the applicable implied warranties, Iowa Plaintiffs and members of the Iowa Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Iowa Plaintiffs and members of the Iowa Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

697.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

698.   Iowa Plaintiffs and members of the Iowa Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

699.   Iowa Plaintiffs and members of the Iowa Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and

have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

700.   Iowa Plaintiffs and members of the Iowa Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Iowa Plaintiffs and the Class Members and through other internal sources.

701.   Nonetheless, Iowa Plaintiffs and members of the Iowa Class provided notice to GM of the breach of express warranties when Iowa Plaintiffs took their vehicles to a GM-authorized provider of warranty repairs. Iowa Plaintiffs also provided notice to GM of its breach of express warranty by letter dated June 8, 2023.

702.   As a direct and proximate cause of GM's breach, Iowa Plaintiffs and members of the Iowa Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, Iowa Plaintiffs and members of the Iowa Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

703.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Iowa Plaintiffs and members of the Iowa Class have been damaged in an amount to be proven at trial.

**COUNT 12**
**BREACH OF EXPRESS WARRANTY**
**IOWA CODE § 554.2313**

704.   Plaintiffs incorporate by reference and re-allege the allegations

contained in paragraphs 1-513 of this Complaint.

705.   Iowa Plaintiffs bring this count on behalf of themselves and the Iowa

Class against Defendant.

706.   Defendant is and was at all relevant times a "merchant" with respect to

motor vehicles under Iowa Code §§554.2104(1), and a "seller" of motor vehicles

under §554.2103(1)(d).

707.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of Iowa Code §§554.2105(1) and 554.13103(1)(h).

708.   Defendant provided all purchasers of the Class Vehicles with an

express warranty described herein, which became a material part of the bargain.

Accordingly, GM's express warranty is an express warranty under Iowa state law.

709.   GM provided all purchasers of Class Vehicles with the

Chevrolet/GMC/Cadillac Warranties.

710.   Under the Warranties, GM expressly warranted the following: "The

warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or

other normal characteristics of the vehicle due to materials or workmanship

occurring during the warranty period." Accordingly, the warranty covered all defects

247

except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

711.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

712.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

713.   The Transmission Defects at issue in this litigation were present at the

248

time the Class Vehicles were sold to Iowa Plaintiffs and members of the Iowa Class.

714.   The Warranty formed the basis of the bargain that was reached when Iowa Plaintiffs and other members of the Iowa Class purchased their Class Vehicles.

715.   Further, Iowa Plaintiffs and members of the Iowa Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Iowa Plaintiffs and members of the Iowa Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

716.   Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by Iowa Plaintiffs and members of the Iowa Class.

717.   Although GM was obligated to correct both of the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect..

718.   Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Iowa Plaintiffs and members of the Iowa Class that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the

Class Vehicles.

719.   GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

720.   GM provided warranties directly to Iowa Plaintiffs and the members of the Iowa Class and Iowa Plaintiffs and the members of the Iowa Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

721.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect Iowa Plaintiffs and the members of the Iowa Class. Among other things, Iowa Plaintiffs and members of the Iowa Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between

GM, Iowa Plaintiffs and members of the Iowa Class.

722.    Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

723.    Because GM has not been able to remedy the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Iowa Plaintiffs and members of the Iowa Class whole, rendering them null and void.

724.    Iowa Plaintiffs and members of the Iowa Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

725.    Iowa Plaintiffs and members of the Iowa Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Iowa Plaintiffs and members of the Iowa Class, including those formal complaints submitted to NHTSA, and through other internal sources.

726.    Nonetheless, Iowa Plaintiffs provided notice to GM of the breach of express warranties Iowa Plaintiffs took their vehicles to a GM-authorized provider

of warranty repairs. Iowa Plaintiffs also provided notice to GM of its breach of express warranty by letter dated June 8, 2023.

727.   As a result of GM's breach of the applicable express warranties, owners of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Iowa Plaintiffs and Iowa Class Members were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

728.   As a result of GM's breach of the express warranty, Iowa Plaintiffs and Iowa Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 13
## BREACH OF EXPRESS WARRANTY
## IND. CODE § 26-1-2-313

729.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

730.   Plaintiffs Jacob and Britney Brellenthin ("Indiana Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Indiana Class.

731.   GM is and was at all relevant times a "merchant" with respect to motor

vehicles under Ind. Code § 26-1-2-104(1), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

732.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code § 26-1-2-105(1).

733.   GM provided all purchasers of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

734.   GM provided all purchasers of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

735.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, they are covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class

Vehicles (the "Bumper-to-Bumper Limited Warranties").

736.   Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

737.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

738.   The Transmission Defects at issue in this litigation were present at the time the Class Vehicles were sold to Indiana Plaintiffs and the Indiana Class Members.

739.   Plaintiffs relied on GM's express Warranties, which were a material part of the bargain, when purchasing their Class Vehicles.

740.   Further, Plaintiffs and members of the Indiana Class experienced

defects within the warranty period. Despite the existence of the Warranties, Defendant failed to inform Indiana Plaintiffs and members of the Indiana Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

741.   Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by Indiana Plaintiffs and the Indiana Class Members.

742.   Although GM was obligated to correct the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect.

743.   Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Indiana Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

744.   GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

745.   GM provided warranties directly to Indiana Plaintiffs and the members

of the Indiana Class and Indiana Plaintiffs and the members of the Indiana Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

746. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the defects. The time limits are unconscionable and inadequate to protect Indiana Plaintiffs and members of the Indiana Class. Among other things, Indiana Plaintiffs and the Indiana Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM and members of the Class.

747. Indiana Plaintiff and the Indiana Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

748. Because GM, through its conduct and exemplified by its own service

bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

749.    Because GM has not been able to remedy the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Indiana Plaintiffs and Indiana Class Members whole, rendering them null and void.

750.    Indiana Plaintiffs and the Indiana Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Plaintiffs and the Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

751.    Nonetheless, Indiana Plaintiffs provided notice to GM of the breach of express warranties when they took their vehicle in for servicing related to the Transmission Defects on December 6, 2022 and February 15, 2023.

752.    As a direct and proximate cause of GM's breach, Indiana Plaintiffs and the Indiana Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiffs and the Indiana Class Members have

incurred or will incur economic damages at the point of repair in the form of the cost of repair.

753.   As a direct and proximate result of GM's breach of express warranties, Indiana Plaintiffs and the Indiana Class Members have been damaged in an amount to be determined at trial.

## COUNT 14
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## IND. CODE § 26-1-2-314

754.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

755.   Indiana Plaintiffs bring this cause of action on behalf of themselves and the Indiana Class.

756.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

757.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1).

758.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ind. Code § 26-1-2-314.

759.   GM knew or had reason to know of the specific use for which the Class

Vehicles were purchased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Indiana Plaintiff and the Indiana Class Members bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Indiana Plaintiffs and the Indiana Class Members, with no modification to the defective transmissions.

760.   GM provided Indiana Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

761.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

762.   Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the

existence of the Transmission Defects at the time of sale and thereafter. GM knew of these defects at the time these sale transactions occurred.

763.   As a direct and proximate cause of GM's breach, Indiana Plaintiff and the Indiana Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

764.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ind. Code § 26-1-2-314.

765.   Indiana Plaintiffs and the Indiana Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

766.   Indiana Plaintiffs and the Indiana Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

767.   Nonetheless, Indiana Plaintiffs provided notice to GM of the breach of express warranties when they took their vehicle in for servicing related to the

Transmission Defects on December 6, 2022 and February 15, 2023.

768.   GM provided warranties directly to Indiana Plaintiffs and the members of the Indiana Class and Indiana Plaintiffs and the members of the Indiana Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

769.   As a direct and proximate cause of GM's breach, Indiana Plaintiffs and members of the Indiana Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

770.   As a direct and proximate result of GM's breach of the implied warranties of merchantability, Indiana Plaintiffs and members of the Indiana Class have been damaged in an amount to be proven at trial.

**COUNT 15**
**VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS 93A, § 1, ET SEQ.**

771.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of the Complaint.

772.   Plaintiff Paul Aiello ("Massachusetts Plaintiff") brings this cause of

action on behalf of himself and on behalf of the members of the Massachusetts Class.

773.    GM, Massachusetts Plaintiff, and the Massachusetts Class Members are "persons" within the meaning of "persons" within the meaning of Mass. Gen. Laws 93A, § 1(a).

774.    The Massachusetts Consumer Protection Act ("MCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws 93A, § 2(a).GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the MCPA.

775.    GM participated in unfair or deceptive trade practices that violated the MCPA. As described below and alleged throughout the Complaint, by failing to disclose the Transmission Defects by concealing the Transmission Defects by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transmission Defects in the course of its business.

776.    GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

777.  GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

778.  GM knew that the Class Vehicles suffered from inherent defects, were defectively designed and/or manufactured, and were not suitable for their intended use.

779.  GM knew or should have known that its conduct violated the MCPA.

780.  Defendant was under a duty to Massachusetts Plaintiff and the Massachusetts Class Members to disclose the defective nature of the Class Vehicles because:

(a)  Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)  Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)  Defendant actively concealed the defective nature of the Class Vehicles from Massachusetts Plaintiff and the Massachusetts Class Members at the time of sale and thereafter.

781.  By failing to disclose the Transmission Defects Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

782.  The facts concealed or not disclosed by Defendant to Massachusetts Plaintiff and the Massachusetts Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains defects causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had Massachusetts Plaintiff and the Massachusetts Class Members known that the Class Vehicles suffered from the Transmission Defects described herein, they would not have purchased the Class Vehicles or would have paid less for them.

783.  Massachusetts Plaintiff and the Massachusetts Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

784.  As a result of Defendant's misconduct, Massachusetts Plaintiff and the Massachusetts Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

785.  As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Massachusetts Plaintiff and the Massachusetts Class Members have

suffered and will continue to suffer actual damages.

786.   GM's violations present a continuing risk to Massachusetts Plaintiff and the Massachusetts Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

787.   Massachusetts Plaintiff provided notice of his claims by letter dated August 10, 2023.

788.   Pursuant to Mass. Gen. Laws 93A, § 9, Massachusetts Plaintiff and members of the Massachusetts Class seek an order enjoining GM's unlawful contact, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Consumer Protection Act.

## COUNT 16
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## MASS. GEN. LAWS CH. 106 § 2-314

789.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of the Complaint.

790.   Massachusetts Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Massachusetts Class.

791.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

792.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of Mass. Gen. Laws ch. 106 § 2-105(1).

793.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mass. Gen. Laws ch. 106 § 2-314.

794.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Massachusetts Plaintiff and members of the Massachusetts Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Massachusetts Plaintiff and members of the Massachusetts Class, with no modification to the defective Class Vehicles.

795.   GM provided Massachusetts Plaintiff and members of the Massachusetts Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from inherent defects at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

796.   This implied warranty included, among other things: (i) a warranty that

266

the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

797.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Massachusetts Plaintiff and members of the Massachusetts Class with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above. GM knew of the Defects at the time these sale transactions occurred.

798.   As a result of GM's breach of the applicable implied warranties, Massachusetts Plaintiffs and members of the Massachusetts Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Massachusetts Plaintiffs and members of the Massachusetts Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

799.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation

of the Uniform Commercial Code and relevant state law.

800.   Massachusetts Plaintiff and members of the Massachusetts Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

801.   Massachusetts Plaintiff and members of the Massachusetts Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

802.   Massachusetts Plaintiff and members of the Massachusetts Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Massachusetts Plaintiff and the Class Members and through other internal sources.

803.   Nonetheless, Massachusetts Plaintiff and members of the Massachusetts Class provided notice to GM of the breach of express warranties

when Plaintiff took his vehicle to a GM-authorized provider of warranty repairs. Massachusetts Plaintiff also provided notice to GM of its breach of express warranty by letter dated August 10, 2023.

804.   As a direct and proximate cause of GM's breach, Massachusetts Plaintiff and members of the Massachusetts Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, Massachusetts Plaintiff and members of the Massachusetts Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

805.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Massachusetts Plaintiff and members of the Massachusetts Class have been damaged in an amount to be proven at trial.

## COUNT 17
## BREACH OF THE EXPRESS WARRANTY
## MASS. GEN. LAWS CH. 106 § 2-313

806.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of the Complaint.

807.   Massachusetts Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Massachusetts Class.

808.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 §§ 2-104(1), and a "seller" of motor

vehicles under § 2-103(1)(d).

809. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1).

810. Defendant provided all purchasers of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Massachusetts state law.

811. GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

812. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

813.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

814.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

815.   The Transmission Defects at issue in this litigation were present at the time the Class Vehicles were sold to Massachusetts Plaintiff and members of the Massachusetts Class.

816.   The Warranty formed the basis of the bargain that was reached when Massachusetts Plaintiff and other members of the Massachusetts Class purchased their Class Vehicles.

817.   Further, Massachusetts Plaintiff and members of the Massachusetts Class experienced defects within the warranty period. Despite the existence of the

warranties, Defendant failed to inform Massachusetts Plaintiff and members of the Massachusetts Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

818.   Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by Massachusetts Plaintiff and members of the Massachusetts Class.

819.   Although GM was obligated to correct both of the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect.

820.   Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Massachusetts Plaintiff and members of the Massachusetts Class that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

821.   GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

822.   GM provided warranties directly to Massachusetts Plaintiff and the

members of the Massachusetts Class and Massachusetts Plaintiff and the members of the Massachusetts Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

823.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect Massachusetts Plaintiff and the members of the Massachusetts Class. Among other things, Massachusetts Plaintiff and members of the Massachusetts Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM, Massachusetts Plaintiff and members of the Massachusetts Class.

824.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the

repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

825.   Because GM has not been able to remedy both of the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Massachusetts Plaintiff and members of the Massachusetts Class whole, rendering them null and void.

826.   Massachusetts Plaintiff and members of the Massachusetts Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

827.   Massachusetts Plaintiff and members of the Massachusetts Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Massachusetts Plaintiff and members of the Massachusetts Class, including those formal complaints submitted to NHTSA, and through other internal sources.

828.   Nonetheless, Massachusetts Plaintiff provided notice to GM of the breach of express warranties when he took his vehicle to an authorized GM dealership and requested warranty repairs.  Massachusetts Plaintiff also provided

notice to GM of its breach of express warranty by letter August 10, 2023.

829.   As a result of GM's breach of the applicable express warranties, owners of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Massachusetts Plaintiff and Massachusetts Class Members were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

830.   As a result of GM's breach of the express warranty, Massachusetts Plaintiff and Massachusetts Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 18
## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT MO. REV. STAT. § 407.010, ET SEQ.

831.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of the Complaint.

832.   Plaintiffs Dale Bland and Ryan Volmert ("Missouri Plaintiffs") bring this cause of action on behalf of themselves and on behalf of the members of the Missouri Class.

833.   GM, Missouri Plaintiffs and members of the Missouri Class are "persons" within the meaning of the Missouri Merchandising Practices Act

("Missouri MPA"), Mo. Rev. Stat. § 407.010(5).

834.   GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

835.   The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Missouri MPA.

836.   GM participated in unfair or deceptive trade practices that violated the Missouri MPA. As described below and alleged throughout the Complaint, by failing to disclose the Transmission Defects by concealing the Transmission Defects by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transmission Defects in the course of its business.

837.   GM also engaged in unlawful trade practices by employing deception,

276

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

838. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

839. GM knew that the Class Vehicles suffered from inherent defects, were defectively designed and/or manufactured, and were not suitable for their intended use.

840. GM knew or should have known that its conduct violated the Missouri MPA.

841. Defendant was under a duty to Missouri Plaintiffs and the Missouri Class Members to disclose the defective nature of the Class Vehicles because:

(a) Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b) Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c) Defendant actively concealed the defective nature of the Class Vehicles from Missouri Plaintiffs and the Missouri Class Members at the time of

277

sale and thereafter.

842.   By failing to disclose the Transmission Defects Defendant knowingly and intentionally concealed material facts and beached its duty not to do so.

843.   The facts concealed or not disclosed by Defendant to Missouri Plaintiffs and the Missouri Class Members are material because a reasonable person would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains defects causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had Missouri Plaintiffs and the Missouri Class Members known that the Class Vehicles suffered from the Transmission Defects described herein, they would not have purchased the Class Vehicles or would have paid less for them.

844.   Missouri Plaintiffs and the Missouri Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

845.   As a result of Defendant's misconduct, Missouri Plaintiffs and the Missouri Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

846.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Missouri Plaintiffs and the Missouri Class Members have suffered and

278

will continue to suffer actual damages.

847.   GM's violations present a continuing risk to Missouri Plaintiff and the Missouri Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

848.   Missouri Plaintiffs provided notice of her claims, including a written demand for relief, by letter dated June 8, 2023.

849.   GM is liable to Missouri Plaintiffs and Missouri Class Members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining GM's unfair and deceptive practices, and any other just and proper relief available under Mo. Rev. Stat. § 407.025.

## COUNT 19
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## MO. REV. STAT. § 400.2-314

850.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of the Complaint.

851.   Missouri Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Missouri Class.

852.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

853.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1).

854.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314..

855.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Missouri Plaintiffs and members of the Missouri Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Missouri Plaintiffs and members of the Missouri Class, with no modification to the defective Class Vehicles.

856.   GM provided Missouri Plaintiffs and members of the Missouri Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from inherent defects at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

857.   This implied warranty included, among other things: (i) a warranty that

the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

858.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above. GM knew of the Defects at the time these sale transactions occurred.

859.   As a result of GM's breach of the applicable implied warranties, Missouri Plaintiffs and members of the Missouri Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Missouri Plaintiffs and members of the Missouri Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

860.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

861.   Missouri Plaintiffs and members of the Missouri Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

862.   Missouri Plaintiffs and members of the Missouri Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

863.   Missouri Plaintiffs and members of the Missouri Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Missouri Plaintiffs and the Class Members and through other internal sources.

864.   Nonetheless, Missouri Plaintiffs and members of the Missouri Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. Missouri Plaintiffs also provided notice to GM of its breach of express warranty by letter dated June 8, 2023.

865.   As a direct and proximate cause of GM's breach, Missouri Plaintiffs

and members of the Missouri Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiffs and members of the Missouri Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

866. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Missouri Plaintiff and members of the Missouri Class have been damaged in an amount to be proven at trial.

## COUNT 20
## BREACH OF EXPRESS WARRANTY
## MO. REV. STAT. § 400.2-313

867. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of the Complaint.

868. Missouri Plaintiffs brings this cause of action on behalf of themselves and on behalf of the members of the Missouri Class.

869. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

870. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1).

871. Defendant provided all purchasers of the Class Vehicles with an

express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Missouri state law.

872.   GM   provided   all   purchasers   of   Class   Vehicles   with   the Chevrolet/GMC/Cadillac Warranties.

873.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

874.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/

transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

875.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

876.   The Transmission Defects at issue in this litigation were present at the time the Class Vehicles were sold to Missouri Plaintiffs and members of the Missouri Class.

877.   The Warranty formed the basis of the bargain that was reached when Missouri Plaintiffs and other members of the Missouri Class purchased their Class Vehicles.

878.   Further, Missouri Plaintiffs and members of the Missouri Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Missouri Plaintiffs and members of the Missouri Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

879.   Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by Missouri Plaintiffs and members of the Missouri Class.

880.   Although GM was obligated to correct both of the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect.

881.   Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Missouri Plaintiffs and members of the Missouri Class that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

882.   GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

883.   GM provided warranties directly to Missouri Plaintiffs and the members of the Missouri Class and Missouri Plaintiffs and the members of the Missouri Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class

Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

884.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect Missouri Plaintiffs and the members of the Missouri Class. Among other things, Missouri Plaintiffs and members of the Missouri Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM, Missouri Plaintiffs and members of the Missouri Class.

885.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

886.   Because GM has not been able to remedy both of the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make

Missouri Plaintiffs and members of the Missouri Class whole, rendering them null and void.

887.   Missouri Plaintiffs and members of the Missouri Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

888.   Missouri Plaintiffs and members of the Missouri Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Missouri Plaintiffs and members of the Missouri Class, including those formal complaints submitted to NHTSA, and through other internal sources.

889.   Nonetheless, Missouri Plaintiffs provided notice to GM of the breach of express warranties when they took their vehicle to an authorized GM dealership and requested warranty repairs. Missouri Plaintiffs also provided notice to GM of its breach of express warranties in a letter dated June 8, 2023.

890.   As a result of GM's breach of the applicable express warranties, owners of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Missouri Plaintiffs and Missouri Class Members were harmed and suffered actual damages including economic damages at the point of

sale and diminution of value of their Class Vehicles, and costs for repair.

891.   As a result of GM's breach of the express warranty, Missouri Plaintiffs and Missouri Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 21
## VIOLATION OF THE NORTH DAKOTA UNLAWFUL SALE OR ADVERTISING PRACTICES LAW
## N.D. CENT. CODE § 51-15, ET SEQ.

892.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

893.   Plaintiff Duane Egge ("North Dakota Plaintiff") brings this claim on behalf of himself and other members of the North Dakota Class.

894.   GM, North Dakota Plaintiff, and North Dakota Class Members are "persons" within the meaning of N.D. Cent. Code § 51-15-01(4) of the North Dakota Unlawful Sale or Advertising Practices Act ("North Dakota USAP").

895.   The Class Vehicles are and were at all relevant times "merchandise" within the meaning of within the meaning of N.D. Cent. Code § 51-15-01(3).

896.   GM engaged in the "sale" and "advertisement" of the Class Vehicles within the meaning of N.D. Cent. Code § 51-15-01(1) and (5).

897.   GM's actions, as set forth herein, occurred in the conduct of trade or commerce.

898.   The North Dakota USAP provides: "The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice. The act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice." N.D. Cent. Code § 51-15-02.

899.   GM's acts and practices, as described throughout this Complaint, constitute the use of a "deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, , with the intent that others rely thereon in connection with the sale or advertisement of any merchandise" by GM, and are unlawful under N.D. Cent. Code § 51-15-02.

900.   GM knowingly and intentionally used deceptive practices in violation of the North Dakota USAP. As described below and alleged throughout the Complaint, GM knowingly and intentional misled North Dakota Plaintiff and members of the North Dakota Class by failing to disclose the Transmission Defects,

290

by concealing the Transmission Defects, by misrepresenting its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold. GM systematically misrepresented material facts relating to the Class Vehicles and the Transmission Defects in the course of its business and in connection with the sale of the Class Vehicles.

901.   GM engaged in unlawful practices by using deceptive acts, fraud, false pretense, false promises, and misrepresentations with intent that others rely upon such deceptive actions in connection with the sale of the Class Vehicles.

902.   GM's deceptive acts or practices imposed a serious safety risk to North Dakota Plaintiff and members of the North Dakota Class which would not be reasonably avoidable by the North Dakota Plaintiff and members of the North Dakota Class and are not outweighed by countervailing benefits to consumers or to competition. The Transmission Defects can make the Class Vehicles behave in "distracting and hazardous ways". *Speerly,* ECF No. 284, PageID.20429-30. "[A]s many as 1 in 100 of typical divers would be unable to maintain control of the vehicle and avoid an accident[.]" *Speerly,* ECF No. 284, PageID.20429-30 (summarizing evidence of dangers posed by the Transmission Defects and noting it "prompts serious safety concerns").

903.   GM knew that the Class Vehicles suffered from an inherent defect,

were defectively designed and/or manufactured, and were not suitable for their intended use.

904.  GM knew or should have known that its conduct violated the North Dakota USAP.

905.  GM had an ongoing duty to its customers to refrain from deceptive practices under the North Dakota USAP. Specifically, GM owed North Dakota Plaintiff and members of the North Dakota Class a duty to disclose all material facts concerning the Class Vehicles because it possessed exclusive knowledge, intentionally concealed such material facts from North Dakota Plaintiff and members of the North Dakota Class; and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

906.  By failing to disclose the Transmission Defects, GM knowingly and intentionally concealed material facts and beached its duty not to do so.

907.  The facts concealed or not disclosed by GM to North Dakota Plaintiff and members of the North Dakota Class are material because a reasonable person would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains defects causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern.

908.  North Dakota Plaintiff and members of the North Dakota Class are

reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

909.   Had North Dakota Plaintiff and members of the North Dakota Class known that the Class Vehicles suffered from the Transmission Defects described herein, they would not have purchased the Class Vehicles or would have paid less for them.

910.   GM acquired money by means of deceptive and unconscionable practices in connection with the sale and advertisement of the Class Vehicles.

911.   North Dakota Plaintiff and members of the North Dakota Class suffered ascertainable loss, injury-in-fact and/or actual damage in the form of the diminished value of their vehicles and require repairs or replacement, as a direct and proximate result of GM's deceptive acts and practices made in connection with the sale or advertisement of the Class Vehicles.

912.   Pursuant to N.D. Cent. Code § 51-15-09, Connecticut Plaintiff and the Connecticut Class Members seek an order awarding actual damages proven, treble damages, costs, disbursements, and actual reasonable attorney's fees incurred in the action, and any other just and proper relief available under the North Dakota USAP.

## COUNT 22
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## N.D. CENT. CODE § 41-02-31

913.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-516 of this Complaint.

914.   North Dakota Plaintiff brings this count on behalf of himself and the North Dakota Class against Defendant.

915.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under NDCC § 41-02-04(3) and a "seller" of motor vehicles under § 41-02-03(1).

916.   The Class Vehicles are and were at all relevant times "goods" within the meaning of NDCC § 41-02-05(2).

917.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under NDCC § 41-02-31.

918.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom North Dakota Plaintiff and members of the North Dakota Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to North Dakota Plaintiff

and members of the North Dakota Class, with no modification to the defective Class Vehicles.

919.   GM provided North Dakota Plaintiff and members of the North Dakota Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from inherent defects at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

920.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

921.   Contrary the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing North Dakota Plaintiff and members of the North Dakota Class with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above. GM knew of the Defects at the time these sale transactions occurred.

922.   As a result of GM's breach of the applicable implied warranties, North Dakota Plaintiff and members of the North Dakota Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects North Dakota Plaintiff and members of the North Dakota Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

923.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

924.   North Dakota Plaintiff and members of the North Dakota Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

925.   North Dakota Plaintiff and members of the North Dakota Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the

consumer only.

926.   North Dakota Plaintiff and members of the North Dakota Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from North Dakota Plaintiff and members of the North Dakota Class and through other internal sources.

927.   Nonetheless, North Dakota Plaintiff and members of the North Dakota Class provided notice to GM of the breach of express warranties when North Dakota Plaintiff took his vehicles to a GM-authorized provider of warranty repairs on August 22, 2019 and again on August 7, 2023.

928.   As a direct and proximate cause of GM's breach, North Dakota Plaintiff and members of the North Dakota Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, North Dakota Plaintiff and members of the North Dakota Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

929.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, North Dakota Plaintiff and members of the North Dakota Class have been damaged in an amount to be proven at trial.

297

**COUNT 23**
**BREACH OF EXPRESS WARRANTY**
**N.D. CENT. CODE § 41-02-30**

930.   Plaintiffs incorporate by reference and re-allege the allegations

contained in paragraphs 1-513 of this Complaint.

931.   North Dakota Plaintiff brings this cause of action on behalf of himself

and on behalf of the members of the North Dakota Class.

932.   GM is and was at all relevant times a "merchant" with respect to motor

vehicles under NDCC § 41-02-04(3) and a "seller" of motor vehicles under § 41-02-

03(1).

933.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of NDCC § 41-02-05(2).

934.   Defendant provided all purchasers of the Class Vehicles with an

express warranty described herein, which became a basis of the bargain.

Accordingly, GM's express warranty is an express warranty under North Dakota

state law.

935.   GM provided all purchasers of Class Vehicles with the

Chevrolet/GMC/Cadillac Warranties.

936.   Under the Warranties, GM expressly warranted the following: "The

warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or

other normal characteristics of the vehicle due to materials or workmanship

occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

937.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

938.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

939.   The Transmission Defects at issue in this litigation were present at the time the Class Vehicles were sold to North Dakota Plaintiff and members of the North Dakota Class.

940.   The Warranty formed the basis of the bargain that was reached when North Dakota Plaintiff and other members of the North Dakota Class purchased their Class Vehicles.

941.   Further, North Dakota Plaintiff and members of the North Dakota Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform North Dakota Plaintiff and members of the North Dakota Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

942.   Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by North Dakota Plaintiff and members of the North Dakota Class.

943.   Although GM was obligated to correct both of the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect.

944.   Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed North Dakota Plaintiff and members of the North Dakota Class

that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

945.   GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

946.   GM provided warranties directly to North Dakota Plaintiff and members of the North Dakota Class and North Dakota Plaintiff and members of the North Dakota Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

947.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect North Dakota Plaintiff and members of the North Dakota Class. Among other things, North Dakota Plaintiff and members

of the North Dakota Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM, North Dakota Plaintiff and members of the North Dakota Class.

948.  Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

949.  Because GM has not been able to remedy both of the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to North Dakota Plaintiff and members of the North Dakota Class whole, rendering them null and void.

950.  North Dakota Plaintiff and members of the North Dakota Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

951.  North Dakota Plaintiff and members of the North Dakota Class were not required to notify GM of the breach because affording GM a reasonable

opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from North Dakota Plaintiff and members of the North Dakota Class, including those formal complaints submitted to NHTSA, and through other internal sources.

952.   Nonetheless, North Dakota Plaintiff provided notice to GM of the breach of express warranties when he took his vehicle to an authorized GM dealership and requested warranty repairs on August 22, 2019 and again on August 7, 2023.

953.   As a result of GM's breach of the applicable express warranties, owners of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects North Dakota Plaintiff and members of the North Dakota Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

954.   As a result of GM's breach of the express warranty, North Dakota Plaintiff and members of the North Dakota Class are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**COUNT 24**
## VIOLATION OF THE OREGON CONSUMER PROTECTION ACT
## OR. REV. STAT. § 646.605, ET SEQ.

955.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513of this Complaint.

956.   Plaintiff Kenneth James Wilkinson ("Oregon Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Oregon Class.

957.   GM, Oregon Plaintiff, and Oregon Class members are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

958.   GM is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

959.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § Ann. 646.608(1).

960.   GM violated the Oregon CPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

961.   GM participated in unfair or deceptive trade practices that violated the Oregon CPA. As described below and alleged throughout the Complaint, by failing

to disclose the Transmission Defects by concealing the Transmission Defects by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transmission Defects in the course of its business.

962.   GM engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

963.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

964.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

965.   GM knew that the Class Vehicles suffered from inherent defects, were defectively designed and/or manufactured, and were not suitable for their intended

use.

966.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Oregon Plaintiff and the members of the Oregon Class.

967.   GM knew or should have known that its conducted violated the Oregon CPA.

968.   Defendant was under a duty to Oregon Plaintiff and the Oregon Class members to disclose the defective nature of the Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the Class Vehicles from Oregon Plaintiff and the Oregon Class members at the time of sale and thereafter.

969.   By failing to disclose the Transmission Defects Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

970.   The facts concealed or not disclosed by Defendant to Oregon Plaintiff and the members of the Oregon Class are material because a reasonable person

would have considered them to be important in deciding whether or not to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains defects causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had Oregon Plaintiff and the members of the Oregon Class known that the Class Vehicles suffered from the Transmission Defects described herein, they would not have purchased the Class Vehicles or would have paid less for them.

971.   Oregon Plaintiff and the members of the Oregon Class are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

972.   All owners of Class Vehicles suffered ascertainable loss, injury-in-fact, and/or actual damage, including in the form of the diminished value of their vehicles and the need for repairs or replacement of parts for their vehicles, as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

973.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Oregon Plaintiff and members of the Oregon Class have suffered and will continue to suffer actual damages.

974.   Pursuant to Or. Rev. Stat. § 646.638, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding actual damages or statutory damages in the amount of $200 for each class member, whichever is

greater, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Oregon UTPA.

## COUNT 25
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## OR. REV. STAT. § 72.3140

975.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

976.   Oregon Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Oregon Class.

977.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. § 72.1040(1), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

978.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. § 72.1050(1).

979.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. § 72.3140.

980.   GM sold Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

981.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to

customers through authorized dealers, like those from whom Oregon Plaintiff and members of the Oregon Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Oregon Plaintiff and members of the Oregon Class, with no modification to the Class Vehicles.

982.   GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from inherent defects at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

983.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

984.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above. GM knew of the Defects at the time these sale transactions occurred.

985. As a result of GM's breach of the applicable implied warranties, Oregon Plaintiff and members of the Oregon Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects, Oregon Plaintiff and members of the Oregon Class were harmed and suffered actual damages economic damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses..

986. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Or. Rev. Stat. §§ 72.3140.

987. Oregon Plaintiff and members of the Oregon Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

988. Oregon Plaintiff and members of the Oregon Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from

Plaintiffs and the Class Members, and through other internal sources.

989.   Nonetheless, Oregon Plaintiff and members of the Oregon Class provided notice to GM of the breach when Oregon Plaintiff took his vehicle to a GM-authorized provider service relative to the Transmission Defects on or about July 8, 2022 and March 8, 2024.

990.   As a direct and proximate cause of GM's breach, March 8, 2024suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, Oregon Plaintiff and members of the Oregon Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

991.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Oregon Plaintiff and members of the Oregon Class have been damaged in an amount to be proven at trial.

## COUNT 26
## BREACH OF EXPRESS WARRANTY
## OR. REV. STAT. § 72.3130

992.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513of this Complaint.

993.   Oregon Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Oregon Class.

994.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. § 72.1040(1), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

995.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. § 72.1050(1).

996.   GM provided all purchasers of the Class Vehicles with an express warranty described herein, which became a material part of the bargain.

997.   GM provided all purchasers of the Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

998.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, for Chevrolet or GM-branded vehicles and for up to 4 years or 50,000 miles for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

999.   Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles  for Chevrolet or GM brand vehicles, or 6 years or 70,000 miles  for Cadillac brand vehicles (the "Powertrain Warranties").

1000. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1001. The Transmission Defects at issue in this litigation was present at the time the Class Vehicles were sold to Oregon Plaintiff and members of the Oregon Class.

1002. Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1003. The Warranty formed the basis of the bargain that was reached when Oregon Plaintiff and members of the Oregon Class purchased their Class Vehicles.

1004. Further,  Oregon  Plaintiff  and  members  of  the  Oregon  Class

experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Oregon Plaintiff and members of the Oregon Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

1005. Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by Oregon Plaintiff and members of the Oregon Class.

1006. Although GM was obligated to correct both of the Transmission Defects, GM could not correct the Harsh Shift Defect and they did not timely notify Plaintiffs to correct the Shudder Defect.

1007. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed members of the Oregon Class that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1008. GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1009. GM provided warranties directly to Oregon Plaintiff and members of

the Oregon Class and Oregon Plaintiff and members of the Oregon Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1010. Any attempt by GM to disclaim or limit recovery to the terms of it Express Warranties is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold a defective product without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect Oregon Plaintiff and members of the Oregon Class. Among other things, Oregon Plaintiff and members of the Oregon Class  did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM, Oregon Plaintiff, and members of the Oregon Class.

1011. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

1012. Because GM has not been able to remedy the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Oregon Plaintiff and members of the Oregon Class whole, rendering them null and void.

1013. Oregon Plaintiff and members of the Oregon Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1014. Oregon Plaintiff and members of the Oregon Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Plaintiffs and the Class Members including those formal complaints submitted to NHTSA, and through other internal sources.

1015. Nonetheless, Oregon Plaintiff and members of the Oregon Class provided notice to GM of the breach when Oregon Plaintiff took his vehicle to a GM-authorized provider service relative to the Transmission Defects on or about July 8, 2022 and March 8, 2024.

1016. As a direct and proximate cause of GM's breach, Oregon Plaintiff and members of the Oregon Class suffered and continue to suffer, an ascertainable loss

of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Oregon Plaintiff and members of the Oregon Class were harmed and suffered actual damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

1017. As a direct and proximate result of GM's breach of express warranties, Oregon Plaintiff and members of the Oregon Class have been damaged in an amount to be determined at trial.

**COUNT 27**
**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICE**
**AND CONSUMER PROTECTION ACT**
**6. R.I. GEN. LAWS § 6-13.1-1, ET SEQ.**

1018. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

1019. Plaintiff Paul Northup ("Rhode Island Plaintiff") bring this count on behalf of themselves and the Rhode Island Class against Defendant.

1020. Defendant, Rhode Island Plaintiff and the Rhode Island Class members are "person[s]" within the meaning of within the meaning of 6 R.I. Gen. Laws Ann. § 6-13.1-1(3).

1021. Defendant was and is engaged in "trade" or "commerce" within the meaning of 6 R.I. Gen. Laws Ann. § 6-12.1-1(5).

1022. The Rhode Island Unfair Trade Practices Consumer Protection Act ("Rhode Island CPA"), declares that unfair methods of competition and unfair or

317

deceptive acts or practices in the conduct of trade or commerce are unlawful. 6 R.I. Gen. Laws § 6-13.1-2. Specifically, the Rhode Island CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;" "(vii) Representing that goods or services are of a particular standard, quality, or grade, ... if they are of another;" "(ix) Advertising goods or services with intent not to sell them as advertised;" "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer;" and "(xiv) Using other methods, acts or practices which mislead or deceive Members of the public in a material respect." 6 R.I. Gen. Law § 6-13.1-1(6). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Rhode Island CPA.

1023. GM participated in unfair or deceptive trade practices that violated the Rhode Island CPA. As described below and alleged throughout the Complaint, by failing to disclose the Transmission Defects by concealing the Transmission Defects by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale

of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transmission Defects in the course of its business.

1024. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1025. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1026. GM knew that the Class Vehicles suffered from inherent defects, were defectively designed and/or manufactured, and were not suitable for their intended use.

1027. GM knew or should have known that its conduct violated the Rhode Island CPA.

1028. Defendant was under a duty to Rhode Island Plaintiff and the Rhode Island Class Members to disclose the defective nature of the Class Vehicles because:

(a)     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)     Defendant made partial disclosures about the quality of the Class

Vehicles without revealing the defective nature of the Class Vehicles; and

(c)     Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles.

1029. By failing to disclose the Transmission Defects Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1030. The facts concealed or not disclosed by Defendant to Rhode Island Plaintiff and the Rhode Island Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains defects causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had Rhode Island Plaintiff and the Rhode Island Class Members known that the Class Vehicles suffered from the Transmission Defects described herein, they would not have purchased the Class Vehicles or would have paid less for them.

1031. Rhode Island Plaintiff and the Rhode Island Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

1032. As a result of Defendant's misconduct, Rhode Island Plaintiff and

Rhode Island Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

1033.  As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Rhode Island Plaintiff and the Rhode Island Class Members have suffered and will continue to suffer actual damages.

1034.  GM's violations present a continuing risk to Rhode Island Plaintiff and the Rhode Island Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1035.  Pursuant to 6 R.I. Gen. Laws Ann. § 6-13.1-5.2, Rhode Island Plaintiff and the Rhode Island Class Members seek an order enjoining GM's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the Rhode Island CPA.

**COUNT 28**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**6A R.I. GEN. LAWS § 6A-2-314**

1036.  Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

1037.  Rhode Island Plaintiff brings this count on behalf of himself and the Rhode Island Class against Defendant.

1038.  Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under 6A R.I. Gen. Laws Ann. § 6A-2-104(1), and a "seller" of motor

321

vehicles under § 6A-2-103(1)(a).

1039. The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws Ann. § 6A-2-105(1).

1040. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 6A R.I. Gen. Laws Ann. § 6A-2-314.

1041. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Rhode Island Plaintiff and members of the Rhode Island Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Rhode Island Plaintiffs and members of the Rhode Island Class, with no modification to the defective Class Vehicles.

1042. GM provided Rhode Island Plaintiff and members of the Rhode Island Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from inherent defects at the time of sale and thereafter and are not fit for

their particular purpose of providing safe and reliable transportation.

1043. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1044. Contrary the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Rhode Island Plaintiff and members of the Rhode Island Class with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above. GM knew of the Defects at the time these sale transactions occurred.

1045. As a result of GM's breach of the applicable implied warranties, Rhode Island Plaintiff and members of the Rhode Island Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Rhode Island Plaintiff and members of the Rhode Island Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

1046. GM's actions, as complained of herein, breached the implied warranty

that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1047. Rhode Island Plaintiff and members of the Rhode Island Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1048. Rhode Island Plaintiff and members of the Rhode Island Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1049. Rhode Island Plaintiff and members of the Rhode Island Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Rhode Island Plaintiff and the Class Members and through other internal sources.

1050. Nonetheless, Rhode Island Plaintiff and members of the Rhode Island Class provided notice to GM of the breach of express warranties when Rhode Island

Plaintiff took his vehicle to a GM-authorized provider of warranty repairs. Rhode Island Plaintiff also provided notice to GM of its breach of express warranty by letter dated June 8, 2023.

1051. As a direct and proximate cause of GM's breach, Rhode Island Plaintiff and members of the Rhode Island Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, Rhode Island Plaintiff and members of the Rhode Island Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1052. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Rhode Island Plaintiff and members of the Rhode Island Class have been damaged in an amount to be proven at trial.

## COUNT 29
## BREACH OF EXPRESS WARRANTY
## 6A R.I. GEN. LAWS ANN. § 6A-2-313

1053. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

1054. Rhode Island Plaintiff brings this count on behalf of himself and the Rhode Island Class against Defendant.

1055. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under 6A R.I. Gen. Laws Ann. §§ 6A-2-104(1), and a "seller" of

motor vehicles under § 6A-2-103(1)(a).

1056. The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws Ann. § 6A-2-105(1).

1057. Defendant provided all purchasers of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Rhode Island state law.

1058. GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

1059. Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

1060. Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

1061. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1062. The Transmission Defects at issue in this litigation were present at the time the Class Vehicles were sold to Rhode Island Plaintiff and members of the Rhode Island Class.

1063. The Warranty formed the basis of the bargain that was reached when Rhode Island Plaintiff and other members of the Rhode Island Class purchased their Class Vehicles.

1064. Further, Rhode Island Plaintiff and members of the Rhode Island Class experienced defects within the warranty period. Despite the existence of the

warranties, Defendant failed to inform Rhode Island Plaintiff and members of the Rhode Island Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

1065. Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by Rhode Island Plaintiff and members of the Rhode Island Class.

1066. Although GM was obligated to correct both of the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect.

1067. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Rhode Island Plaintiff and members of the Rhode Island Class that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1068. GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1069. GM provided warranties directly to Rhode Island Plaintiff and the

members of the Rhode Island Class and Rhode Island Plaintiff and the members of the Rhode Island Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1070. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect Rhode Island Plaintiffs and the members of the Rhode Island Class. Among other things, Rhode Island Plaintiff and members of the Rhode Island Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM, Rhode Island Plaintiff and members of the Rhode Island Class.

1071. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the

repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

1072. Because GM has not been able to remedy the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Rhode Island Plaintiff and members of the Rhode Island Class whole, rendering them null and void.

1073. Rhode Island Plaintiff and members of the Rhode Island Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1074. Rhode Island Plaintiff and members of the Rhode Island Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Rhode Island Plaintiff and members of the Rhode Island Class, including those formal complaints submitted to NHTSA, and through other internal sources.

1075. Nonetheless, Rhode Island Plaintiff provided notice to GM of the breach of express warranties when he took his vehicle to an authorized GM dealership and requested warranty repairs. Rhode Island Plaintiff also provided notice to GM of its breach of express warranties in a letter dated June 8, 2023.

1076. As a result of GM's breach of the applicable express warranties, owners of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects Rhode Island Plaintiff and Rhode Island Class Members were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

1077. As a result of GM's breach of the express warranty, Rhode Island Plaintiff and Rhode Island Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 30
## VIOLATION OF SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
## S.D. CODIFIED LAWS § 37-24, ET SEQ.

1078. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

1079. Plaintiff Angela Bailey ("South Dakota Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the South Dakota Class.

1080. South Dakota Plaintiff, members of the South Dakota Class, and GM are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

1081. The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices," which are defined to

include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

1082. GM participated in deceptive trade practices that violated the South Dakota CPA as described below and alleged throughout the Complaint. By failing to disclose the Transmission Defects, by concealing the Transmission Defects, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Transmission Defects in the course of its business. By systematically devaluing safety and concealing a plethora of defects in the 8L90 and 8L45 Transmissions and the Class Vehicles, GM engaged in unfair or deceptive practices prohibited by the South Dakota CPA, including:

> (a)     Representing that the 8L90 and 8L45 Transmissions and the Class Vehicles have characteristics, uses, benefits, and qualities which they

do not have;

(b)     Representing that the 8L90 and 8L45 Transmissions and the Class
        Vehicles are of a particular standard, quality, and grade when they are
        not; and

(c)     Advertising the 8L90 and 8L45 Transmissions and the Class Vehicles
        with the intent not to sell them as advertised.

1083. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1084. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

1085. GM knew that the Class Vehicles and their transmissions suffered from inherent defects, were defectively designed or manufactured, and were not suitable for their intended use.

1086. GM knew or should have known that its conduct violated the South Dakota CPA.

1087. Defendant was under a duty to South Dakota Plaintiff and the South Dakota Class members to disclose the defective nature of the Class Vehicles

because:

> (a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> (b)   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and
>
> (c)   Defendant actively concealed the defective nature of the Class Vehicles from South Dakota Plaintiff and the South Dakota Class members at the time of sale and thereafter.

1088. By failing to disclose the Transmission Defects Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

1089. South Dakota Plaintiff and the members of the South Dakota Class reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1090. The facts concealed or not disclosed by Defendant to South Dakota Plaintiff and the South Dakota Class members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains a defect causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety

concern.

1091. South Dakota Plaintiff and the South Dakota Class members are reasonable consumers who do not expect that their vehicles will suffer from the Transmission Defects. That is the reasonable and objective consumer expectation for vehicles.

1092. Had South Dakota Plaintiff and the South Dakota Class members known that the Class Vehicles would exhibit the Transmission Defects, they would not have purchased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

1093. South Dakota Plaintiff and the South Dakota Class members suffered injury in fact to a legally protected interest. As a result of GM's conduct, South Dakota Plaintiff and the South Dakota Class members were harmed and suffered actual damages in the form of the diminished value of their vehicles and the need to repair or replace their vehicles.

1094. South Dakota Plaintiff and the South Dakota Class members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' transmissions because they purchased vehicles which do not perform as advertised.

1095. As a direct and proximate result of GM's unfair or deceptive acts or practices, South Dakota Plaintiff and the South Dakota Class Members suffered and

will continue to suffer injury in fact and/or actual damages.

1096. South Dakota Plaintiff and the South Dakota Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages, under the South Dakota CPA.

## COUNT 31
## BREACH OF EXPRESS WARRANTY
## S.D. CODIFIED LAWS § 57A-2-313

1097. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513of this Complaint.

1098. South Dakota Plaintiff brings this cause of action on behalf of himself and the South Dakota Class.

1099. GM is and was at all relevant times a "merchant" with respect to motor vehicles under S.D. Codified Laws § 57A-2-104(1), and a "seller" of motor vehicles under § 57A-2-104(1)(d).

1100. The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws § 4-2-105(1).

1101. GM provided all purchasers of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1102. GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

1103. Under the Warranties, GM expressly warranted the following: "The

336

warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defects do not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GMC-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

1104. Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GMC-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

1105. GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

1106. The Transmission Defects at issue in this litigation were present at the time the Class Vehicles were sold to South Dakota Plaintiff and members of the South Dakota Class.

1107. South Dakota Plaintiffs relied on GM's express warranties, which were a material part of the bargain, when purchasing their Class Vehicles.

1108. The Warranty formed the basis of the bargain that was reached when South Dakota Plaintiff and other members of the South Dakota Class purchased their Class Vehicles.

1109. Further, South Dakota Plaintiff and members of the South Dakota Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform South Dakota Plaintiff and members of the South Dakota Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete.

1110. Under the express Warranties, GM was obligated to correct the Transmission Defects in the vehicles owned by South Dakota Plaintiff and members

of the South Dakota Class.

1111. Although GM was obligated to correct both of the Transmission Defects, GM could not correct the Harsh Shift Defect and it did not timely notify Plaintiffs to correct the Shudder Defect.

1112. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed South Dakota Plaintiffs and members of the South Dakota Class that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

1113. GM has failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties.

1114. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1115. GM provided warranties directly to South Dakota Plaintiffs and the members of the South Dakota Class, and South Dakota Plaintiffs and the members of the South Dakota Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit

the consumer only.

1116. Any attempt by GM to disclaim or limit recovery to the terms of the express Warranties is unconscionable and unenforceable here. Specifically, GM's warranty limitation is unenforceable because GM knowingly sold a defective product without informing consumers about the Transmission Defects. The time limits are unconscionable and inadequate to protect South Dakota Plaintiff and the members of the South Dakota Class. Among other things, South Dakota Plaintiff and members of the South Dakota Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonably favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Transmission Defects existed between GM, South Dakota Plaintiffs, and members of the South Dakota Class.

1117. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Transmission Defects if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Transmission Defects.

1118. Because GM has not been able to remedy the Transmission Defects, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Iowa

Plaintiffs and members of the Iowa Class whole, rendering them null and void.

1119. South Dakota Plaintiff and the members of the South Dakota Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1120. South Dakota Plaintiff and members of the South Dakota Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from South Dakota Plaintiffs and members of the South Dakota Class, including those formal complaints submitted to NHTSA, and through other internal sources.

1121. Nonetheless, South Dakota Plaintiff provided notice to GM of the breach of warranties when South Dakota Plaintiff took her vehicles to a GM-authorized provider of warranty repairs for service related to the Transmission Defects on or about October 28, 2022, February 2, 2023, March 20, 2023.

1122. As a direct and proximate cause of GM's breach of the applicable express warranties, South Dakota Plaintiff and the South Dakota Class members suffered damages and continue to suffer an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects South Dakota Plaintiffs and members of the South Dakota Class were

harmed and suffered actual damages, including economic damages at the point of sale and diminution of value of their Class Vehicles and costs for repair.

1123. As a direct and proximate result of GM's breach of the applicable express warranties, South Dakota Plaintiff and the South Dakota Class members are entitled to legal and equitable relief against GM, including actual damages, in an amount to be determined at trial, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**COUNT 32**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**S.D. CODIFIED LAWS § 57A-2-314**

1124. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-513 of this Complaint.

1125. South Dakota Plaintiff brings this cause of action on behalf of himself and the members of the South Dakota Class.

1126. GM is and was at all relevant times a "merchant" with respect to motor vehicles under S.D. Codified Laws § 57A-104(1), and a "seller" of motor vehicles under § 57A-104(1)(d).

1127. The Class Vehicles are and were at all relevant times "goods" within the meaning of S S.D. Codified Laws § 4-2-105(1).

1128. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under S

342

S.D. Codified Laws § 57A-2-314.

1129.  GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom South Dakota Plaintiff and the South Dakota Class members bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to South Dakota Plaintiff and the South Dakota Class members, with no modification to the defective Class Vehicles.

1130. GM provided South Dakota Plaintiffs and members of the South Dakota Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from inherent defects at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1131.  This implied warranty included, among other things:

(a)     a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and

(b)     a warranty that the Class Vehicles and their transmissions would be fit

for their intended use while the Class Vehicles were being operated.

1132.  Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing South Dakota Plaintiffs and South Dakota Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above.GM knew of these defects at the time these sale transactions occurred.

1133.  As a result of GM's breach of the applicable implied warranties, South Dakota Plaintiff and the South Dakota Class members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defects, South Dakota Plaintiff and the South Dakota Class members were harmed and suffered actual damages including, damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

1134.  GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of S.D. Codified Laws § 57A-2-314.

1135.  South Dakota Plaintiff and the South Dakota Class members complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1136. South Dakota Plaintiff and the South Dakota Class members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Transmission Defects from the complaints and service requests it received from Plaintiffs and the Class members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

1137. Nonetheless, South Dakota Plaintiff and the South Dakota Class members provided notice to GM of the breach of implied warranties when South Dakota Plaintiff took her vehicle to a GM-authorized provider of warranty repairs on or about October 28, 2022, February 2, 2023, and March 20, 2023.

1138. As a direct and proximate cause of GM's breach, South Dakota Plaintiff and the South Dakota Class members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, South Dakota Plaintiff and the South Dakota Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1139. As a direct and proximate result of GM's breach of the implied warranty of merchantability, South Dakota Plaintiff and the South Dakota Class members have been damaged in an amount to be proven at trial.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs on behalf of themselves, and all others similarly situated, requests the Court to enter judgment against GM, as follows:

A. An order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23, designating Plaintiffs as named representatives of the Class and designating the undersigned as Class Counsel for the Class;

B.  A declaration that Defendant is financially responsible for notifying all members of the Class about the defective nature of the GM 8L45 and 8L90 transmission, any repair or replacement available to remedy the Defects and/or the need for periodic maintenance;

C. A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

D. An order enjoining Defendant from further deceptive distribution, sales, practices with respect to the Class Vehicles, and compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the Shudder Defect at no cost to members of the Class and to notify all members of the Class that such warranty has been reformed

E. A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

F. An award to Plaintiffs and members of the Classes for actual, compensatory, exemplary, and statutory damages, including interest, including damages for economic loss including loss of the benefit of the bargain, overpayment damages, diminished value and the cost of repair to make the Class Vehicles conform to the benefit of the bargain, in an amount to be proven at trial;

G. Any and all remedies provided pursuant to the state and federal consumer protection statutes herein alleged, including any applicable statutory and civil penalties;

H. A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Class Vehicles, or make full restitution to Plaintiffs and members of the Class;

I. An award of attorneys' fees and costs, as allowed by law;

J. An award of pre-judgment and post-judgment interest on any amounts awarded, as provided by law;

K. Leave to amend the Complaint to conform to the evidence produced at trial;

L. Plaintiffs demand that GM perform a recall, and repair all Class Vehicles at no expense to Plaintiffs and members of the Class; and

M. Granting such other and further relief as the Court deems just and proper.

347

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial

by jury of any and all issues in this action so triable.

Dated:  April 17, 2024                    Respectfully submitted,


/s/ Theodore Leopold

Theodore J. Leopold
**COHEN MILSTEIN
SELLERS & TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
Facsimile: (561) 515-1401
tleopold@cohenmilstein.com

Douglas J. McNamara
Karina G. Puttieva
Madelyn N. Petersen
**COHEN MILSTEIN
SELLERS & TOLL PLLC**
1100 New York Ave. NW, 5th Floor
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
kputtieva@cohenmilstein.com
mpetersen@cohenmilsteim.com

Robert Gordon, Esq.
Steven Calamusa, Esq.
Geoff Stahl, Esq.
Rachel Bentley, Esq.
**GORDON & PARTNERS, P.A.**
4114 Northlake Blvd.,

348

Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
rgordon@fortheinjured.com
scalamusa@fortheinjured.com
gstahl@fortheinjured.com
rbentley@fortheinjured.com

Russell D. Paul
Amey J. Park
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Facsimile:   (215) 875-4604
rpaul@bm.net
apark@bm.net

Tarek H. Zohdy
Cody R. Padgett
Laura E. Goolsby
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile: (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Brian M. Saxe (P70046)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852

349

epm@millerlawpc.com
ssa@millerlawpc.com
bms@millerlawpc.com
eeh@millerlawpc.com
dal@millerlawpc.com

Joseph H. Meltzer
Melissa L. Yeates
Lisa M. Port
Tyler S. Graden
Jordan E. Jacobson
James A. Maro
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
myeates@ktmc.com
llambport@ktmc.com
tgraden@ktmc.com
jjacobson@ktmc.com
jmaro@ktmc.com

Lynn Lincoln Sarko
Gretchen Freeman Cappio
Ryan McDevitt
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com

Michael L. Pitt (P24429)
Beth Rivers (P33614)
**PITT McGEHEE PALMER**

350

**AND RIVERS, P.C.**
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
Telephone: (248) 398-9800
Facsimile: (248) 398-9804
mpitt@pittlawpc.com
brivers@pittlawpc.com